UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ANIKA EDREI, SHAY HORSE, JAMES CRAVEN,
KEEGAN STEPHAN and MICHAEL NUSBAUM,

                               Plaintiffs,

              -v-

THE CITY OF NEW YORK, New York City Police
Department ("NYPD") Commissioner WILLIAM
BRATTON, and Officers NYPD LIEUTENANT
"JOHN DOE #1" MAGUIRE and "JOHN DOE #2" (the
names being fictitious as the officers' true names and
shield numbers are not currently known), in their
individual and official capacities,

                             Defendants.
--------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**INDEX NO.**

**ECF CASE**

      Plaintiffs ANIKA EDREI, SHAY HORSE, JAMES CRAVEN, KEEGAN STEPHAN

and MICHAEL NUSBAUM, through their attorneys GIDEON ORION OLIVER and ELENA L.

COHEN, as and for their Complaint in this matter, do hereby state and allege:

## PRELIMINARY STATEMENT

      1.      On December 4 and 5, 2014, Plaintiffs were each participating in, observing, or

otherwise documenting protests and police responses in the wake of the Staten Island grand

jury's decision not to indict New York City Police Department ("NYPD") Officer Daniel

Pantaleo in connection with the death of Eric Garner when Defendants NYPD LIEUTENANT

"JOHN DOE #1" MAGUIRE and "JOHN DOE #2" - officers from the NYPD's Disorder

Control Unit ("DCU") – injured them by firing an LRAD Corporation-manufactured 100X

Model Long Range Acoustic Device ("LRAD") in the vicinity of 57th Street around Madison

Avenue and in nearby New York City streets.

2.      This is a combined civil rights and New York State law action brought to vindicate Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, the attendant provisions of the New York State Constitution, including, but not limited to, Article I, §§ 8, 9, 11 and 12 thereof, and New York State common laws. Plaintiffs seek an award of compensatory and punitive damages as well as attorneys' fees.

3.      The LRAD was developed as a sound weapon designed for military applications in the wake of the 2000 attack on the USS *Cole* in Yemen.

4.      The LRAD is more a sound weapon than a traditional loudspeaker or megaphone.

5.      A traditional loudspeaker or megaphone, including the familiar police megaphone typically used by the NYPD in connection with crowd control, amplifies sound by use of a diaphragm. In contrast, the LRAD technology uses piezoelectric transducers to concentrate - and direct - acoustic energy.

6.      According to a Product Guide provided by the self-described "global leader in long range acoustic hailing devices," LRAD Corporation, "the Long Range Acoustic Device® (LRAD) produces a concentrated 30 [degree] beam of sound to broadcast highly intelligible voice messages (live or pre-recorded) and powerful alarm tones over large distances."

7.      According to an Amnesty International report issued in 2014:

LRADs emit high volume sounds at various frequencies, with some ability to target the sound to particular areas. Used at close range, loud volume and/or excessive lengths of time, LRADs can pose serious health risks which range from temporary pain, loss of balance and eardrum rupture, to permanent hearing damage. LRADs also target people relatively indiscriminately, and can have markedly different effects on different individuals and in different environments.[1]

---

[1]      "On the Streets of America: Human Rights Abuses in Ferguson," AMNESTY INTERNATIONAL REPORT, October 24, 2014), *available at*

8.      According to the NYPD's own DCU in January of 2010:

Sound travels in waves, and generally spreads in all directions from a source, in the form of a wave front…. The LRAD…focuses the sound waves in a specific direction. While the sound being emitted from in front of the LRAD may be very loud, it is substantially quieter outside the "cone" of sound produced by the device. In fact, someone could stand next to the device or just behind it and hear the noise being emitted at much lower levels than someone standing several hundred feet away, but within the "cone" of sound being emitted. [2]

9.      According to the manufacturer, in ideal conditions, sound amplified by the LRAD is directed in a 30-to-45-degree, cone-shaped beam emitting from the front of the LRAD. [3]

10.     LRADs are immensely loud: As an "emergency mass notification" solution, the manufacturer's materials boast that "LRAD systems blow away bullhorns by being 20-35 dB louder and allowing law enforcement personnel to quickly communicate instructions and directions to large groups. LRAD can be heard clearly through buildings or moving vehicles…"[4]

11.     Also according to the manufacturer, "LRAD broadcasts have been optimized to the 1 – 5 kHz range where human hearing is most sensitive."[5]

12.     According to the DCU:

Although it can be thought of as a 'loudspeaker', [the LRAD] actually works differently and may also be used as an 'area denial' device for crowd control management purposes. . . . In addition to having "loudspeaker" capabilities, the device can also be used, in a special mode, to propel piercing sound at higher levels (as measured in decibels) than are considered safe to human ears. In this dangerous range (above 120 decibels), the device can cause damage to someone's

---

http://www.amnestyusa.org/research/reports/on-the-streets-of-america-human-rights-abuses-in-ferguson?page=show ("Amnesty International Ferguson Report") (last accessed March 2, 2016).

[2]     *See* January 2010 NYPD Special Operations Division Disorder Control Unit "Briefing on the LRAD (Long Range Acoustical Device)" ("DCU LRAD Briefing") at p. 3. A true copy of the DCU LRAD Briefing is annexed hereto as Exhibit A.

[3]     *See, e.g.,* LRAD 100X Datasheet; description of LRAD 100X on LRAD Corporations website, *available at* http://www.lradx.com/site/content/view/207/110/ (last accessed December 2014).

[4]     *Id.*

[5]     Roger Cook, "LRAD Bridges the Communication Gap in Civil Emergency Situations," LRAD CORPORATION WHITE PAPER  (May 2011), at p. 3.

hearing and may be painful, It is this technology that device was designed for a USS Cole attack-type scenario. If mounted aboard a Navy ship, the device's loudspeaker could be used to "warn off" boats that come too close. If those warnings are ignored, the device could be used to send out sound at a dangerously high level causing attackers to turn away, or at least, to cause pain/hearing damage to try to repel the attack.[6]

13.     According to one of the manufacturer's statements in marketing the LRAD as a

crowd control device to law enforcement:

> When LRAD's deterrent tone is used at close range, protesters sense audible discomfort, cover their ears and move away. Just the act of covering ears with hands reduces the sound pressure level (SPL) by approximately 25dB and could prevent protestors from throwing protesters. LRAD can be quickly modulated in response to protesters actions by controlling the audio output through a prominently positioned volume control knob. Law enforcement agencies with concerns about the deterrent tone and [sic] can easily disable this option."[7]

14.     The same marketing document employs the below diagram to illustrate an LRAD

blasting waves of "intense communication" over a 2-3 block area of Times Square, and "clear

communication" from around 41st Street to beyond 54th Street:



---

[6]     *See* DCU LRAD Briefing at p. 2.

[7]     "Law Enforcement Solutions: Saving Lives Through Clear Communication," LRAD CORPORATION (Jan. 8, 2014).

15.     As seen below, on December 5, 2014, Defendants Maguire and JD#2 utilized the LRAD as a weapon against Plaintiffs and others by operating it as if it were a megaphone at unsafe distances and volumes, and by repeatedly firing its so-called "deterrent" tone at unsafe distances and volumes from distances as close as a car width away.

16.     Those gratuitous and unlawful uses of force and authority against Plaintiffs physically controlled Plaintiffs' movements and also caused Plaintiffs to endure physical and other injuries, including deprivations of their rights to free speech, assembly, expression, and to gather and disseminate information freely, as well as their free press rights.

17.     Additionally, Defendants City and Bratton failed properly to train and/or supervise Defendants Maguire and JD#2 in connection with deploying and using the LRAD.

18.     For example, although Defendants City and Bratton knew specifically that Plaintiffs had been injured by Defendants as early as December of 2014, they ratified and endorsed Defendants' conduct.

19.     Also, since learning of Plaintiffs' injuries, Defendants City and Bratton have failed to develop policies and practices governing the safe use of LRADs and failed to train and supervise NYPD officers in the use of LRADs.

20.     On December 12, 2014, within days of the December 5, 2014 LRAD firings that injured Plaintiffs, counsel wrote Defendant Bratton a nine-page letter along with a request under the Freedom of Information Law, a true copy of which is annexed hereto as Exhibit B, including detailed complaints about the December 5, 2014 LRAD uses, and calling on Defendant Bratton to direct officers under his command

> to refrain from using the LRAD for crowd control purposes until thorough, independent testing and review has been conducted; appropriate, written guidelines regarding the use of LRADs, including their use as force tools and their use for crowd control purposes, are promulgated and made public; members of

the service authorized to operate LRADs are adequately trained in them; and there are adequate use of force reporting requirements in place to document the circumstances under which the Department's LRADs are utilized.

21.     Defendant Bratton did not respond to the letter directly.

22.     However, as reported by Colin Moynihan in the *New York Times* on December 12, 2014,

A spokesman for the Police Department said that officer training in the use of the devices addresses intensity of sound, duration and distance. 'On December 4th all of these factors were controlled at levels that are not considered dangerous or harmful,' the spokesman said, adding that the device has only been used to advise people of illegal conduct.[8]

23.     To the contrary, as seen below, the LRAD was used for pain compliance and other purposes against Plaintiffs on December 5, 2014.

24.     Additionally, Defendants Maguire and JD#2 used the LRAD to seize Plaintiffs and assault them with unreasonably loud sound waves from unreasonably close distances and/or for unreasonably long periods of time.

25.     Defendants Maguire and JD#2 fired the LRAD almost continuously while directing its area of effect cone at Plaintiffs within ten feet, even turning to angle the cone toward Plaintiffs and others who were only a car width away.

26.     By way of further example, the image below shows the "LRAD 100X Operation Zones" as depicted on the back of an LRAD 100X, including a red "beam" graphic extending in a 30' cone from the front of the LRAD labeled "DO NOT ENTER WITHIN 10 METERS DURING CONTINUOUS OPERATION" and a yellow graphic indicating an approximately three-foot area around the LRAD in which persons are cautioned not to enter "without hearing protection."

---

[8]     Colin Moynihan, *Concerns Raised Over Shrill Device New York Police Used During Garner Protests,* NEW YORK TIMES, December 12, 2014, *available at* http://www.nytimes.com/2014/12/13/nyregion/lawyers-raise-concerns-over-shrill-device-used-by-police-during-garner-protests.html (last visited March 3, 2016).



27.     Thus, as seen below, Defendants Maguire and JD#2 not only violated Plaintiffs' rights and injured them – Defendants Bratton and City are also liable for those violations and injuries, including because Defendant Bratton ratified Defendants' Maguire's and JD#2's misconduct.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

29.     The federal claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that the Plaintiffs' claims arose in the County of New York in the State of New York, within the confines of this judicial district.

31.     Pursuant to New York State General Obligations Law § 50-e, Plaintiffs EDREI, STEPHAN, CRAVEN, and HORSE filed timely Notices of Claim with the New York City Comptroller on or about March 4, 2015, within 90 days of the events herein complained of.

32.     Plaintiff NUSBAUM filed a Notice of Claim on March 6, 2015.

33.     By letter dated March 19, 2015, the Comptroller disallowed the claim on the basis that the Notice of Claim had been submitted one day past the 90-day deadline.

34.     On March 3, 2016, Plaintiff Nusbaum initiated a proceeding seeking leave to file a Notice of Claim out of time, including on the basis that the Comptroller had actual notice of his claim by virtue of the other five Notices of Claim that were timely filed on March 4, 2015 and the letter sent to the New York Police Department on December 12, 2014, Index number 151826/2016. That proceeding is pending.

35.     Plaintiffs' claims were not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

36.     Thus, this Court has supplemental jurisdiction over Plaintiffs' claims under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

37.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

38.     Plaintiff ANIKA EDREI was at all times relevant to this action a resident of the County of Kings in the State of New York.

39.     Plaintiff SHAY HORSE was at all times relevant to this action a resident of the County of Kings in the State of New York.

40.     Plaintiff JAMES CRAVEN was at all times relevant to this action a resident of the County of Queens in the State of New York.

41.     Plaintiff KEEGAN STEPHAN was at all times relevant to this action a resident of the County of Queens in the State of New York.

42.     Plaintiff MICHAEL NUSBAUM was at all times relevant to this action a resident of Easthampton, Massachusetts.

43.     Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

44.     Defendant WILLIAM BRATTON was the NYPD's Police Commissioner at all times relevant herein, and as such was personally involved in developing and/or implementing and/or ratifying the unconstitutional policies, practices, customs and/or conduct complained of herein. Defendant Bratton was at all time relevant herein the highest ranking duly appointed and acting supervisory officer within the NYPD, ultimately responsible as a policymaker and supervisor for the training, retention, supervision, discipline, and control of subordinate members of the NYPD.

45.     At all times relevant herein, Defendants NYPD LIEUTENANT "JOHN DOE #1" MAGUIRE and "JOHN DOE #2" (referred to collectively as the "officer-defendants") were officers, employees, and agents of the NYPD and who were personally involved in depriving

Plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

46.     Defendant MAGUIRE is the NYPD officer to the left, with his hand on the LRAD, in the below photographs. Defendant JD#2 is the officer to the right in the second photograph.





47.     Copies of the second photograph were included along with each of Plaintiffs' Notices of Claim filed in March 2014 in order to put Defendants on notice to identify Defendant Maguire and JD#2 and to provide them with information to assist them in doing so.

48.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

49.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants acting within the scope of their employment by the Defendant City.

50.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting in furtherance of their employment by the Defendant City.

51.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

52.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

53.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

54.     Each individual Defendant is sued in her or his individual and official capacities.

55.     At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

## THE NYPD AND LRADS – 2004 THROUGH 2014

56.     Upon information and belief, the NYPD purchased two LRAD Model 3300 devices in 2004, in advance of the Republican National Convention ("RNC") in New York City in August of 2004.

57.     Upon information and belief, those LRADs were "among the first devices sold to law enforcement."[9]

58.     The DCU conducted tests utilizing those LRADs in 2004 but as of 2010 the results of those tests were "unavailable." [10]

59.     Then-NYPD spokesman Paul Browne cited two possible uses for them to the Associated Press ("AP") in 2004: "directing crowds to safety following a terrorist attack or other calamity, and reminding protesters where they're allowed to march and rally."[11]

60.     According to the AP, the Department "insist[ed that] the [warning tone] feature [would not] be used at the convention" and then-DCU Commander Thomas Graham guaranteed the public that the LRAD was "only to communicate in large crowds.[12]

61.     According to the NYPD itself, the NYPD only used the LRAD in connection with the 2004 RNC "sporadically…as loudspeakers." Also according to the NYPD, "[b]oth devices were used sporadically in Manhattan at protests outside of the convention site (Madison Square Garden), including those in the Union Square area . . . as a loudspeaker to make announcements

---

[9]     DCU LRAD Briefing at p. 8.
[10]    DCU LRAD Briefing at p. 4.
[11]    Tom Hays, "Authorities to Turn up the Volume for GOP Convention: A 150-decibel Megaphone," ASSOCIATED PRESS (Aug. 19, 2004).
[12]    *Id*.

to the crowd of protesters, with mixed results."[13]

62.    Neither Plaintiffs nor counsel are aware of uses of the LRAD by the NYPD between 2004 and around 2011. Nevertheless, during that time period, the NYPD policed thousands of First Amendment assemblies involving street and sidewalk marches.

63.    Plaintiffs and counsel are only aware of a few incidents in which the NYPD deployed  LRADs between 2011 and November of 2014.

64.    All were in connection with protests, and most were in connection with protests against police brutality.

65.    For example, upon information and belief, the NYPD did not deploy LRADs to use in communicating with New Yorkers in the wake of or in connection with recovery efforts related to Hurricane Sandy.

66.    LRADs deployed by the NYPD have frequently been observed beginning since around late 2014 - but only in connection with policing protests, and especially in connection with protests against policy brutality.

67.    LRADs were first observed regularly deployed by the NYPD in connection with the protests against police brutality that had begun just days before in the aftermath of the November 24, 2014 announcement that the Ferguson, Missouri grand jury considering charges against Darren Wilson, the law enforcement officer who shot and killed Mike Brown, had voted no true bill, and which resurged in the wake of the Staten Island grand jury's failure to indict NYPD Officer Daniel Pantaleo on December 3, 2014.

68.    Upon information and belief, although the NYPD had been using LRADs in connection with policing demonstrations since 2004, at no time prior to September of 2012 did

---

[13]    DCU LRAD Briefing at p. 2.

the NYPD develop or train its officers who were charged with using LRADs in policies, directives, manuals, or memoranda related to the proper use or operation of LRADs, how LRAD uses related to established NYPD use of force protocols, when the use of the LRAD's "deterrent" tone was appropriate, and at what volumes, distances, and frequencies, or anything else at all related to LRADs.

69.     The basis for that information and belief is that, in 2011, Plaintiff Keegan Stephan and another person filed a Freedom of Information Law ("FOIL") request with the NYPD seeking, *inter alia*, records related to any policies whatsoever related to LRAD operation and use, and the NYPD eventually averred that its diligent searches had uncovered no such policies.

70.     The only documents the NYPD located related to LRADs or NYPD use of LRADs in its possession *at all* as of 2012 were seventeen pages of news clippings and marketing materials from the manufacturer and the eight-page DCU "Briefing on the LRAD" dated January of 2010.

71.     Therefore, as of at least 2012, the NYPD had no written policies or training materials related to LRAD use.

72.     As reflected in the DCU LRAD Briefing, the DCU tested its two LRAD Model 3300 devices again in 2010 "in an empty parking lot at Orchard Beach, in the Bronx." [14]

73.     The DCU conducted two tests: The first with the power/audio "turned to level just below Maximum, using spoken voice commands" and the second with the power/audio "turned to maximum, using noise bursts."[15]

74.     The tests revealed as follows:

**Test #1 – Just below maximum, spoken voice commands**

---

[14]     *Id.* at pp. 4-6.
[15]     *Id.* at pp. 5-6.

102 dB at 320 feet
78 dB at 640 feet
64 dB at 800 feet

**Test #2 – Maximum, noise bursts**
110 dB at 320 feet
90 dB at 640 feet
68 dB at 800 feet

75.     A DCU chart of "examples of sound levels in comparison" notes that 110 dB is around as loud as a power saw.[16]

76.     The DCU did not take *any* readings within 320 feet of the front of the LRAD device for *either* test, calling that zone a "potential danger area" and labeling it "not tested."[17]



77.     At some point after 2010 and before November of 2011, the NYPD purchased at least one LRAD 100x – the type of device used to injure Plaintiffs.

---

16          *Id.* at p. 3.
17          *Id.*

78.     The LRAD 100x manufacturer's product sheet specifically boasts that it can

provide "powerful, intelligible communication up to 600 meters" with a maximum continuous

output of 136 dB at 1 meter, A-weighted, and the capacity to overcome 88dB of background

noise at 250 meters, which is "10-20 decibels . . . louder than the most competitive megaphones

[and] four to six times louder [than] . . . [s]ystems of comparable size and power."[18]

79.     "The level of sound produced by these devices exceeds both the threshold for

human discomfort (between 85 and 95 dB) and the normal human pain threshold (between 120

and 140 dB)."[19]

80.     According to the National Institute for Occupational Safety and Health,

"exposures [greater than] 85 dB may cause hearing loss."[20]

81.     According to the National Institute on Deafness and Other Communication

Disorders, "any sound over 90 dB can damage a person's hearing. So the LRAD can threaten the

hearing of anyone in its path, regardless of whether there is any wrongdoing, even when used

only for communication."[21]

82.     Against that backdrop,

The possible health risks are magnified due to the fact that the LRAD is a large-
scale device, targeting a large population rather than specific individuals. Pain
tolerance varies among the population, and certain groups – including children –
are more vulnerable to hearing loss. Moreover, individuals within large crowds
may be unable to move out of the LRAD's range due to physical disability or the
sheer volume of people in a given area. The indiscriminate nature of this device

---

[18]     LRAD 100X Product Sheet (downloaded from LRAD website in December of 2014).
[19]     Letter of Canadian Civil Liberties Association to Chief of Police William Blair, dated
June 1, 2010 ("CCLA Letter"), at p. 3.
[20]     *See* http://www.cdc.gov/niosh/topics/noise/noisemeter.html (last visited March 2, 2016).
[21]     Tracy V. Wilson, "How LRAD Works," http://Science.howstuffworks.com/lrad4.htm
(citing http://www.nidcd.nih.gov/health/hearing/pages/noise.aspx) (cited in DCU LRAD
Briefing) (last visited March 2, 2016)).

does not allow the police to accommodate and respond to individuals' differing reactions, increasing the possibility that at-risk populations will be hurt.[22]

83. In 2009, the Pittsburgh Police Department deployed LRAD's in connection with policing protests in response to the 2009 G20 Summit.

84. The DCU LRAD Briefing says that LRADs were used "successfully" by the Pittsburgh Police Department in connection with policing the 2009 G20. [23]

85. So do the LRAD's manufacturing materials, which include the following quotation from a Pittsburgh law enforcement official: "'Every police officer I talked to thought it worked famously, the bottom line is we could maintain order with the protesters without hurting them.'"[24]

86. However, immediately after the G20, the American Tinnitus Association, the National Institute of Health, and the National Institute on Deafness and Other Communication Disorders, reportedly disagreed.

87. For example, *The Washington Times* reported that the American Tinnitus Association said that protesters had been "'acoustically assaulted' with sound" at volumes that could cause 'tinnitus and hearing damage immediately.'" *The Washington Times* also reported: "The National Institutes of Health (NIH) has said permanent hearing loss can result from sounds at about 110 to 120 decibels in short bursts or at 75 decibels with long periods of exposure. The

---

[22]     CCLA Letter at p. 3.
[23]     *See* DCU LRAD Briefing at p. 2.
[24]     "Law Enforcement Solutions: Saving Lives Through Clear Communication," *LRAD Corporation* (Jan. 8, 2014).

National Institute on Deafness and Other Communication Disorders said regular exposure of more than one minute of 110 decibels can result in permanent hearing loss."[25]

88.    Additionally, in September of 2011, the American Civil Liberties Union of Pittsburgh sued on behalf of Plaintiff Karen L. Piper, a visiting professor at Carnegie Mellon University who suffered permanent hearing loss, nausea, pain and disorientation on September 24, 2009 when the LRAD was fired at protesters by the City of Pittsburgh and its agents. *See Karen Piper v. City of Pittsburgh, et al.,* 11-cv-01215 (JFC)(MPK) (USDC, Western District of Pennsylvania).

89.    According to the ACLU and the *Piper* Complaint:

After the protest began, Piper walked on the sidewalk a short distance from the marching protesters, in the company of other curiosity seekers and journalists. When Piper became concerned about rapidly increasing police activity, she tried to leave the area. As she was walking away, police officers activated, suddenly and without warning, an LRAD a short distance away from her. It emitted a continuous piercing sound lasting several minutes.

Piper immediately suffered intense pain as mucus discharged from her ears. She became nauseous and dizzy and developed a severe headache. Since then, Piper has suffered from tinnitus (ringing of the ears), barotrauma, left ear pain and fluid drainage, dizziness, and nausea.[26]

90.    Ms. Piper won a $72,000 monetary settlement in that lawsuit in 2012 as well as an agreement from the City to develop "a policy governing LRAD deployment to ensure its careful and controlled use."[27]

---

[25]    "DHS helps local police buy military-style sonic devices," THE WASHINGTON TIMES, October 1, 2009. Available at http://www.washingtontimes.com/news/2009/oct/1/police-buy-sonic-device-to-subdue-unruly-crowds/?page=all (last visited March 3, 2016).

[26]    *See Piper* Complaint; ACLU of Pennsylvania website - http://www.aclu.org/our-work/legal/legaldocket/piper-v-city-pittsburgh-et-al/ (last visited March 3, 2016).

[27]    *See* ACLU of Pennsylvania website - http://www.aclupa.org/news/2012/11/14/city-pittsburgh-settles-g-20-lawsuits (last visited March 3, 2016).

91.     As articulated by the Canadian Civil Liberties Association ("CCLA") in a letter written to Canadian government officials in advance of potential Canadian LRAD use to police anticipated mass protests in connection with the G8 and G20 in 2010:

> The introduction of any new weapon into police arsenals requires a process of objective scientific research into the short-term and long-term physical effects of the weapon's use, consultation with the public who are the potential targets of such weapons, and policy debates. Reliance on research by the manufacturer is insufficient. . . .
>
> Simply put, new weapons such as the LRAD should not be employed without prior independent assessment and study. Protocols regarding deployment and use should be developed with reference to independent science, not on the basis of manufacturer's claims and should incorporate public consultation and participation. Finally, comprehensive reporting, monitoring and oversight mechanisms must be established to account for how any approved weapons are actually used in the field.[28]

92.     In this case, although Defendants Bratton and City knew or should have known as early as 2004 that the LRADs they purchased in 2004 were dangerous weapons, they have not conducted adequate studies in connection with LRAD uses, have not developed and trained officers in appropriate, written protocols regarding LRAD deployment and use, and have not established appropriate reporting, monitoring, and oversight mechanisms, since then.

93.     Since some time after December of 2014, Defendants Bratton and City has been deploying LRADs routinely at demonstrations. For example, NYPD officers assigned to the Department's "Strategic Response Group" – a unit founded by Defendants Bratton and City in 2015 that has been a constant presence at protests since 2015 – frequently brandish and/or have used LRADs at protests.

94.     The increased frequency of these LRAD deployments and threatened uses - at least with respect to protests against police brutality - coupled with Plaintiffs' experiences, and

---

[28]     CCLA Letter at p. 3.

the proof that the Department had no written policies or practices regarding LRAD use as of September 2012, though LRADS were deployed by the Department in connection with crowd control between 2004 and September of 2012, show that Defendants' policies, practices, and customs with respect to LRAD deployment and use and related lack of training, monitoring, and oversight were the motivating forces behind the Department's LRAD uses against Plaintiffs on December 5, 2014, and the resulting injuries.

### THE DECEMBER 4-5, 2014 ERIC GARNER GRAND JURY PROTESTS

95.     On December 3, 2014, news broke that a Staten Island grand jury had declined to indict the NYPD officer involved in the death of Eric Garner.

96.     On December 4, 2014, hundreds protested in New York City, on the streets of Manhattan, in other boroughs, elsewhere in the country, and internationally.

97.     On December 4-5, 2014, as described more fully below, Plaintiffs were each protesters, observers, photojournalists, or filmmakers who were participating in, observing, or documenting the protests and police responses when they were assaulted by Defendants Maguire and JD#2 utilizing an LRAD.

98.     For the first few hours of the evening protests in which Plaintiffs participated or which Plaintiffs observed or documented, NYPD officers escorted and facilitated the protests.

99.     At some time after 1:00 am, NYPD officers made arrests in the intersection of 57th Street and Madison Avenue in Manhattan.

100.     For example, three to four officers cooperated to pin a person to the ground, including with a knee in the back, who was not apparently resisting them.

101.     Some Plaintiffs, and others, gathered to observe, document, and otherwise respond to those police actions, for example by protesting verbally.

20

102.   They did not interfere with or threaten the ongoing arrest activity.

103.   Some unidentified person or persons – not Plaintiffs – then apparently threw some objects, possibly glass bottles, toward the scene.

104.   The objects did not strike or injure anyone.

105.   At around the same time, without warning, an NYPD officer or NYPD officers at the scene deployed pepper spray.

106.   In response, Plaintiffs and many other non-NYPD officers present began to run away and otherwise flee from the police, including by moving on 57th Street between Madison and Park Avenues.

107.   Defendant Maguire and JD#2 were holding and jointly operating a LRAD at the scene.

108.   Within moments, Defendants Maguire and JD#2 began to fire the "deterrent" tone of the LRAD in the direction of the people who were already fleeing on 57th Street.

109.   As they operated the LRAD on 57th Street, Defendants Maguire and JD#2 were themselves in the roadway on 57th Street, obstructing the flow of vehicular traffic along with many other NYPD officers who were also present and in the roadways in the intersection of 57th Street and Madison Avenue and nearby.

110.   At the same time as they repeatedly fired the "deterrent" tone, Defendants Maguire and JD#2 also used the LRAD to broadcast messages identifying themselves as NYPD and directing people to get or stay on the sidewalk and out of the street or they would be placed in custody.

111.   The use of the "deterrent" tone at the same time as the broadcast feature made it difficult or impossible to hear and/or comply with the police directions.

112.    The messages were at times conflicting and/or difficult to understand, including because at least many of the people they were directed at were already fleeing on the sidewalks and/or because the police themselves were blocking traffic in the streets.

113.    In the just under three minutes it took Defendants Maguire and JD#2 to walk the length of 57th Street between Madison and Park Avenues, they fired the LRAD "deterrent" tone between fifteen or twenty times – almost continuously – as they walked in the roadway, blocking traffic.

114.    As described more fully below, Plaintiffs were each seized and injured by Defendants Maguire and JD#2 on 57th Street between Madison and Park Avenues when Defendants fired the LRAD at them.

115.    When Defendants Maguire and JD#2 fired the LRAD at Plaintiffs, Plaintiffs were lawfully and properly exercising their rights and privileges to be on or around the streets and sidewalks of the City of New York, to associate, to assemble, to express themselves, and to gather and disseminate information freely, as well as their free press rights.

116.    When Defendants Maguire and JD#2 fired the LRAD at Plaintiffs and others, that use of force terminated or severely limited Plaintiffs' freedom of movement through pain compliance and threat of permanent injury.

117.    When Defendants Maguire and JD#2 fired the LRAD at Plaintiffs and others, they knew or should have known that the use of the LRAD could cause permanent hearing damage and other injury.

118.    At certain points during the just under three minutes that Defendants Maguire and JD#2 were firing the LRAD on 57th Street, they were fewer than ten feet away from Plaintiffs, protesters, and innocent bystanders, angling the LRAD directly at them.

119.   When Defendants Maguire and JD#2 fired the LRAD at Plaintiffs and others, they knew or should have known that the use of the LRAD at such close ranges would be likely to cause permanent hearing damage and other injury.

120.   As seen above, Defendants Bratton and City have ratified Defendants' Maguire's and JD#2's uses of force against Plaintiffs.

## ANIKA EDREI

121.   On December 5, 2014, Plaintiff ANIKA EDREI was a twenty-year-old photojournalist and photographer enrolled in a one-year intensive certificate program in Documentary Photography and Photojournalism at the International Center of Photography in New York City.

122.   Plaintiff Edrei is known professionally in Plaintiff Edrei's photojournalism work as "Moth Dust". *See http://www.mothdust.net/.*

123.   Plaintiff Edrei's work has been published in *VICE Motherboard* & *Galore Magazine*, among others. Plaintiff Edrei's images have also been featured in festivals and galleries such as *Tipping Point, Guatephoto* and several other private shows in New York City.

124.   On the evening of December 4, 2014, Plaintiff Edrei was informed by co-plaintiff and fellow photojournalist Shay Horse that there would be protests in Manhattan related to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

125.    Plaintiff Edrei attended the protests in order to document them, as part of Plaintiff Edrei's photojournalism coursework, and in order to pitch photographs she might take to magazines, newspapers, and other outlets with a view toward publishing them, in the name of gathering and publishing newsworthy information, and in furtherance of Plaintiff Edrei's career goals.

126.   Plaintiff Edrei followed protests around the streets of Manhattan for several hours.

127.   The protesters were escorted and accompanied by NYPD officers for those several hours.

128.   Around or after 1 a.m. on December 5, 2014, at or around the area of 57th Street and Madison Avenue, Plaintiff Edrei saw NYPD officers arresting people.

129.   Those arrests appeared violent to Plaintiff Edrei.

130.   Plaintiff Edrei took photographs of people being placed under arrest with their faces pressed into the ground and police knees in their backs.

131.   Plaintiff Edrei was careful to position Plaintiff Edrei so that she could get what Plaintiff Edrei believed could be newsworthy shots without interfering with the officers.

132.   Plaintiff Edrei tried to continue taking photographs, but was pushed out of view by officers.

133.   Plaintiff Edrei heard and saw several protesters verbally protest and beg police to stop violently arresting people.

134.   Plaintiff Edrei saw people gather to observe the ongoing arrests and police uses of force.

135.   Plaintiff Edrei heard a sound like glass breaking.

136.   Plainitff Edrei heard yelling and shouting.

137.   Plaintiff Edrei started running away.

138.   Plaintiff Edrei then saw other people who had been gathered near the arrests run away.

139.   From behind Plaintiff Edrei, Plaintiff Edrei then heard a sort of high-pitched, whirring siren what Plaintiff Edrei now believes to be the "deterrent tone" of a LRAD.

140.    There was no warning that the deterrent tone of the LRAD would be used.

141.     At first, Plaintiff Edrei thought Plaintiff Edrei was hearing a very loud car alarm.

142.    Plaintiff Edrei then remembered that co-plaintiff Horse had previously told Plaintiff Edrei about an LRAD he had seen and heard deployed in Ferguson, Missouri, and Plaintiff Edrei formed the belief that Plaintiff Edrei was likely hearing the LRAD.

143.     After hearing the LRAD's deterrent tone, Plaintiff Edrei turned around and observed two NYPD officers holding the LRAD, following behind Plaintiff Edrei and others who were running or otherwise moving quickly away from the police or otherwise fleeing.

144.    Almost immediately, Plaintiff Edrei felt a surge of adrenaline and began to experience a migraine and to feel woozy.

145.    Plaintiff Edrei heard the "deterrent" tone used repeatedly, interrupted by brief pauses.

146.    Plaintiff Edrei heard some portions of an unclear and wordy directive to the effect of "Get off the street" also coming through the LRAD's speaker, at the same time the deterrent tone was firing.

147.    Plaintiff Edrei was in between parked cars on the side of the street, outside the part of the roadway reserved for cars to travel on.

148.    People were running away from the Defendants using the LRAD.

149.    Plaintiff Edrei tried to put her fingers in her ears to plug them, and to run as fast as she could from the sound.

150.    Plaintiff Edrei was able to leave the immediate area where the police had been using LRAD.

151.    After being exposed to the LRAD, Plaintiff Edrei was very confused.

152.    Plaintiff Edrei tried to meet back up with the marches to continue documenting the night, but her physical condition deteriorated and prevented her from doing that.

153.    Specifically, Plaintiff Edrei got a migraine, which then spread to Plaintiff Edrei's entire face.

154.    Plaintiff Edrei felt acute pain in her sinuses and overall pain across Plaintiff Edrei's face.

155.    Plaintiff Edrei felt very dizzy and had to sit down.

156.    People asked if Plaintiff Edrei was alright.

157.    Plaintiff Edrei was physically and emotionally jarred.

158.    Plaintiff Edrei felt very disoriented and wanted to go home.

159.    Plaintiff Edrei attempted to call Plaintiff Edrei's boyfriend to figure out how Plaintiff Edrei could get home, but was unable to concentrate.

160.    Eventually, someone helped Plaintiff Edrei into a taxi cab that took Plaintiff Edrei home.

161.    Plaintiff Edrei had a migraine headache for around the next week.

162.    For at least the following five days, Plaintiff Edrei noticed that Plaintiff Edrei was very sensitive to sounds and even very soft sounds hurt her ears.

163.    Plaintiff Edrei continued to feel woozy and to have a headache.

164.    Plaintiff Edrei felt a lot of facial pressure for around the next week.

165.    Ever since the incident, Plaintiff Edrei has been more sensitive to noise than Plaintiff Edrei was before the incident.

166.    Plaintiff Edrei feels very traumatized after having the LRAD's deterrent sound fired at Plaintiff Edrei, particularly as Plaintiff Edrei was at the scene as a member of the press.

167.    For Plaintiff Edrei, this was an act of violence committed without warning, while Plaintiff Edrei was trying to leave the scene of glass breaking as fast as Plaintiff Edrei could.

168.    Plaintiff Edrei experiences ringing in her ears to this day, about half of the time.

169.    The ringing in Plaintiff Edrei's ears gets worse after listening to live music.

170.    After December 5, 2014, Plaintiff Edrei pitched some of the photographs Plaintiff Edrei had taken the night of this incident to various publications, including *The Villager* and *The Shadow*.

171.    Multiple photographs taken by Plaintiff Edrei were published in *VICE Motherboard*. *See* Alex Pasternack, *The New Sound of Crowd Control*, MOTHERBOARD, December 17, 2014, *available at* http://motherboard.vice.com/read/the-new-sound-of-crowd-control (last visited March 2, 2016).

172.    As part of her photojournalism coursework, Plaintiff Edrei uploaded photographs Plaintiff Edrei had taken that night to her professional photography blog.

173.    Plaintiff Edrei still works as a professional photojournalist and photographer.

174.    Plaintiff Edrei's career has been adversely affected by the injuries Plaintiff Edrei sustained on December 5, 2014.

175.    Plaintiff Edrei dream job has always been to be a photojournalist, covering protests and other heated current events.

176.    For work, among other things, Plaintiff Edrei's shoots live concerts.

177.    Plaintiff Edrei's must now bring additional ear protection when covering live concerts.

178.    Even with additional ear protection, Plaintiff Edrei experiences pain and sensitivity while carrying out these job duties.

179.   The season before December 5, 2014, Plaintiff Edrei had been photographing protests regularly, including two BlackLivesMatter protests and a few climate-related protests.

180.   After being exposed to the LRAD and the ensuing pain, ringing, and sensitivity, Plaintiff Edrei has not felt able to cover protests.

181.   Plaintiff Edrei attempted to take photographs at one protest after December 5, 2014, and had to leave early due to the emotional and physical effects of this incident.

182.   Plaintiff Edrei is afraid to go to protests, and has not been able to cover a protest since December 5, 2014, out of fear that Plaintiff Edrei will be exposed to an LRAD and will suffer further confusion, headaches, ear pain, and hearing damage.

## SHAY HORSE

183.   On December 5, 2014, Plaintiff SHAY HORSE was a twenty-one-year-old working as a freelance photojournalist.

184.   Plaintiff Horse still works as a freelance photojournalist.

185.   Plaintiff Horse's photographs have appeared in *Al Jazeera* and *Russia Today*, in addition to other media outlets.

186.   Plaintiff Horse has travelled around the United States and to other countries to document protests and other newsworthy events.

187.   On the evening of December 4, 2015, Plaintiff Horse went to where he believed there would be protests in response to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

188.   Plaintiff Horse attended the protests in order to document aspects of the protests and police response to them, as part of his photojournalism work, and in order to pitch photographs to magazines, newspapers, and other outlets, in the name of gathering and

publishing newsworthy information and so that the photographs could be published and in furtherance of his career goals.

189.    Plaintiff Horse followed protests around the streets of Manhattan for several hours.

190.    The protesters were escorted and accompanied by NYPD officers for those several hours.

191.    At around or after 1 a.m., Plaintiff Horse was attempting to walk near protesters west on 58th Street when Plaintiff Horse observed NYPD officers blocking protesters from continuing westward by forming a police line stretching across the street and sidewalks.

192.    Unable to proceed westward on 58th Street, some protesters proceeded south on 7th Avenue, and turned east on 57th Street.

193.    At some time between around 1:10 and 1:15 a.m. or after, Plaintiff Horse observed protesters proceed on 57th Street and attempt to cross the intersection of 57th Street and Madison Avenue.

194.    Plaintiff Horse then observed police officers violently arrest several people.

195.    Plaintiff Horse saw the officers with their batons out and swinging.

196.    Plaintiff Horse saw some people move toward the officers who were arresting people, and then saw the officers make additional arrests.

197.    Plaintiff Horse saw police officers discharge pepper spray towards the crowd.

198.    Plaintiff Horse saw what he believed to be glass bottles thrown toward where the police were arresting people.

199.    At that point, Plaintiff Horse was about four feet away from the people being arrested, and was trying to take photographs.

29

200.    Plaintiff Horse was careful to position himself so that he would not be interfering with the officers.

201.    Plaintiff Horse then heard the police yell in sum and substance for everyone to get on the sidewalk.

202.    Plaintiff Horse then heard the sound of an LRAD being activated.

203.    Plaintiff Horse did not hear a dispersal order from the police.

204.    Plaintiff Horse did not hear any warning that the LRAD would be used.

205.    Plaintiff Horse then heard the LRAD repeatedly fire its "deterrent" tone.

206.    Plaintiff Horse tried to get away from the LRAD quickly, by moving away from the police.

207.    Plaintiff Horse heard police officers use the LRAD to broadcast messages, including to get on the sidewalk, as he was moving away from them.

208.    At the same time as the officers used the LRAD to broadcast many of those messages, they were also firing its "deterrent" tone.

209.    Plaintiff Horse got on the sidewalk and continued to move away from the officers.

210.    Plaintiff Horse turned around and saw Defendants Maguire and JD#2 walking behind him and others who were fleeing from the police firing the LRAD.

211.    Plaintiff Horse saw Defendants Maguire and JD#2 holding the LRAD between the two of them, firing it, apparently indiscriminately, as people were fleeing from the police firing the LRAD.

212.    At that point, Plaintiff Horse was on the sidewalk near Plaintiff Edrei and others.

213.    Plaintiff Horse was upset that the police were using the LRAD against people who were trying to get away, and from such a close distance.

214.     Plaintiff Horse yelled a critical comment at the officers holding the LRAD, and stepped briefly off the curb to take a picture of them, and then returned to the sidewalk.

215.     After yelling at Defendants Maguire and JD#2, Plaintiff Horse then saw these two officers turn toward him, and fire the LRAD while pointing it at him, although he had all complied with orders and were on the sidewalk.

216.     Plaintiff Horse ran down the sidewalk away from the officers, and saw Defendants Maguire and JD#2 continue to direct the LRAD at him and Plaintiff Edrei and others while firing its "deterrent" tone.

217.     Plaintiff Horse was eventually able to leave the area where the officers were firing the LRAD.

218.     While the LRAD was directed at him, Plaintiff Horse's eardrums were beating hard and it was incredibly painful.

219.     Plaintiff Horse felt as though he were bleeding out of his nose, ears, and mouth.

220.     Plaintiff Horse repeatedly asked others around him if he was actually bleeding.

221.     Plaintiff Horse got a migraine headache, and his sinuses, nose, throat, and ears all felt as though they were on fire.

222.     The side of Plaintiff Horse's body that was hit by the LRAD felt numb.

223.     The next day and for at least the following five days, Plaintiff Horse's migraine headache and the sensation that he was bleeding out of his ears and nose continued.

224.     Plaintiff Horse heard ringing in his ears and white noise, even when he was in silent places.

225.     On December 9, 2014, Plaintiff Horse went to an Urgent Care facility to seek medical assistance because he was still experiencing ringing and extreme pain in his ears.

226.    Plaintiff Horse complained of nausea, pain and ringing in his ears, and dizziness.

227.    Plaintiff Horse was diagnosed with "Tinnitus, bilateral" and "vertigo" and prescribed Meclizine.

228.    Plaintiff Horse was referred to an Ear, Nose, and Throat specialist, but did not pursue the referral, including because he was uninsured and thought he could not afford specialist care.

229.    Plaintiff Horse still experiences ringing in his ears sometimes to this date.

230.    Plaintiff Horse still experiences dizzy spells as often as once or twice a week.

231.    Plaintiff Horse is very worried about the long-term effects of his December 5, 2014 exposure to the LRAD on his hearing, and about his ability to continue to work as a photojournalist who covers protests and conflict situations.

232.    Plaintiff Horse is very worried that as he continues to cover protests in New York City as a photojournalist, the police will use the LRAD against him again and it will result in a permanent and significant impact on his hearing.

233.    Plaintiff Horse has covered protests since December 5, 2014 as a photojournalist.

234.    Plaintiff Horse intends to continue documenting protests and conflicts because it is his career and his life passion.

235.    However, his experiences on December 5, 2014 continue to harm his work as a photojournalist in those contexts because he is now more nervous and cautious and less able to get the newsworthy shots he seeks.

## JAMES CRAVEN

236.    On December 4, 2014, Plaintiff Craven was a twenty-seven year-old full-time student pursuing his Master of Science in Information Systems from Baruch College.

237.   Plaintiff Craven works as an Information Technology consultant.

238.   On December 4, 2014, Plaintiff Craven learned that there would be a large protest in Manhattan related to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

239.   Plaintiff Craven wanted to join others who were also outraged.

240.   Plaintiff Craven also intended to document the protests and police responses thereto with a view toward potentially publishing newsworthy information.

241.   At around 10:30 pm, Plaintiff Craven joined the march by riding nearby on his bicycle in the street, filming some of the events with a GoPro camera that was attached to his bicycle helmet.

242.   Footage of the incident Plaintiff posted on YouTube has garnered almost 80,000 hits.

243.   Mr. Craven spent most of the next few hours after 10:30 p.m. riding his bicycle in the street.

244.   The protesters were escorted and accompanied by NYPD officers for those several hours.

245.   During that time period, Plaintiff Craven did not observe any noteworthy arrests.

246.   On or around 1 a.m. on December 5, 2014, Plaintiff Craven was near the back of the march as it proceeded east on 57th Street towards Madison Avenue.

247.   At around 57th Street and Madison Avenue, Plaintiff Craven saw people gathering around the police making arrests to observe them.

248.   Near the scene of the arrests, Plaintiff Craven saw what he thought were bottles in the air near the arrest scene.

249.   Plaintiff Craven did not see anyone hit or injured.

250.   Less than ten seconds later, Plaintiff Craven heard the LRAD "deterrent" tone.

251.   There was no warning that the LRAD would be used.

252.   The LRAD produced one of the loudest noises he had ever heard.

253.   Plaintiff Craven felt like he was inches from a car alarm going off.

254.   Plaintiff Craven continued bicycling east towards Park Avenue.

255.   Plaintiff Craven heard what seemed to be orders from the police officers over the LRAD as well, but could not hear what they were, as they were given at the same time as the "deterrent" tone was being fired.

256.   Plaintiff Craven saw other people fleeing east on 57th Street to get away from the police using the LRAD.

257.   Defendants Maguire and JD#2 fired the LRAD's "deterrent" tone repeatedly over the course of almost three minutes on 57th Street between Madison and Park Avenues.

258.   Plaintiff Craven continued bicycling near marchers for about 40 minutes, and then returned to his home for the night.

259.   The next day, Plaintiff Craven suffered severe pain and ringing in both ears.

260.   This pain intensified when Plaintiff Craven encountered any loud sounds.

261.   This pain, sensitivity, and ringing continued for at least six days.

262.   The pain made bicycling around New York City, Plaintiff Craven's usual mode of transportation, difficult.

263.   Within a week, because of the pain, ringing, and sensitivity in his ears, Plaintiff Craven sought medical treatment from the New York Eye and Ear Infirmary.

264.    Plaintiff Craven later sought treatment from his General Practitioner, who in turn referred him to an Ear, Nose, and Throat specialist.

265.    Plaintiff Craven saw an Ear, Nose, and Throat specialist in early 2015 because he was experiencing ringing in his ears.

266.    Plaintiff Craven was deterred from attending protests for several months after December 5, 2014.

267.    Plaintiff Craven remains nervous about attending future protests.

268.    Plaintiff Craven has only been to one protest since December 5, 2014.

269.    After the incident, Plaintiff Craven put earplugs on his keychain so that he could have them ready to hand in case police use the LRAD again at or near him.

270.    Plaintiff Craven worries that he will not have time to put earplugs in before another LRAD is fired at or near him.

## KEEGAN STEPHAN

271.    Plaintiff KEEGAN STEPHAN is a long-time activist, and has been involved with political protests his entire adult life.

272.    Prior to December 4, 2014, Plaintiff Stephan had been to nearly every protest related to the deaths of Eric Garner and Michael Brown in New York City.

273.    Plaintiff Stephan joined the December 4, 2014 protests at around 4-5 p.m. in Union Square.

274.    Plaintiff Stephan attended the protest intending to observe and document the protests and police response thereto with a view toward publishing newsworthy images, video, and/or commentary.

275.    At the time, Plaintiff Stephan regularly attended protests, taking and posting photos and videos to his social media accounts.

276.    On many occasions prior to December 4, 2014, mainstream media outlets had re-broadcasted images and videos posted by Plaintiff Stephan.

277.    For example, Plaintiff Stephan's posts had been used in coverage of protests by *The New York Times*, *Newsweek*, *Newsday*, *Telesur*, *New York Magazine*, and *PBS*.

278.    On December 4, 2014, Plaintiff Stephan intended to take and broadcast photos and/or videos of the protests and police responses to his substantial social media following, with a view toward republishing some of the images and videos, and/or commentary, including to mainstream media outlets.

279.    Indeed, Plaintiff Stephan's images, videos, and commentary from December 4 and 5, 2014, were used in stories on *Buzzfeed*, *The Village Voice*, and *The Epoch Times*. *See Several Arrested During Second Night of Protests After Eric Garner Decision*, BUZZFEED NEWS, December 4, 2014, *available at* http://www.buzzfeed.com/buzzfeednews/protesters-take-to-new-york-city-again#.psLoDJvPK (last accessed March 3, 2016); Katie Toth, *The NYPD's Moment of Restraint is Over: 200+ Arrested*, THE VILLAGE VOICE, December 5, 2014, *available at* http://www.villagevoice.com/news/the-nypds-moment-of-restraint-is-over-200-arrested-6674835 (last accessed March 3, 2016); Reid Schram, *Eric Garner Decision Fuels Protests Across New York*, THE EPOCH TIMES, December 4, 2014, *available at* http://www.theepochtimes.com/n3/1123416-eric-garner-decision-fuels-protests-across-new-york-liveblog/ (last accessed March 3, 2016).

280.    Since December 5, 2014, photos, videos, and/or commentary from Plaintiff Stephan's posts have been republished and/or used by *Pix 11*, *WNYC*, *MTV*, *CBS*, *International Business Times*, *The Washington Post*, *AMNY*, *Telesure*, *Mic News*, and *The Huffington Post*.

281.    Several articles specifically acknowledge how Plaintiff Stephan's work as a "livetweeter" has influenced mainstream media. *See, e.g.*, Mark Chiusano, *Video is shaping #BlackLivesMatter Protests in New York City*, AMNEWYORK, December 17, 2015, *available at* http://www.amny.com/opinion/columnists/mark-chiusano/video-is-shaping-blacklivesmatter-protests-in-new-york-city-1.11237109 (last accessed March 3, 2016); Amber van Moessner, *What Everyone Should Know About Filming (and Sharing) Injustice on Social Media*, MIC NEWS, *available at* http://mic.com/articles/136154/what-everyone-should-know-about-filming-and-sharing-injustice-on-social-media#.7u0TRqIno (last accessed March 3, 2016)

282.    Plaintiff Stephan has also  been quoted as an expert on protest and police in several sources, and has written pieces for *Gothamist*, *US Uncut*, *Alternet,* and *PINAC News* regularly since December 4, 2014.

283.    On the night of December 4, 2014, Plaintiff Stephan proceeded near protesters for several hours.

284.    Around or after 1 a.m., as a group of protesters neared 57th Street and Madison Avenue, Plaintiff Stephan saw a person with his face down, and at least three police officers on top of him, as at least one officer pressed his knee into the arrestees' back while apparently cuffing him.

285.    Plaintiff Stephan saw others gather at the scene to observe the police.

286.    Plaintiff Stephan did not see people gathered in a way that appeared to interfere with or threaten to interfere with their arrest.

287.   Plaintiff Stephan then saw a police officer walk over and discharge what he believed to be pepper spray toward the people who were watching the arrest.

288.   Plaintiff Stephan smelled pepper spray and his eyes began burning.

289.   Plaintiff Stephan felt sinus pain, itching and burning.

290.   Plaintiff Stephan heard no warning before the pepper spray was deployed.

291.   Plaintiff Stephan then ran from the scene of the arrests and onto the sidewalk.

292.   As Plaintiff Stephan reached the sidewalk, he heard what he believed to be the "deterrent" tone of a LRAD.

293.   Plaintiff Stephan had no warning before the police began firing the LRAD.

294.   Plaintiff Stephan moved on 57th Street between Madison and Park as the NYPD fired the "deterrent" tone of a LRAD for nearly three minutes.

295.   Plaintiff Stephan was shocked that the police were using the LRAD, and that they were using its "deterrent" tone rather than its announcement feature.

296.   Plaintiff Stephan was particularly surprised because when it was used most people had already responded to the pepper spray by fleeing.

297.   Plaintiff Stephan felt reverberation and pain while the LRAD was being used.

298.   The reverberation went beyond Plaintiff Stephan's eardrums, going down his ear canal.

299.   This was the most traumatic ear pain Plaintiff Stephan has ever experienced.

300.   Plaintiff Stephan could not sleep that night, due to the intense ringing and pain in his ears.

301.   Video that Mr. Stephan took of the LRAD being used on December 5, 2014 was subsequently published by *Vice Motherboard*. *See* Alex Pasternack, *The New Sound of Crowd*

*Control*, MOTHERBOARD, December 17, 2014, *available at* http://motherboard.vice.com/read/the-new-sound-of-crowd-control (last visited March 2, 2016).

302.    After the events of December 5, 2014, when Plaintiff Stephan considers going to a protest, the pain and fear that the use of the LRAD caused him resurfaces.

303.    Plaintiff Stephan has considered not going to protests because of this acute pain and fear.

304.    However, Plaintiff Stefan has chosen to fight through his fears and continue to attend and report on protests, in part because he believes both activities are so important.

305.    Plaintiff Stephan was and remains afraid of being exposed to the LRAD again and of experiencing permanent hearing damage.

**PLAINTIFF NUSBAUM**

306.    On December 5, 2014, Plaintiff MICHAEL NUSBUM was a twenty-five-year-old working as a freelance photographer.

307.    Plaintiff Nusbaum is now a freelance filmmaker and photographer, with a Bachelor of Science Degree in Film and Television from Boston University.

308.    On December 5, 2014, Plaintiff Nusbaum was working as a filmmaker to create a historical documentation of an emerging protest movement, including through film, one aspect of which was ultimately published as "*This Ain't a Parade*" on Vimeo, *available at* https://vimeo.com/113821448 (last accessed March 2, 2016) - with the description: "The protest movement in this video is in response to what many see as a failure of the justice system in the United States: the grand jury decisions not to indict police officers who killed Eric Garner, Michael Brown, and others."

309. Plaintiff Nusbaum had a history of tinnitus and hearing loss, and had seen multiple doctors about his hearing conditions prior to December 5, 2014.

310. Plaintiff Nusbaum is particularly vulnerable to loud sounds and to further hearing damage.

311. On the night of December 4, 2014, Plaintiff Nusbaum joined with the protests of the non-indictment of the officer involved in Eric Garner's death.

312. Plaintiff Nusbaum was at the protest both as a filmmaker and as a protester.

313. Plaintiff Nusbaum marched with others for several hours.

314. At some time after 1 a.m. on December 5, 2014, Plaintiff Nusbaum saw people gather around the scene of some arrests near 57th Street and Madison Avenue.

315. Plaintiff Nusbaum heard something that sounded like a glass bottle breaking.

316. Plaintiff Nusbaum then heard someone say that they had been pepper sprayed.

317. At this point, Plaintiff Nusbaum heard what he now believes was the "deterrent" tone of a LRAD.

318. After Plaintiff Nusbaum heard the LRAD fire, he saw people fleeing from it.

319. Plaintiff Nusbaum heard the LRAD broadcast a message saying in substance that "This is the New York City Police Department, you must remain on the sidewalk."

320. Plaintiff Nusbaum heard parts of this message broadcast repeatedly, apparently directed at him and other people who were already on the sidewalk.

321. The LRAD was approximately 15 feet away from the closest protesters and from Plaintiff Nusbaum.

322.   Plaintiff Nusbaum had earplugs in his backpack, which he carries with him because his hearing issues mean that it is very dangerous and painful for him to be exposed to loud sounds.

323.   Plaintiff Nusbaum put in his earplugs and began filming to document the LRAD use.

324.   Plaintiff Nusbaum began filming approximately 30 seconds after he first heard the LRAD being used, and continued filming for approximately two and a half minutes, during which time the LRAD and its deterrent function were used almost continuously.

325.   However, because there was no warning or indication that the LRAD would be used, his ears were exposed to sounds at volume levels and proximities that are very dangerous and deleterious because of his pre-existing hearing condition.

326.   "*This Ain't a Parade*" (https://vimeo.com/113821448 (last accessed March 2, 2016)) is the published product of the filmmaking project Plaintiff Nusbaum was working on when he was assaulted with the LRAD.

327.   When the LRAD's "deterrent" tone was first used near plaintiff Nusbaum, he experienced what he would describe as a 10 out of 10 pain in his ears.

328.   Plaintiff Nusbaum has had to get an MRI test for his hearing before, and this was louder than being in an MRI machine.

329.   Because of his fear that he will be hit by an LRAD and injured again, Mr. Nusbaum has attended many fewer protests since December 5, 2014.

330.   Plaintiff Nusbaum works as a photographer at music concerts, and the sound of the LRAD was much louder and more painful than anything he had ever heard before.

331.    Since December 5, 2014, the ringing in Plaintiff Nusbaum's right ear that he had experienced has been much more noticeable, and he hears a slight ringing at all times.

### FIRST CLAIM FOR RELIEF
### UNREASONABLE SEIZURE – EXCESSIVE FORCE
### FOURTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983

332.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

333.    Defendants Maguire and JD#2 terminated or severely limited Plaintiffs' freedom of movement utilizing the LRAD.

334.    Defendants seized Plaintiffs without privilege or lawful justification.

335.    Defendants had no judicial warrant authorizing Plaintiffs' seizure.

336.    Plaintiffs were conscious of the confinements and did not consent to them.

337.    Defendants used force against Plaintiffs by deploying the LRAD against them.

338.    Defendants did not have lawful cause to detain or arrest Plaintiffs, nor was it objectively reasonable for Defendants to believe that they did have such cause to detain or arrest Plaintiffs.

339.    The levels of force employed by Defendants Maguire and JD#2 in using the LRAD, and in particular in using its "deterrent" tone without prior warning, unreasonably close to people, for unreasonably long periods of time, were objectively unreasonable.

340.    As seizures of and uses of force against Plaintiffs, the NYPD's uses of the LRAD were unjustified and unreasonable under the circumstances.

341.    The LRAD was used as a weapon without reasonable notice and without providing a meaningful opportunity to disperse beyond the range of the LRAD and therefore avoid injury.

342.     The LRAD was used in circumstances where there was no imminent threat to public safety or property and/or where its use was not necessary to protect public safety or property.

343.     Defendants' uses of the LRAD were not only in contravention of best practices regarding crowd control and use of force, but also in violation of the NYPD's use of force requirements that "All members of the service at the scene of a police incident <u>must</u>:…(b) use minimal necessary force," as reflected in the relevant provisions of the NYPD's Patrol Guide, Section 203-11, that was in effect at all times relevant herein (emphasis in original).

344.     Because the LRAD is designed to target large areas, it necessarily targets more than one person, if more than one person is within that area.

345.     When the LRAD is implemented to force behavior modification or compliance (for example, to compel people to stop moving in a direction or to move in a particular direction), it impacts their ability to move freely.

346.     Put more simply, use of the LRAD as a weapon seizes not just one individual, but all people in an area, and in so doing does away with the requirements of individualized probable cause and individualized justifications for appropriate and proportionate use of force.

347.     As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF PLAINTIFFS' FIRST AMENDMENT RIGHTS**
**<u>FIRST AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983</u>**

348.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

349.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected conduct and/or speech, including their protected conduct and/or speech in being near, participating in, or observing and/or documenting protests and police responses to them.

350.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected conduct.

351.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

352.    Each Plaintiff suffered actual chill in that each Plaintiff was prevented and /or deterred from or impeded in participating in protected conduct on the date of and after the incident.

353.    In addition to being retaliatory, the restrictions imposed by Defendants Maguire and JD#2 on Plaintiffs' First Amendment rights complained of herein were:

      a.   Not content-neutral and lacked narrowly tailored to promote a compelling government interest; and/or

      b.   Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression; and/or

      c.   Afforded Defendants unbridled discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns).

354.    The uses of force and other regulations imposed on Plaintiffs by Defendants Maguire and JD#2 interfered with Plaintiffs' rights to speech, expression, assembly, and/or to

engage in observing and/or documenting newsworthy events including, but not limited to, protests against police brutality and police responses to them.

355.    With respect to those Plaintiffs who intended to observe and document with a view toward disseminating documentation of protests and/or police responses thereto and/or otherwise newsworthy images, video, sounds, and/or commentary, those uses of force and other regulations prevented such Plaintiffs from engaging in the "gathering" of such images, video, sounds, and/or commentary, which is a necessary and protected prerequisite to the protected dissemination those Plaintiffs ultimately intended to engage in.

356.    Even assuming, *arguendo*, that the physical regulations on freedom of movement imposed on Plaintiffs when they were fired on by the LRAD were content neutral, absent a very small subset of extremely exigent circumstances, the use of an LRAD for crowd control purposes will almost always result in overbroad or over-inclusive regulation of protected conduct, because the restrictions imposed by the haphazard applications of the LRAD's force are almost always not narrowly tailored to serve significant governmental interests, and almost always fail to provide ample alternatives for expression.

357.    Additionally, the NYPD's practices with respect to LRAD uses  - including the lack of (1) written guidelines and policies, (2) appropriate training regarding LRAD use, and (3) basic use of LRAD force reporting requirements - fail to provide adequate safeguards to prevent NYPD officers on the streets from enjoying and exercising unbridled, unreviewable discretion to suppress protected speech and conduct, thus violating constitutional prohibitions against viewpoint discrimination and other, related guarantees.

358.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATIONS OF PLAINTIFFS' RIGHTS TO EQUAL PROTECTION AND**
**SUBSTANTIVE DUE PROCESS**
**FOURTEENTH AMENDMENT THROUGH 42 U.S.C. § 1983**

359.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

360.    Defendants' acts and omissions described elsewhere herein violated Plaintiffs' rights to enjoy equal protection of the laws as well as their substantive due process rights, including their liberty interests.

361.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**FOURTH CLAIM FOR RELIEF**
**ASSAULT AND BATTERY**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

362.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

363.    Defendants Maguire and JD#2 committed assaulted within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

364.    Defendants Maguire and JD#2 committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

365.    Defendants Maguire and JD#2 did thereby inflict assault and battery upon the Plaintiffs.

366.     Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

367.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

368.     As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**FIFTH CLAIM FOR RELIEF**
**FALSE ARREST/FALSE IMPRISEMENT**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

369.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

370.     By the actions described above, all of the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement and it was without their consent.

371.     Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

372.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials,

and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

373.   As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

## SIXTH CLAIM FOR RELIEF
## NEGLIGENCE
## UNDER THE LAWS OF THE STATE OF NEW YORK

374.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

375.   Defendants owed Plaintiffs duties to exercise care in performing their police duties, including in operating the LRAD.

376.    Defendants breached those duties and jointly, severally, and negligently caused injuries, and damage to the Plaintiffs.

377.   The acts and conduct of the officer-defendants were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

378.   The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

379.   As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**SEVENTH CLAIM FOR RELIEF**
**CONSTITUTIONAL TORTS**
**UNDER THE CONSTITUTION OF THE STATE OF NEW YORK**

380.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

381.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 8, 9, 11, and 12 of the New York State Constitution.

382.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

383.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**EIGHTH CLAIM FOR RELIEF**
**NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION & TRAINING**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

384.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

385.    Upon information and belief, Defendant City negligently hired, screened, retained, supervised, and trained the police officials described above.

386.    The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

387.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or

invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

388.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

## JURY DEMAND

389.    Plaintiffs demand a trial by jury in this action on each and every one of their damage claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Compensatory damages against the Defendants jointly and severally; and

B.    Punitive damages against the individual Defendants; and

C.    Attorney's fees and costs pursuant to 42 USC § 1988; and

D.    Such other and further relief as the Court deems just and proper.


Dated:        New York, New York
              March 3, 2016

                              Respectfully submitted,


                              _____
                              Gideon Orion Oliver
                              277 Broadway, Suite 1501
                              New York, NY  10007
                              (646) 263-3495


                              _____
                              Elena L. Cohen
                              365 Fifth Avenue, Room 5202
                              New York, NY  10016
                              (203) 541-0617