UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ANIKA EDREI, SHAY HORSE, JAMES CRAVEN,
KEEGAN STEPHAN, MICHAEL NUSBAUM, and
ALEXANDER APPEL,

                                  Plaintiffs,

                -v-

THE CITY OF NEW YORK, New York City Police
Department ("NYPD") Commissioner WILLIAM
BRATTON, LIEUTENANT JOHN MAGUIRE and
OFFICER MIKE POLETTO, Shield No. 3762, in their
individual and official capacities,

                                  Defendants.
-------------------------------------------------------------------x

**FIRST AMENDED
COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**16-cv-01652 (RWS)**

**ECF CASE**

      Plaintiffs ANIKA EDREI, SHAY HORSE, JAMES CRAVEN, KEEGAN STEPHAN

MICHAEL NUSBAUM, and ALEXANDER APPEL, through their attorneys GIDEON ORION

OLIVER and ELENA L. COHEN, as and for their First Amended Complaint in this matter, do

hereby state and allege:

**PRELIMINARY STATEMENT**

      1.     On December 4 and 5, 2014, Plaintiffs were each participating in, observing, or

otherwise documenting protests and police responses in the wake of the Staten Island grand

jury's decision not to indict New York City Police Department ("NYPD") Officer Daniel

Pantaleo in connection with the death of Eric Garner when Defendants NYPD LIEUTENANT

JOHN MAGUIRE and NYPD OFFICER MIKE POLETTO, Shield No. 3762 - officers from

what was then called the NYPD's Disorder Control Unit ("DCU") – injured them by firing an

LRAD Corporation-manufactured 100X Model Long Range Acoustic Device ("LRAD") in the

vicinity of 57th Street around Madison Avenue and in nearby New York City streets.

2.      This is a combined civil rights and New York State law action brought to vindicate Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, the attendant provisions of the New York State Constitution, including, but not limited to, Article I, §§ 8, 9, 11 and 12 thereof, and New York State common laws. Plaintiffs seek also seek declaratory and injunctive relief related to NYPD LRAD uses. Plaintiffs also seek an award of compensatory and punitive damages as well as attorneys' fees.

3.      LRADs of the sort at issue in this lawsuit were first developed as a sound weapon designed for military applications in the wake of the 2000 attack on the USS *Cole* in Yemen.

4.      An LRAD is more a sound weapon than a traditional loudspeaker or megaphone. A traditional loudspeaker or megaphone, including the familiar police megaphone typically used by the NYPD in connection with crowd control, amplifies sound by use of a diaphragm. In contrast, the LRAD technology uses piezoelectric transducers to concentrate - and direct - acoustic energy.

5.      According to a Product Guide provided by the self-described "global leader in long range acoustic hailing devices," LRAD Corporation, "the Long Range Acoustic Device® (LRAD) produces a concentrated 30 [degree] beam of sound to broadcast highly intelligible voice messages (live or pre-recorded) and powerful alarm tones over large distances."

6.      According to an Amnesty International report issued in 2014:

LRADs emit high volume sounds at various frequencies, with some ability to target the sound to particular areas. Used at close range, loud volume and/or excessive lengths of time, LRADs can pose serious health risks which range from temporary pain, loss of balance and eardrum rupture, to permanent hearing

damage. LRADs also target people relatively indiscriminately, and can have markedly different effects on different individuals and in different environments.[1]

7.     According to the NYPD's own DCU in January of 2010:

Sound travels in waves, and generally spreads in all directions from a source, in the form of a wave front…. The LRAD…focuses the sound waves in a specific direction. While the sound being emitted from in front of the LRAD may be very loud, it is substantially quieter outside the "cone" of sound produced by the device. In fact, someone could stand next to the device or just behind it and hear the noise being emitted at much lower levels than someone standing several hundred feet away, but within the "cone" of sound being emitted. [2]

8.     According to the manufacturer, in ideal conditions, sound amplified by the LRAD is directed in a 30-to-45-degree, cone-shaped beam emitting from the front of the LRAD.[3]

9.     LRADs are immensely loud: As an "emergency mass notification" solution, the manufacturer's materials boast that "LRAD systems blow away bullhorns by being 20-35 dB louder and allowing law enforcement personnel to quickly communicate instructions and directions to large groups. LRAD can be heard clearly through buildings or moving vehicles…"[4]

10.     Also according to the manufacturer, "LRAD broadcasts have been optimized to the 1 – 5 kHz range where human hearing is most sensitive."[5]

11.     According to the DCU:

---

[1]     "On the Streets of America: Human Rights Abuses in Ferguson," AMNESTY INTERNATIONAL REPORT, October 24, 2014, *available at* http://www.amnestyusa.org/research/reports/on-the-streets-of-america-human-rights-abuses-in-ferguson?page=show ("Amnesty International Ferguson Report") (last accessed March 2, 2016).

[2]     *See* January 2010 NYPD Special Operations Division Disorder Control Unit "Briefing on the LRAD (Long Range Acoustical Device)" ("DCU LRAD Briefing") at p. 3. A true copy of the DCU LRAD Briefing is annexed hereto as Exhibit A.

[3]     *See, e.g.,* LRAD 100X Datasheet; description of LRAD 100X on LRAD Corporations website, *available at* http://www.lradx.com/site/content/view/207/110/ (last accessed December 2014).

[4]     *Id*.

[5]     Roger Cook, "LRAD Bridges the Communication Gap in Civil Emergency Situations," LRAD CORPORATION WHITE PAPER  (May 2011), at p. 3.

3

Although it can be thought of as a 'loudspeaker', [the LRAD] actually works differently and may also be used as an 'area denial' device for crowd control management purposes. . . . In addition to having "loudspeaker" capabilities, the device can also be used, in a special mode, to propel piercing sound at higher levels (as measured in decibels) than are considered safe to human ears. In this dangerous range (above 120 decibels), the device can cause damage to someone's hearing and may be painful. It is this technology that device was designed for a USS Cole attack-type scenario. If mounted aboard a Navy ship, the device's loudspeaker could be used to "warn off" boats that come too close. If those warnings are ignored, the device could be used to send out sound at a dangerously high level causing attackers to turn away, or at least, to cause pain/hearing damage to try to repel the attack.[6]

12.     According to one of the manufacturer's statements in marketing the LRAD as a

crowd control device to law enforcement:

When LRAD's deterrent tone is used at close range, protesters sense audible discomfort, cover their ears and move away. Just the act of covering ears with hands reduces the sound pressure level (SPL) by approximately 25dB and could prevent protestors from throwing projectiles. LRAD can be quickly modulated in response to protesters actions by controlling the audio output through a prominently positioned volume control knob. Law enforcement agencies with concerns about the deterrent tone and [sic] can easily disable this option."[7]

13.     The same marketing document employs the below diagram to illustrate an LRAD

blasting waves of "intense communication" over a 2-3 block area of Times Square, and "clear

communication" from around 41st Street to beyond 54th Street:



---

[6]     *See* DCU LRAD Briefing at p. 2.

[7]     "Law Enforcement Solutions: Saving Lives Through Clear Communication," LRAD CORPORATION (Jan. 8, 2014).

14.     As seen below, on December 5, 2014, Defendants Maguire and Poletto utilized the LRAD as a weapon against Plaintiffs and others by operating it as if it were a megaphone at unsafe distances and volumes, and by repeatedly firing its so-called "deterrent" tone at unsafe distances and volumes from distances as close as, or closer than, a car width away from Plaintiffs and others targeted or caught in its beam.

15.     Those gratuitous and unlawful uses of force and authority against Plaintiffs physically controlled Plaintiffs' movements and also caused Plaintiffs to endure physical and other injuries, including deprivations of their rights to free speech, assembly, expression, and to gather and disseminate information freely, as well as their free press rights.

16.     Additionally, Defendants City and Bratton failed properly to train and/or supervise Defendants Maguire and Poletto in connection with deploying and using the LRAD.

17.     Beyond that, although Defendants City and Bratton knew specifically that Plaintiffs had been injured by Defendants as early as December of 2014, they ratified and endorsed Defendants' conduct.

18.     Further, since learning of Plaintiffs' injuries, Defendants City and Bratton have failed to develop policies and practices governing the safe use of LRADs and failed to train and supervise NYPD officers in the use of LRADs.

19.     On December 12, 2014, within days of the December 5, 2014 LRAD firings that injured Plaintiffs, counsel wrote Defendant Bratton a nine-page letter along with a request under the Freedom of Information Law, a true copy of which is annexed hereto as Exhibit B, including detailed complaints about the December 5, 2014 LRAD uses, and calling on Defendant Bratton to direct officers under his command

> to refrain from using the LRAD for crowd control purposes until thorough, independent testing and review has been conducted; appropriate, written

guidelines regarding the use of LRADs, including their use as force tools and their use for crowd control purposes, are promulgated and made public; members of the service authorized to operate LRADs are adequately trained in them; and there are adequate use of force reporting requirements in place to document the circumstances under which the Department's LRADs are utilized.

20.     Defendant Bratton did not respond to the letter directly.

21.     However, as reported by Colin Moynihan in *The New York Times* on December 12, 2014,

A spokesman for the Police Department said that officer training in the use of the devices addresses intensity of sound, duration and distance. 'On December 4th all of these factors were controlled at levels that are not considered dangerous or harmful,' the spokesman said, adding that the device has only been used to advise people of illegal conduct.[8]

22.     To the contrary, as seen below, the LRAD was used for pain compliance and other purposes against Plaintiffs on December 5, 2014.

23.     Additionally, Defendants Maguire and Poletto used the LRAD to seize Plaintiffs and assault them with unreasonably loud sound waves from unreasonably close distances and/or for unreasonably long periods of time.

24.     Defendants Maguire and Poletto fired the LRAD almost continuously while directing its area of effect cone at Plaintiffs within ten feet, even turning to angle the cone toward Plaintiffs and others who were only a car width away.

25.     By way of further example, the image below shows the "LRAD 100X Operation Zones" as depicted on the back of an LRAD 100X, including a red "beam" graphic extending in a 30' cone from the front of the LRAD labeled "DO NOT ENTER WITHIN 10 METERS DURING CONTINUOUS OPERATION" and a yellow graphic indicating an approximately

---

[8]     Colin Moynihan, *Concerns Raised Over Shrill Device New York Police Used During Garner Protests,* NEW YORK TIMES, December 12, 2014, *available at* http://www.nytimes.com/2014/12/13/nyregion/lawyers-raise-concerns-over-shrill-device-used-by-police-during-garner-protests.html (last visited March 3, 2016).

three-foot area around the LRAD in which persons are cautioned not to enter "without hearing

protection."



26.    Thus, as seen below, Defendants Maguire and Poletto not only violated Plaintiffs'

rights and injured them – Defendants Bratton and City are also liable for those violations and

injuries, including because Defendant Bratton ratified Defendants' Maguire's and Poletto's

misconduct.

27.    In March of 2016, Physicians for Human Rights ("PHR") and the International

Network of Civil Liberties Organizations ("INCLO") – a group of "11 independent, national

human right organisations working to promote fundamental rights and freedoms by supporting

and mutually reinforcing the work of the member organisations working in their respective

countries" including "the American Civil Liberties Union" and organizations from Canada,

Argentina, Egypt, India, Ireland, and other countries – published "Lethal in Disguise: The Health

Consequences of Crowd-Control Weapons"[9], including a chapter on "acoustic weapons"

focusing on LRADs, at pp. 71-77.

---

[9]    "Lethal in Disguise: The Health Consequences of Crowd-Control Weapons," PHYSICIANS
FOR HUMAN RIGHTS AND THE INTERNATIONAL NETWORK OF CIVIL LIBERTIES ORGANIZATIONS
REPORT , March 2016, *available at* https://www.aclu.org/report/lethal-disguise-health-
consequences-crowd-control-weapons ("PHR/INCL Report") (last accessed July 29, 2016).

28.     Two of the four documented uses of LRADs discussed in the PHR/INCLO Report were by the NYPD, and the last uses of LRAD force discussed are the December 5, 2014 LRAD uses at issue in this lawsuit. *See* PHR/INCLO Report at p. 74.

29.     The PHR/INCLO Report notes:

Sales of LRADs to U.S. police departments have grown since the wave of Black Lives Matter protests around the United States protesting police killing s of African-Americans, raising concerns that the inappropriate deployment of LRADs against protesters will only increase.

*Id*.

30.     As to the Health Effects, the PHR/INCLO Report finds:

Sound cannons are used to emit painful, loud sounds that have the potential to cause significant harm to the eardrums and delicate organs of the ears and/or cause hearing loss. Use of earplugs or firmly blocking the ears with hands can decrease the sound by 20 – 30 dB, but this may not be enough to avoid significant injury. Manufacturer guidelines indicate that sound cannons should only be used from at least a 10 – 20 metre distance. Significantly, there is a risk of injury to law enforcement officers, particularly those operating the device, who are advised to wear ear protection. In addition to auditory effects, acoustic weapons may also injure internal membranes (infrasonic devices).

There is little medical literature on the effects of acoustic weapons on people. Some literature notes that acoustic weapons were first developed by the military and any early evaluations of their health effects are biased and, in some cases, have unclear findings. The weapons can be indiscriminate, causing harm or pain to protesters, bystanders, and law enforcement, despite the narrow beam in which sound is concentrated. The sound is designed to be controlled by police officers, who can alter the frequency, level, quality, and length of the alarm. Abuse or lack of operator knowledge about the health effects can easily lead to incorrect use of the weapon and exacerbate injuries. Serious questions remain about the safety and efficacy of acoustic weapons in crowd-control contexts.

*Id*. at p. 76.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

32.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

33.     The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiffs the declaratory relief they pray for herein.

34.     Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant Plaintiffs the injunctive relief they pray for herein.

35.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that the Plaintiffs' claims arose in the County of New York in the State of New York, within the confines of this judicial district.

36.     Pursuant to New York State General Municipal Law ("GML") § 50-e, Plaintiffs EDREI, STEPHAN, CRAVEN, HORSE, and NUSBAUM[10] filed timely Notices of Claim with the New York City Comptroller on or about March 4, 2015, within 90 days of the events herein complained of.

37.     Their claims were not adjusted by the New York City Comptroller's Office within the period of time provided by the GML.

---

[10]     Plaintiff Nusbaum filed a Notice of Claim on March 6, 2015. By letter dated March 19, 2015, the Comptroller disallowed the claim on the basis that the Notice of Claim had been submitted one day past the 90-day deadline. On March 3, 2016, Plaintiff Nusbaum initiated a proceeding seeking leave to file a Notice of Claim out of time, including on the basis that the Comptroller had actual notice of his claim by virtue of the other five Notices of Claim that were timely filed on March 4, 2015 and the letter sent to the New York Police Department on December 12, 2014, Index number 151826/2016.  On June 16, 2016, the Court granted the Petition in its entirety without opposition and dismissed the proceeding based on a So Order Stipulation dated June 15, 2016 deeming the Notice of Claim served and filed *nunc pro tunc*.

38.     Thus, this Court has supplemental jurisdiction over Plaintiffs' claims[11] under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

39.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

40.     Plaintiff ANIKA EDREI was at all times relevant to this action a resident of the County of Kings in the State of New York.

41.     Plaintiff SHAY HORSE was at all times relevant to this action a resident of the County of Kings in the State of New York.

42.     Plaintiff JAMES CRAVEN was at all times relevant to this action a resident of the County of Queens in the State of New York.

43.     Plaintiff KEEGAN STEPHAN was at all times relevant to this action a resident of the County of Queens in the State of New York.

44.     Plaintiff MICHAEL NUSBAUM was at all times relevant to this action a resident of Easthampton, Massachusetts.

45.     Plaintiff ALEXANDER APPEL was at all times relevant to this action a resident of the County of New York in the State of New York.

46.     Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force

---

[11]     As Plaintiff Appel did not file a Notice of Claim, Plaintiff Appel is not asserting any state law-based claims.

and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

47.     Defendant WILLIAM BRATTON was the NYPD's Police Commissioner at all times relevant herein, and as such was personally involved in developing and/or implementing and/or ratifying the unconstitutional policies, practices, customs and/or conduct complained of herein. Defendant Bratton was at all time relevant herein the highest ranking duly appointed and acting supervisory officer within the NYPD, ultimately responsible as a policymaker and supervisor for the training, retention, supervision, discipline, and control of subordinate members of the NYPD.

48.     At all times relevant herein, Defendants NYPD LIEUTENANT JOHN MAGUIRE and POLICE OFFICER MIKE POLETTO, Shield No. 3762, referred to collectively as the "officer-defendants", were officers, employees, and agents of the NYPD and who were personally involved in depriving Plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

49.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

50.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants acting within the scope of their employment by the Defendant City.

51.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting in furtherance of their employment by the Defendant City.

52.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

53.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

54.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

55.     Each individual Defendant is sued in her or his individual and official capacities.

56.     At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

### THE NYPD AND LRADS – 2004 THROUGH 2014

57.     Upon information and belief, the NYPD purchased two LRAD Model 3300 devices in 2004, in advance of the Republican National Convention ("RNC") in New York City in August of 2004.

58.     Upon information and belief, those LRADs were "among the first devices sold to law enforcement."[12]

59.     Then-NYPD spokesman Paul Browne cited two possible uses for LRADs to the Associated Press ("AP") in 2004: "directing crowds to safety following a terrorist attack or other calamity, and reminding protesters where they're allowed to march and rally."[13]

60.     Upon information and belief, prior to purchasing those LRADs, the NYPD did not engage in appropriate research into whether the LRADs could be used safely, for crowd control purposes or otherwise.

61.     For example, upon information and belief, the NYPD did not engage in research beyond obtaining materials from the manufacturer designed to sell LRADs.

62.     The DCU conducted tests utilizing those LRADs in 2004 but as of 2010 the results of those tests were "unavailable."[14]

63.     According to the AP, the Department "insist[ed that] the [warning tone] feature [would not] be used at the convention" and then-DCU Commander Thomas Graham guaranteed the public that the LRAD was "only to communicate in large crowds.[15]

64.     According to the NYPD itself, the NYPD only used the LRAD in connection with the 2004 RNC "sporadically…as loudspeakers." Also according to the NYPD, "[b]oth devices were used sporadically in Manhattan at protests outside of the convention site (Madison Square Garden), including those in the Union Square area . . . as a loudspeaker to make announcements

---

[12]     DCU LRAD Briefing at p. 8.
[13]     Tom Hays, "Authorities to Turn up the Volume for GOP Convention: A 150-decibel Megaphone," ASSOCIATED PRESS (Aug. 19, 2004).
[14]     DCU LRAD Briefing at p. 4.
[15]     *Id*.

to the crowd of protesters, with mixed results."[16]

65.     Neither Plaintiffs nor counsel are aware of uses of the LRAD by the NYPD

between 2004 and around September or later in 2011.

66.     Nevertheless, during that time period between 2014 and before around September

or later in 2011, the NYPD policed thousands of First Amendment assemblies involving street

and sidewalk marches.

67.     Plaintiffs and counsel are only aware of a few incidents in which the NYPD

deployed LRADs between 2011 and November of 2014.

68.     All were in connection with protests, and most were in connection with protests

against police brutality.

69.     For example, upon information and belief, the NYPD did not deploy LRADs to

use in communicating with New Yorkers in the wake of or in connection with recovery efforts

related to Hurricane Sandy.

70.     LRADs have frequently been deployed by the NYPD beginning since around late

2014, for example in connection with police responses to protests over the NYPD killing of Akai

Gurley.

71.     Upon information and belief, LRADs were first deployed regularly by the NYPD

in connection with the protests against police brutality that had begun just days before in the

aftermath of the November 24, 2014 announcement that the Ferguson, Missouri grand jury

considering charges against Darren Wilson, the law enforcement officer who shot and killed

Mike Brown, had voted no true bill, and which resurged in the wake of the Staten Island grand

jury's failure to indict NYPD Officer Daniel Pantaleo on December 3, 2014.

---

[16]     DCU LRAD Briefing at p. 2.

72.     Since December of 2014, the NYPD routinely deploys and uses LRADs in connection with perceived protests, demonstrations, and other assemblies.

73.     As reflected in the DCU LRAD Briefing, the DCU tested its two LRAD Model 3300 devices – the ones it had bought in advance of the 2004 RNC - in 2010 "in an empty parking lot at Orchard Beach, in the Bronx." [17]

74.     The DCU conducted two tests: The first with the power/audio "turned to level just below Maximum, using spoken voice commands" and the second with the power/audio "turned to maximum, using noise bursts." [18]

75.     The tests revealed as follows:

**Test #1 – Just below maximum, spoken voice commands**

102 dB at 320 feet
78 dB at 640 feet
64 dB at 800 feet

**Test #2 – Maximum, noise bursts**

110 dB at 320 feet
90 dB at 640 feet
68 dB at 800 feet

76.     A DCU chart of "examples of sound levels in comparison" notes that 110 dB is around as loud as a power saw. [19]

77.     The DCU did not take *any* readings within 320 feet of the front of the LRAD device for *either* test, calling that zone a "potential danger area" and labeling it "not tested." [20]

---

[17]     *Id.* at pp. 4-6.
[18]     *Id.* at pp. 5-6.
[19]     *Id.* at p. 3.
[20]     *Id.*



78.     At some point after 2010 and before November of 2011, the NYPD purchased at least one LRAD 100x – the type of device used to injure Plaintiffs.

79.     Upon information and belief, the NYPD did not conduct testing of LRAD 100x's prior to December 5, 2014.

80.     The LRAD 100x manufacturer's product sheet specifically boasts that it can provide "powerful, intelligible communication up to 600 meters" with a maximum continuous output of 136 dB at 1 meter, A-weighted, and the capacity to overcome 88dB of background noise at 250 meters, which is "10-20 decibels . . . louder than the most competitive megaphones [and] four to six times louder [than] . . . [s]ystems of comparable size and power."[21]

---

[21]     LRAD 100X Product Sheet (downloaded from LRAD website in December of 2014).

81.     "The level of sound produced by these devices exceeds both the threshold for human discomfort (between 85 and 95 dB) and the normal human pain threshold (between 120 and 140 dB)."[22]

82.     According to the National Institute for Occupational Safety and Health, "exposures [greater than] 85 dB may cause hearing loss."[23]

83.     According to the National Institute on Deafness and Other Communication Disorders, "any sound over 90 dB can damage a person's hearing. So the LRAD can threaten the hearing of anyone in its path, regardless of whether there is any wrongdoing, even when used only for communication."[24]

84.     Against that backdrop,

> The possible health risks are magnified due to the fact that the LRAD is a large-scale device, targeting a large population rather than specific individuals. Pain tolerance varies among the population, and certain groups – including children – are more vulnerable to hearing loss. Moreover, individuals within large crowds may be unable to move out of the LRAD's range due to physical disability or the sheer volume of people in a given area. The indiscriminate nature of this device does not allow the police to accommodate and respond to individuals' differing reactions, increasing the possibility that at-risk populations will be hurt.[25]

85.     In 2009, the Pittsburgh Police Department deployed LRAD's in connection with policing protests in response to the 2009 G20 Summit.

86.     The DCU LRAD Briefing says that LRADs were used "successfully" by the Pittsburgh Police Department in connection with policing the 2009 G20. [26]

---

[22]     Letter of Canadian Civil Liberties Association to Chief of Police William Blair, dated June 1, 2010 ("CCLA Letter"), at p. 3.

[23]     *See* http://www.cdc.gov/niosh/topics/noise/noisemeter.html (last visited March 2, 2016).

[24]     Tracy V. Wilson, "How LRAD Works," http://Science.howstuffworks.com/lrad4.htm (citing http://www.nidcd.nih.gov/health/hearing/pages/noise.aspx) (cited in DCU LRAD Briefing) (last visited March 2, 2016)).

[25]     CCLA Letter at p. 3.

[26]     *See* DCU LRAD Briefing at p. 2.

87.     So do the LRAD's manufacturing materials, which include the following

quotation from a Pittsburgh law enforcement official: "'Every police officer I talked to thought it

worked famously, the bottom line is we could maintain order with the protesters without hurting

them.'"[27]

88.     However, immediately after the G20, the American Tinnitus Association, the

National Institute of Health, and the National Institute on Deafness and Other Communication

Disorders, reportedly disagreed.

89.     For example, *The Washington Times* reported that the American Tinnitus

Association said that protesters had been "'acoustically assaulted' with sound" at volumes that

could cause 'tinnitus and hearing damage immediately.'" *The Washington Times* also reported:

"The National Institutes of Health (NIH) has said permanent hearing loss can result from sounds

at about 110 to 120 decibels in short bursts or at 75 decibels with long periods of exposure. The

National Institute on Deafness and Other Communication Disorders said regular exposure of

more than one minute of 110 decibels can result in permanent hearing loss."[28]

90.     Additionally, in September of 2011, the American Civil Liberties Union of

Pittsburgh sued on behalf of Plaintiff Karen L. Piper, a visiting professor at Carnegie Mellon

University who suffered permanent hearing loss, nausea, pain and disorientation on September

24, 2009 when the LRAD was fired at protesters by the City of Pittsburgh and its agents. *See*

*Karen Piper v. City of Pittsburgh, et al.,* 11-cv-01215 (JFC)(MPK) (USDC, Western District of

Pennsylvania).

---

[27]     "Law Enforcement Solutions: Saving Lives Through Clear Communication," *LRAD Corporation* (Jan. 8, 2014).

[28]     "DHS helps local police buy military-style sonic devices," THE WASHINGTON TIMES, October 1, 2009. Available at http://www.washingtontimes.com/news/2009/oct/1/police-buy-sonic-device-to-subdue-unruly-crowds/?page=all (last visited March 3, 2016).

91.     According to the ACLU and the *Piper* Complaint:

After the protest began, Piper walked on the sidewalk a short distance from the marching protesters, in the company of other curiosity seekers and journalists. When Piper became concerned about rapidly increasing police activity, she tried to leave the area. As she was walking away, police officers activated, suddenly and without warning, an LRAD a short distance away from her. It emitted a continuous piercing sound lasting several minutes.

Piper immediately suffered intense pain as mucus discharged from her ears. She became nauseous and dizzy and developed a severe headache. Since then, Piper has suffered from tinnitus (ringing of the ears), barotrauma, left ear pain and fluid drainage, dizziness, and nausea.[29]

92.     Ms. Piper won a $72,000 monetary settlement in that lawsuit in 2012 as well as an agreement from the City to develop "a policy governing LRAD deployment to ensure its careful and controlled use."[30]

93.     As articulated by the Canadian Civil Liberties Association ("CCLA") in a letter written to Canadian government officials in advance of potential Canadian LRAD use to police anticipated mass protests in connection with the G8 and G20 in 2010:

The introduction of any new weapon into police arsenals requires a process of objective scientific research into the short-term and long-term physical effects of the weapon's use, consultation with the public who are the potential targets of such weapons, and policy debates. Reliance on research by the manufacturer is insufficient. . . .

Simply put, new weapons such as the LRAD should not be employed without prior independent assessment and study. Protocols regarding deployment and use should be developed with reference to independent science, not on the basis of manufacturer's claims and should incorporate public consultation and participation. Finally, comprehensive reporting, monitoring and oversight mechanisms must be established to account for how any approved weapons are actually used in the field.[31]

---

[29]     *See Piper* Complaint; ACLU of Pennsylvania website - http://www.aclupa.org/our-work/legal/legaldocket/piper-v-city-pittsburgh-et-al/ (last visited March 3, 2016).
[30]     *See* ACLU of Pennsylvania website - http://www.aclupa.org/news/2012/11/14/city-pittsburgh-settles-g-20-lawsuits (last visited March 3, 2016).
[31]     CCLA Letter at p. 3.

94.     Upon information and belief, although the NYPD had been using LRADs in connection with policing demonstrations since 2004, at no time prior to September of 2012 did the NYPD develop or train its officers who were charged with using LRADs in policies, directives, manuals, or memoranda related to the proper use or operation of LRADs, how LRAD uses related to established NYPD use of force protocols, when the use of the LRAD's "deterrent" tone was appropriate, and at what volumes, distances, and frequencies, or anything else at all related to LRADs.

95.     One basis for that information and belief is that, in 2011, Plaintiff Keegan Stephan and another person filed a Freedom of Information Law ("FOIL") request with the NYPD seeking, *inter alia*, records related to any policies whatsoever related to LRAD operation and use, and the NYPD eventually averred that its diligent searches had uncovered no such policies.

96.     The only documents the NYPD located related to LRADs or NYPD use of LRADs in its possession *at all* as of 2012 were seventeen pages of news clippings and marketing materials from the manufacturer and the eight-page DCU "Briefing on the LRAD" dated January of 2010.

97.     Therefore, as of at least 2012, the NYPD had no written policies or training materials related to LRAD use.

98.     Additionally, since this litigation was initially commenced, there has been a final determination and response from the NYPD on the FOIL submitted in December of 2014 related to NYPD LRAD uses between 2012 and 2014, in connection with which the NYPD disclosed only the same materials, which it had previously disclosed in 2012, along with copies of then-

active version of the NYPD's Patrol Guide provision regarding Use of Force, PG 203-11, which does not account for LRAD use.

99.     Moreover, in "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD")[32], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

   a.  NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

   b.  NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

   c.  NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

   d.  NYPD training does not adequately focus on de-escalation; and

   e.  In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force.

OIG-NYPD Report at pp. 3-5.

100.     After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents". *See*

---

[32]     "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed July 29, 2016).

OIG-NYPD Report at p. 2 *et seq.*; *see also* NYPD Patrol Guide Section 221-01[33] ("Force Guidelines") and 221-02[34] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

101.    Significantly, none of those changes to the NYPD's use of force written guidelines address LRAD uses as uses of force.

102.    For example, according to a June 2016 "Use of Force: Revised NYPD Policy" NYPD training document[35], the "New Levels of Force" enshrined in NYPD Patrol Guide provision 221-03 ("New Levels of Force") describe the following levels of force:

**LEVEL 1: Physical Force/Less Lethal Device**

   a.   Hand strikes
   b.   Foot strikes
   c.   Forcible take-downs
   d.   Wrestling subject to the ground
   e.   Use of OC spray (PG 221-07)
   f.   Use of a Conducted Electrical Weapon (CEW) in cartridge mode (PG 221-08)
   g.   Use of a mesh restraining blanket

**LEVEL 2: Use of Impact Weapon/Canine/Less Lethal Device**

   a.   Use of Conducted Energy Weapon in drive stun mode (PG 221-08)
   b.   Impact weapon
   c.   Police canine bite

**LEVEL 3: Deadly physical force**

---

[33]    Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.
[34]    Available online via the CCRB website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.
[35]    "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed July 29, 2016) (footnotes omitted).

    a.   Firearms discharge (PG 221-04)
    b.   Physical force readily capable of causing death or serious physical injury

103.    Therefore, upon information and belief, the NYPD recently changed its use of force written guidelines, practices, and training, to cover everything from "use of a mesh restraining blanket" to "wrestling subject to the ground" – but not LRAD uses.

104.    Although Defendants Bratton and City knew or should have known as early as 2004 that the LRADs they purchased in 2004 were dangerous weapons, they have not conducted adequate studies in connection with LRAD uses, have not developed and trained officers in appropriate, written protocols regarding LRAD deployment and use, and have not established appropriate reporting, monitoring, and oversight mechanisms, since then.

105.    Since some time after December of 2014, Defendants Bratton and City have been deploying LRADs routinely at demonstrations. For example, NYPD officers assigned to the Department's "Strategic Response Group" – a division of the NYPD created by Defendants Bratton and City in 2015 that has replaced the DCU and been a constant presence at protests since 2015 – frequently brandish and/or have used LRADs at protests.

106.    The increased frequency of these LRAD deployments and threatened uses - at least with respect to protests against police brutality - coupled with Plaintiffs' experiences, and the proof that the Department had no written policies or practices regarding LRAD use as of September 2012, though LRADs were deployed by the Department in connection with crowd control between 2004 and September of 2012, show that Defendants' policies, practices, and customs with respect to LRAD deployment and use and related lack of training, monitoring, and oversight were the motivating forces behind the Department's LRAD uses against Plaintiffs on December 5, 2014, and the resulting injuries.

## THE DECEMBER 4-5, 2014 ERIC GARNER GRAND JURY PROTESTS

107.    On December 3, 2014, news broke that a Staten Island grand jury had declined to indict the NYPD officer involved in the death of Eric Garner.

108.    On December 4, 2014, hundreds protested in New York City, on the streets of Manhattan, in other boroughs, elsewhere in the country, and internationally.

109.    On December 4-5, 2014, as described more fully below, Plaintiffs were each protesters, observers, photojournalists, or filmmakers who were participating in, observing, or documenting the protests and police responses when they were assaulted by Defendants Maguire and Poletto utilizing an LRAD.

110.    For the first few hours of the evening protests in which Plaintiffs participated or which Plaintiffs observed or documented, NYPD officers escorted and facilitated the protests.

111.    At some time after 1:00 am, NYPD officers made arrests in the intersection of 57th Street and Madison Avenue in Manhattan.

112.    For example, three to four officers cooperated to pin a person to the ground, including with a knee in the back, who was not apparently resisting them.

113.    Some Plaintiffs, and others, gathered to observe, document, and otherwise respond to those police actions, for example by protesting verbally.

114.    They did not interfere with or threaten the ongoing arrest activity.

115.    Some unidentified person or persons – not Plaintiffs – then apparently threw some objects, possibly glass bottles, toward the scene.

116.    The objects did not strike or injure anyone.

117.    At around the same time, without warning, an NYPD officer or NYPD officers at the scene deployed pepper spray.

118.    In response, Plaintiffs and many other non-NYPD officers present began to run away and otherwise flee from the police, including by moving on 57th Street between Madison and Park Avenues.

119.    Defendant Maguire and Poletto were holding and jointly operating a LRAD at the scene.

120.    Within moments, Defendants Maguire and Poletto began to fire the "deterrent" tone of the LRAD in the direction of the people who were already fleeing on 57th Street.

121.    As they operated the LRAD on 57th Street, Defendants Maguire and Poletto were themselves in the roadway on 57th Street, obstructing the flow of vehicular traffic along with many other NYPD officers who were also present and in the roadways in the intersection of 57th Street and Madison Avenue and nearby.

122.    At the same time as they repeatedly fired the "deterrent" tone, Defendants Maguire and Poletto also used the LRAD to broadcast messages identifying themselves as NYPD and directing people to get or stay on the sidewalk and out of the street or they would be placed in custody.

123.    The use of the "deterrent" tone at the same time as the broadcast feature made it difficult or impossible to hear and/or comply with the police directions.

124.    The messages were at times conflicting and/or difficult to understand, including because at least many of the people they were directed at were already fleeing on the sidewalks and/or because the police themselves were blocking traffic in the streets.

125.    In the just under three minutes it took Defendants Maguire and Poletto to walk the length of 57th Street between Madison and Park Avenues, they fired the LRAD "deterrent" tone

between fifteen or twenty times – almost continuously – as they walked in the roadway, blocking traffic.

126.    As described more fully below, Plaintiffs were each seized and injured by Defendants Maguire and Poletto on 57th Street between Madison and Park Avenues when Defendants fired the LRAD at them.

127.    When Defendants Maguire and Poletto fired the LRAD at Plaintiffs, Plaintiffs were lawfully and properly exercising their rights and privileges to be on or around the streets and sidewalks of the City of New York, to associate, to assemble, to express themselves, and to gather and disseminate information freely, as well as their free press rights.

128.    When Defendants Maguire and Poletto fired the LRAD at Plaintiffs and others, those uses of force terminated or severely limited Plaintiffs' freedom of movement through pain compliance and threat of permanent injury.

129.    When Defendants Maguire and Poletto fired the LRAD at Plaintiffs and others, those uses of the LRAD terminated or severely limited Plaintiffs' freedoms to move, assemble, associate, receive and communicate ideas, and otherwise express themselves.

130.    When Defendants Maguire and Poletto fired the LRAD at Plaintiffs and others, they knew or should have known that the use of the LRAD could cause permanent hearing damage and other injury.

131.    At certain points during the just under three minutes that Defendants Maguire and Poletto were firing the LRAD on 57th Street, they were fewer than ten feet away from Plaintiffs, protesters, and innocent bystanders, angling the LRAD directly at them.

132.     When Defendants Maguire and Poletto fired the LRAD at Plaintiffs and others, they knew or should have known that the use of the LRAD at such close ranges would be likely to cause permanent hearing damage and other injury.

133.     As seen above, Defendants Bratton and City have ratified Defendant Maguire's and Poletto's uses of force in deploying the LRAD against Plaintiffs.

134.     Each Plaintiff is reluctant to participate in and/or engage in documenting future protests, demonstrations, and other, similar events for fear of further injuries inflicted by NYPD LRAD uses.

### PLAINTIFF ANIKA EDREI

135.     On December 5, 2014, Plaintiff ANIKA EDREI was a twenty-year-old photojournalist and photographer enrolled in a one-year intensive certificate program in Documentary Photography and Photojournalism at the International Center of Photography in New York City.

136.     Plaintiff Edrei is known professionally in Plaintiff Edrei's photojournalism work as "Moth Dust". *See http://www.mothdust.net/.*

137.     Plaintiff Edrei's work has been published in *VICE Motherboard* & *Galore Magazine*, among others. Plaintiff Edrei's images have also been featured in festivals and galleries such as *Tipping Point, Guatephoto* and several other private shows in New York City.

138.     On the evening of December 4, 2014, Plaintiff Edrei was informed by co-plaintiff and fellow photojournalist Shay Horse that there would be protests in Manhattan related to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

139.      Plaintiff Edrei attended the protests in order to document them, as part of Plaintiff Edrei's photojournalism coursework, and in order to pitch photographs Plaintiff Edrei

might take to magazines, newspapers, and other outlets with a view toward publishing them, in the name of gathering and publishing newsworthy information, and in furtherance of Plaintiff Edrei's career goals.

140.    Plaintiff Edrei followed protests around the streets of Manhattan for several hours.

141.    The protesters were escorted and accompanied by NYPD officers for those several hours.

142.    Around or after 1 a.m. on December 5, 2014, at or around the area of 57th Street and Madison Avenue, Plaintiff Edrei saw NYPD officers arresting people.

143.    Those arrests appeared violent to Plaintiff Edrei.

144.    Plaintiff Edrei took photographs of people being placed under arrest with their faces pressed into the ground and police knees in their backs.

145.    Plaintiff Edrei was careful to position Plaintiff Edrei so that Plaintiff Edrei could get what Plaintiff Edrei believed could be newsworthy shots without interfering with the officers.

146.    Plaintiff Edrei tried to continue taking photographs, but was pushed out of view by officers.

147.    Plaintiff Edrei heard and saw several protesters verbally protest and beg police to stop violently arresting people.

148.    Plaintiff Edrei saw people gather to observe the ongoing arrests and police uses of force.

149.    Plaintiff Edrei heard a sound like glass breaking.

150.    Plainitff Edrei heard yelling and shouting.

151.    Plaintiff Edrei started running away.

152.    Plaintiff Edrei then saw other people who had been gathered near the arrests run away.

153.    From behind Plaintiff Edrei, Plaintiff Edrei then heard a sort of high-pitched, whirring siren, what Plaintiff Edrei now believes to be the "deterrent tone" of a LRAD.

154.    There was no warning that the deterrent tone of the LRAD would be used.

155.    At first, Plaintiff Edrei thought Plaintiff Edrei was hearing a very loud car alarm.

156.    Plaintiff Edrei then remembered that co-plaintiff Horse had previously told Plaintiff Edrei about an LRAD he had seen and heard deployed in Ferguson, Missouri, and Plaintiff Edrei formed the belief that Plaintiff Edrei was likely hearing the LRAD.

157.    After hearing the LRAD's deterrent tone, Plaintiff Edrei turned around and observed two NYPD officers holding the LRAD, following behind Plaintiff Edrei and others who were running or otherwise moving quickly away from the police or otherwise fleeing.

158.    Almost immediately, Plaintiff Edrei felt a surge of adrenaline and began to experience a migraine and to feel woozy.

159.    Plaintiff Edrei heard the "deterrent" tone used repeatedly, interrupted by brief pauses.

160.    Plaintiff Edrei heard some portions of an unclear and wordy directive to the effect of "Get off the street" also coming through the LRAD's speaker, at the same time the deterrent tone was firing.

161.    Plaintiff Edrei was in between parked cars on the side of the street, outside the part of the roadway reserved for cars to travel on.

162.    People were running away from the Defendants using the LRAD.

163.   Plaintiff Edrei tried to put her fingers in her ears to plug them, and to run as fast as Plaintiff Edrei could from the sound.

164.   Plaintiff Edrei was able to leave the immediate area where the police had been using LRAD.

165.   After being exposed to the LRAD, Plaintiff Edrei was very confused.

166.   Plaintiff Edrei tried to meet back up with the marches to continue documenting the night, but Plaintiff Edrei's physical condition deteriorated and prevented Plaintiff Edrei from doing that.

167.   Specifically, Plaintiff Edrei got a migraine, which then spread to Plaintiff Edrei's entire face.

168.   Plaintiff Edrei felt acute pain in Plaintiff Edrei's sinuses and overall pain across Plaintiff Edrei's face.

169.   Plaintiff Edrei felt very dizzy and had to sit down.

170.   People asked if Plaintiff Edrei was alright.

171.   Plaintiff Edrei was physically and emotionally jarred.

172.   Plaintiff Edrei felt very disoriented and wanted to go home.

173.   Plaintiff Edrei attempted to call Plaintiff Edrei's boyfriend to figure out how Plaintiff Edrei could get home, but was unable to concentrate.

174.   Eventually, someone helped Plaintiff Edrei into a taxi cab that took Plaintiff Edrei home.

175.   Plaintiff Edrei had a migraine headache for around the next week.

176.   For at least the following five days, Plaintiff Edrei noticed that Plaintiff Edrei was very sensitive to sounds and even very soft sounds hurt Plaintiff Edrei's ears.

177.   Plaintiff Edrei continued to feel woozy and to have a headache.

178.   Plaintiff Edrei felt a lot of facial pressure for around the next week.

179.   Ever since the incident, Plaintiff Edrei has been more sensitive to noise than Plaintiff Edrei was before the incident.

180.   Plaintiff Edrei feels very traumatized after having the LRAD's deterrent sound fired at Plaintiff Edrei, particularly as Plaintiff Edrei was at the scene as a member of the press.

181.   For Plaintiff Edrei, this was an act of violence committed without warning, while Plaintiff Edrei was trying to leave the scene of glass breaking as fast as Plaintiff Edrei could.

182.   Plaintiff Edrei experiences ringing in Plaintiff Edrei's ears to this day, about half of the time.

183.   The ringing in Plaintiff Edrei's ears gets worse after listening to live music.

184.   After December 5, 2014, Plaintiff Edrei pitched some of the photographs Plaintiff Edrei had taken the night of this incident to various publications, including *The Villager* and *The Shadow*.

185.   Multiple photographs taken by Plaintiff Edrei on the night of this incident were published in *VICE Motherboard*. *See* Alex Pasternack, *The New Sound of Crowd Control*, MOTHERBOARD, December 17, 2014, *available at* http://motherboard.vice.com/read/the-new-sound-of-crowd-control (last visited March 2, 2016).

186.   As part of Plaintiff Edrei's photojournalism coursework, Plaintiff Edrei uploaded photographs Plaintiff Edrei had taken that night to Plaintiff Edrei's professional photography blog.

187.   Plaintiff Edrei still works as a professional photojournalist and photographer.

188.    Plaintiff Edrei's career has been adversely affected by the injuries Plaintiff Edrei sustained on December 5, 2014.

189.    Plaintiff Edrei dream job has always been to be a photojournalist, covering protests and other heated current events.

190.    For work, among other things, Plaintiff Edrei's shoots live concerts.

191.    Plaintiff Edrei's must now bring additional ear protection when covering live concerts.

192.    Even with additional ear protection, Plaintiff Edrei experiences pain and sensitivity while carrying out these job duties.

193.    The season before December 5, 2014, Plaintiff Edrei had been photographing protests regularly, including two BlackLivesMatter protests and a few climate-related protests.

194.    After being exposed to the LRAD and the ensuing pain, ringing, and sensitivity, Plaintiff Edrei has not felt able to cover protests.

195.    Plaintiff Edrei attempted to take photographs at one protest after December 5, 2014, and had to leave early due to the emotional and physical effects of this incident.

196.    Plaintiff Edrei is afraid to go to protests, and has not been able to cover a protest since December 5, 2014, out of fear that Plaintiff Edrei will be exposed to an LRAD and will suffer further confusion, headaches, ear pain, and hearing damage.

**PLAINTIFF SHAY HORSE**

197.    On December 5, 2014, Plaintiff SHAY HORSE was a twenty-one-year-old working as a freelance photojournalist.

198.    Plaintiff Horse still works as a freelance photojournalist.

199.    Plaintiff Horse's photographs have appeared in *Al Jazeera* and *Russia Today*, in addition to other media outlets.

200.    Plaintiff Horse has travelled around the United States and to other countries to document protests and other newsworthy events.

201.    On the evening of December 4, 2015, Plaintiff Horse went to where he believed there would be protests in response to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

202.    Plaintiff Horse attended the protests in order to document aspects of the protests and police response to them, as part of his photojournalism work, and in order to pitch photographs to magazines, newspapers, and other outlets, in the name of gathering and publishing newsworthy information and so that the photographs could be published and in furtherance of his career goals.

203.    Plaintiff Horse followed protests around the streets of Manhattan for several hours.

204.    The protesters were escorted and accompanied by NYPD officers for those several hours.

205.    At around or after 1 a.m., Plaintiff Horse was attempting to walk near protesters west on 58th Street when Plaintiff Horse observed NYPD officers blocking protesters from continuing westward by forming a police line stretching across the street and sidewalks.

206.    Unable to proceed westward on 58th Street, some protesters proceeded south on 7th Avenue, and turned east on 57th Street.

207.    At some time between around 1:10 and 1:15 a.m. or after, Plaintiff Horse observed protesters proceed on 57th Street and attempt to cross the intersection of 57th Street and Madison Avenue.

208.    Plaintiff Horse then observed police officers violently arrest several people.

209.    Plaintiff Horse saw the officers with their batons out and swinging.

210.    Plaintiff Horse saw some people move toward the officers who were arresting people, and then saw the officers make additional arrests.

211.    Plaintiff Horse saw police officers discharge pepper spray toward the crowd.

212.    Plaintiff Horse saw what he believed to be glass bottles thrown toward where the police were arresting people.

213.    At that point, Plaintiff Horse was about four feet away from the people being arrested, and was trying to take photographs.

214.    Plaintiff Horse was careful to position himself so that he would not be interfering with the officers.

215.    Plaintiff Horse then heard the police yell in sum and substance for everyone to get on the sidewalk.

216.    Plaintiff Horse then heard the sound of an LRAD being activated.

217.    Plaintiff Horse did not hear a dispersal order from the police.

218.    Plaintiff Horse did not hear any warning that the LRAD would be used.

219.    Plaintiff Horse then heard the LRAD repeatedly fire its "deterrent" tone.

220.    Plaintiff Horse tried to get away from the LRAD quickly, by moving away from the police.

221.    Plaintiff Horse heard police officers use the LRAD to broadcast messages, including to get on the sidewalk, as he was moving away from them.

222.    At the same time as the officers used the LRAD to broadcast many of those messages, they were also firing its "deterrent" tone.

223.    Plaintiff Horse got on the sidewalk and continued to move away from the officers.

224.    Plaintiff Horse turned around and saw Defendants Maguire and Poletto walking behind him and others who were fleeing from the police firing the LRAD.

225.    Plaintiff Horse saw Defendants Maguire and Poletto holding the LRAD between the two of them, firing it, apparently indiscriminately, as people were fleeing from the police firing the LRAD.

226.    At that point, Plaintiff Horse was on the sidewalk near Plaintiff Edrei and others.

227.    Plaintiff Horse was upset that the police were using the LRAD against people who were trying to get away, and from such a close distance.

228.    Plaintiff Horse yelled a critical comment at the officers holding the LRAD, and stepped briefly off the curb to take a picture of them, and then returned to the sidewalk.

229.    After yelling at Defendants Maguire and Poletto, Plaintiff Horse then saw these two officers turn toward him, and fire the LRAD while pointing it at him, although he had all complied with orders and was on the sidewalk.

230.    Plaintiff Horse ran down the sidewalk away from the officers, and saw Defendants Maguire and Poletto continue to direct the LRAD at him and Plaintiff Edrei and others while firing its "deterrent" tone.

231.    Plaintiff Horse was eventually able to leave the area where the officers were firing the LRAD.

232.    While the LRAD was directed at him, Plaintiff Horse's eardrums were beating hard and it was incredibly painful.

233.    Plaintiff Horse felt as though he were bleeding out of his nose, ears, and mouth.

234.    Plaintiff Horse repeatedly asked others around him if he was actually bleeding.

235.    Plaintiff Horse got a migraine headache, and his sinuses, nose, throat, and ears all felt as though they were on fire.

236.    The side of Plaintiff Horse's body that was hit by the LRAD felt numb.

237.    The next day and for at least the following five days, Plaintiff Horse's migraine headache and the sensation that he was bleeding out of his ears and nose continued.

238.    Plaintiff Horse heard ringing in his ears and white noise, even when he was in silent places.

239.    On December 9, 2014, Plaintiff Horse went to an Urgent Care facility to seek medical assistance because he was still experiencing ringing and extreme pain in his ears.

240.    Plaintiff Horse complained of nausea, pain and ringing in his ears, and dizziness.

241.    Plaintiff Horse was diagnosed with "Tinnitus, bilateral" and "vertigo" and prescribed Meclizine.

242.    Plaintiff Horse was referred to an Ear, Nose, and Throat specialist, but did not pursue the referral, including because he was uninsured and thought he could not afford specialist care.

243.    Plaintiff Horse still experiences ringing in his ears sometimes to this date.

244.    Plaintiff Horse still experiences dizzy spells as often as once or twice a week.

245.    Plaintiff Horse is very worried about the long-term effects of his December 5, 2014 exposure to the LRAD on his hearing, and about his ability to continue to work as a photojournalist who covers protests and conflict situations.

246.    Plaintiff Horse is very worried that as he continues to cover protests in New York City as a photojournalist, the police will use the LRAD against him again and it will result in a permanent and significant impact on his hearing.

247.    Plaintiff Horse has covered protests since December 5, 2014 as a photojournalist.

248.    Plaintiff Horse intends to continue documenting protests and conflicts because it is his career and his life passion.

249.    However, his experiences on December 5, 2014 continue to harm his work as a photojournalist in those contexts because he is now more nervous and cautious and less able to get the newsworthy shots he seeks.

## PLAINTIFF JAMES CRAVEN

250.    On December 4, 2014, Plaintiff Craven was a twenty-seven year-old full-time student pursuing his Master of Science in Information Systems from Baruch College.

251.    Plaintiff Craven works as an Information Technology consultant.

252.    On December 4, 2014, Plaintiff Craven learned that there would be a large protest in Manhattan related to a Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

253.    Plaintiff Craven wanted to join others who were also outraged.

254.    Plaintiff Craven also intended to document the protests and police responses thereto with a view toward potentially publishing newsworthy information.

255.    At around 10:30 pm, Plaintiff Craven joined the march by riding nearby on his bicycle in the street, filming some of the events with a GoPro camera that was attached to his bicycle helmet.

256.    Footage of the incident Plaintiff posted on YouTube has garnered almost 80,000 hits.

257.    Mr. Craven spent most of the next few hours after 10:30 p.m. riding his bicycle in the street.

258.    The protesters were escorted and accompanied by NYPD officers for those several hours.

259.    During that time period, Plaintiff Craven did not observe any noteworthy arrests.

260.    On or around 1 a.m. on December 5, 2014, Plaintiff Craven was near the back of the march as it proceeded east on 57th Street toward Madison Avenue.

261.    At around 57th Street and Madison Avenue, Plaintiff Craven saw people gathering around the police making arrests to observe them.

262.    Near the scene of the arrests, Plaintiff Craven saw what he thought were bottles in the air near the arrest scene.

263.    Plaintiff Craven did not see anyone hit or injured.

264.    Less than ten seconds later, Plaintiff Craven heard the LRAD "deterrent" tone.

265.    There was no warning that the LRAD would be used.

266.    The LRAD produced one of the loudest noises he had ever heard.

267.    Plaintiff Craven felt like he was inches from a car alarm going off.

268.    Plaintiff Craven continued bicycling east toward Park Avenue.

269.    Plaintiff Craven heard what seemed to be orders from the police officers over the LRAD as well, but could not hear what they were, as they were given at the same time as the "deterrent" tone was being fired.

270.    Plaintiff Craven saw other people fleeing east on 57th Street to get away from the police using the LRAD.

271.    Defendants Maguire and Poletto fired the LRAD's "deterrent" tone repeatedly over the course of almost three minutes on 57th Street between Madison and Park Avenues.

272.    Plaintiff Craven continued bicycling near marchers for about 40 minutes, and then returned to his home for the night.

273.    The next day, Plaintiff Craven suffered severe pain and ringing in both ears.

274.    This pain intensified when Plaintiff Craven encountered any loud sounds.

275.    This pain, sensitivity, and ringing continued for at least six days.

276.    The pain made bicycling around New York City, Plaintiff Craven's usual mode of transportation, difficult.

277.    Within a week, because of the pain, ringing, and sensitivity in his ears, Plaintiff Craven sought medical treatment from the New York Eye and Ear Infirmary.

278.    Plaintiff Craven later sought treatment from his General Practitioner, who in turn referred him to an Ear, Nose, and Throat specialist.

279.    Plaintiff Craven saw an Ear, Nose, and Throat specialist in early 2015 because he was experiencing ringing in his ears.

280.    Plaintiff Craven was deterred from attending protests for several months after December 5, 2014.

281.    Plaintiff Craven remains nervous about attending future protests.

282.    Plaintiff Craven has only been to one protest since December 5, 2014.

283.    After the incident, Plaintiff Craven put earplugs on his keychain so that he could have them ready to hand in case police use the LRAD again at or near him.

284.    Plaintiff Craven worries that he will not have time to put earplugs in before another LRAD is fired at or near him.

## PLAINTIFF KEEGAN STEPHAN

285.    Plaintiff KEEGAN STEPHAN is a long-time activist, and has been involved with political protests his entire adult life.

286.    Prior to December 4, 2014, Plaintiff Stephan had been to nearly every protest related to the deaths of Eric Garner and Michael Brown in New York City.

287.    Plaintiff Stephan joined the December 4, 2014 protests at around 4-5 p.m. in Union Square.

288.    Plaintiff Stephan attended the protest intending to observe and document the protests and police response thereto with a view toward publishing newsworthy images, video, and/or commentary.

289.    At the time, Plaintiff Stephan regularly attended protests, taking and posting photos and videos to his social media accounts.

290.    On many occasions prior to December 4, 2014, mainstream media outlets had re-broadcasted images and videos posted by Plaintiff Stephan.

291.    For example, Plaintiff Stephan's posts had been used in coverage of protests by *The New York Times*, *Newsweek*, *Newsday*, *Telesur*, *New York Magazine*, and *PBS*.

292.    On December 4, 2014, Plaintiff Stephan intended to take and broadcast photos and/or videos of the protests and police responses to his substantial social media following, with

40

a view toward republishing some of the images and videos, and/or commentary, including to mainstream media outlets.

293.    Indeed, Plaintiff Stephan's images, videos, and commentary from December 4 and 5, 2014, were used in stories on *Buzzfeed*, *The Village Voice*, and *The Epoch Times*. *See Several Arrested During Second Night of Protests After Eric Garner Decision*, Buzzfeed News, December 4, 2014, *available at* http://www.buzzfeed.com/buzzfeednews/protesters-take-to-new-york-city-again#.psLoDJvPK (last accessed March 3, 2016); Katie Toth, *The NYPD's Moment of Restraint is Over: 200+ Arrested*, The Village Voice, December 5, 2014, *available at* http://www.villagevoice.com/news/the-nypds-moment-of-restraint-is-over-200-arrested-6674835 (last accessed March 3, 2016); Reid Schram, *Eric Garner Decision Fuels Protests Across New York*, The Epoch Times, December 4, 2014, *available at* http://www.theepochtimes.com/n3/1123416-eric-garner-decision-fuels-protests-across-new-york-liveblog/ (last accessed March 3, 2016).

294.    Since December 5, 2014, photos, videos, and/or commentary from Plaintiff Stephan's posts have been republished and/or used by *Pix 11*, *WNYC*, *MTV*, *CBS*, *International Business Times*, *The Washington Post*, *AMNY*, *Telesure*, *Mic News*, and *The Huffington Post*.

295.    Several articles specifically acknowledge how Plaintiff Stephan's work as a "livetweeter" has influenced mainstream media. *See, e.g.,* Mark Chiusano, *Video is Shaping #BlackLivesMatter Protests in New York City*, amNewYork, December 17, 2015, *available at* http://www.amny.com/opinion/columnists/mark-chiusano/video-is-shaping-blacklivesmatter-protests-in-new-york-city-1.11237109 (last accessed March 3, 2016); Amber van Moessner, *What Everyone Should Know About Filming (and Sharing) Injustice on Social Media*, Mic

NEWS, *available at* http://mic.com/articles/136154/what-everyone-should-know-about-filming-and-sharing-injustice-on-social-media#.7u0TRqIno (last accessed March 3, 2016)

296.    Plaintiff Stephan has also been quoted as an expert on protest and police in several sources, and has written pieces for *Gothamist*, *US Uncut*, *Alternet,* and *PINAC News* regularly since December 4, 2014.

297.    On the night of December 4, 2014, Plaintiff Stephan proceeded near protesters for several hours.

298.    Around or after 1 a.m., as a group of protesters neared 57th Street and Madison Avenue, Plaintiff Stephan saw a person with his face down, and at least three police officers on top of him, as at least one officer pressed his knee into the arrestee's back while apparently cuffing him.

299.    Plaintiff Stephan saw others gather at the scene to observe the police.

300.    Plaintiff Stephan did not see people gathered in a way that appeared to interfere with or threaten to interfere with their arrest.

301.    Plaintiff Stephan then saw a police officer walk over and discharge what he believed to be pepper spray toward the people who were watching the arrest.

302.    Plaintiff Stephan smelled pepper spray and his eyes began burning.

303.    Plaintiff Stephan felt sinus pain, itching and burning.

304.    Plaintiff Stephan heard no warning before the pepper spray was deployed.

305.    Plaintiff Stephan then ran from the scene of the arrests and onto the sidewalk.

306.    As Plaintiff Stephan reached the sidewalk, he heard what he believed to be the "deterrent" tone of a LRAD.

307.    Plaintiff Stephan had no warning before the police began firing the LRAD.

308.    Plaintiff Stephan moved on 57th Street between Madison and Park as the NYPD fired the "deterrent" tone of a LRAD for nearly three minutes.

309.    Plaintiff Stephan was shocked that the police were using the LRAD, and that they were using its "deterrent" tone rather than its announcement feature.

310.    Plaintiff Stephan was particularly surprised because when it was used most people had already responded to the pepper spray by fleeing.

311.    Plaintiff Stephan felt reverberation and pain while the LRAD was being used.

312.    The reverberation went beyond Plaintiff Stephan's eardrums, going down his ear canal.

313.    This was the most traumatic ear pain Plaintiff Stephan has ever experienced.

314.    Plaintiff Stephan could not sleep that night, due to the intense ringing and pain in his ears.

315.    Video that Mr. Stephan took of the LRAD being used on December 5, 2014 was subsequently published by *Vice Motherboard*. *See* Alex Pasternack, *The New Sound of Crowd Control*, MOTHERBOARD, December 17, 2014, *available at* http://motherboard.vice.com/read/the-new-sound-of-crowd-control (last visited March 2, 2016).

316.     After the events of December 5, 2014, when Plaintiff Stephan considers going to a protest, the pain and fear that the use of the LRAD caused him resurfaces.

317.    Plaintiff Stephan has considered not going to protests because of this acute pain and fear.

318.    However, Plaintiff Stefan has chosen to fight through his fears and continue to attend and report on protests, in part because he believes both activities are so important.

319.    Plaintiff Stephan was and remains afraid of being exposed to the LRAD again and of experiencing permanent hearing damage.

## PLAINTIFF PLAINTIFF NUSBAUM

320.    On December 5, 2014, Plaintiff MICHAEL NUSBAUM was a twenty-five-year-old, working as a freelance filmmaker and photographer.

321.    Plaintiff Nusbaum is now a freelance filmmaker and photographer, with a Bachelor of Science Degree in Film and Television from Boston University.

322.    On December 5, 2014, Plaintiff Nusbaum was working as a filmmaker to create a historical documentation of an emerging protest movement, including through film, one aspect of which was ultimately published as "*This Ain't a Parade*" on Vimeo, *available at* https://vimeo.com/113821448 (last accessed March 2, 2016) - with the description: "The protest movement in this video is in response to what many see as a failure of the justice system in the United States: the grand jury decisions not to indict police officers who killed Eric Garner, Michael Brown, and others."

323.    Plaintiff Nusbaum had a history of tinnitus and hearing loss, and had seen multiple doctors about his hearing conditions prior to December 5, 2014.

324.    Plaintiff Nusbaum is particularly vulnerable to loud sounds and to further hearing damage.

325.    On the night of December 4, 2014, Plaintiff Nusbaum joined with the protests of the non-indictment of the officer involved in Eric Garner's death.

326.    Plaintiff Nusbaum was at the protest both as a filmmaker and as a protester.

327.    Plaintiff Nusbaum marched with others for several hours.

328.    At some time after 1 a.m. on December 5, 2014, Plaintiff Nusbaum saw people gather around the scene of some arrests near 57th Street and Madison Avenue.

329.    Plaintiff Nusbaum heard something that sounded like a glass bottle breaking.

330.    Plaintiff Nusbaum then heard someone say that they had been pepper sprayed.

331.    At this point, Plaintiff Nusbaum heard what he now believes was the "deterrent" tone of a LRAD.

332.    After Plaintiff Nusbaum heard the LRAD fire, he saw people fleeing from it.

333.    Plaintiff Nusbaum heard the LRAD broadcast a message saying in substance that "This is the New York City Police Department, you must remain on the sidewalk."

334.    Plaintiff Nusbaum heard parts of this message broadcast repeatedly, apparently directed at him and other people who were already on the sidewalk.

335.    The LRAD was approximately 15 feet away from the closest protesters and from Plaintiff Nusbaum.

336.    Plaintiff Nusbaum had earplugs in his backpack, which he carries with him because his hearing issues mean that it is very dangerous and painful for him to be exposed to loud sounds.

337.    Plaintiff Nusbaum put in his earplugs and began filming to document the LRAD use.

338.    Plaintiff Nusbaum began filming approximately 30 seconds after he first heard the LRAD being used, and continued filming for approximately two and a half minutes, during which time the LRAD and its deterrent function were used almost continuously.

339.    However, because there was no warning or indication that the LRAD would be used, his ears were exposed to sounds at volume levels and proximities that are very dangerous and deleterious because of his pre-existing hearing condition.

340.    "*This Ain't a Parade*" (https://vimeo.com/113821448 (last accessed March 2, 2016)) is the published product of the filmmaking project Plaintiff Nusbaum was working on when he was assaulted with the LRAD.

341.    When the LRAD's "deterrent" tone was first used near plaintiff Nusbaum, he experienced what he would describe as a 10 out of 10 pain in his ears.

342.    Plaintiff Nusbaum has had to get an MRI test for his hearing before, and this was louder than being in an MRI machine.

343.    Because of his fear that he will be hit by an LRAD and injured again, Mr. Nusbaum has attended many fewer protests since December 5, 2014.

344.    Plaintiff Nusbaum works as a photographer at music concerts, and the sound of the LRAD was much louder and more painful than anything he had ever heard before.

345.    Since December 5, 2014, the ringing in Plaintiff Nusbaum's right ear that he had experienced has been much more noticeable, and he hears a slight ringing at all times.

**PLAINTIFF ALEXANDER APPEL**

346.    Plaintiff ALEXANDER APPEL is a long-time activist with a history of expressing his political views, among other ways, by participating in street marches and other demonstrations.

347.    In November and early December of 2014, Plaintiff Appel had been frequently attending demonstrations and marches against police brutality.

348.     On December 4, 2014, he joined a protest in response to the Staten Island grand jury's failure to indict the police officer involved in the death of Eric Garner.

349.     Plaintiff Appel began marching with the protest around nine p.m., starting at around 8th Avenue and 14th Street in Manhattan.

350.     Plaintiff Appel marched in Manhattan with others for several hours.

351.     The protesters were escorted by police.

352.     At around 1 a.m., Plaintiff Appel reached the corner of Madison Avenue and 57th Street.

353.     Plaintiff Appel saw police vehicles in the middle of the intersection and continued around the police vehicles, heading toward Park Avenue.

354.     Plaintiff Appel heard people yelling and turned around.

355.     Plaintiff Appel saw police had grabbed two or three people who had been crossing through intersection like everyone else had been.

356.     Plaintiff Appel returned to the corner of Madison Avenue and 57th Street to observe the arrests.

357.     Plaintiff Appel smelled in the air what he believed was pepper spray and saw police brandishing batons and swinging their batons.

358.     After Plaintiff Appel smelled the pepper spray, he saw those who were observing the police move away from them and disperse, with people going in different directions.

359.     Plaintiff Appel moved east on 57th Street toward Park Avenue.

360.     Plaintiff Appel paused to care for someone who had been pepper sprayed, whom he heard ask for help.

361.    As Plaintiff Appel stopped to try to assist the pepper spray victim next to him, he heard what he believed to be the "deterrent" tone of a LRAD.

362.    Plaintiff Appel remembers police saying words into the LRAD, but it was very hard for him to make out what the police were saying, in part because they were speaking at the same time as the deterrent tone was deployed.

363.    Plaintiff Appel believed that the officers wanted people to move onto the sidewalk.

364.    Plaintiff Appel moved onto the sidewalk.

365.    Plaintiff Appel tried to cover his ears with both of his hands, but it was very hard as he was simultaneously trying to care for the person who had been pepper sprayed and to physically move away from the LRAD and onto a sidewalk.

366.    It was also hard for Plaintiff Appel to move away from the sound of the LRAD, as there was construction on the side of the street where he was, and it was hard to get from the street onto the sidewalk, especially with a person who had been temporarily blinded.

367.    After being impacted by the LRAD, Plaintiff Appel immediately developed a very severe headache.

368.    This headache lasted for 3 days, until December 7, 2014.

369.    After hearing the LRAD, Plaintiff Appel's ears began ringing.

370.    Plaintiff Appel had extreme difficulty with his hearing for 3 days, until December 7, 2014.

371.    Because of his difficulty hearing and ringing in his ears, Plaintiff Appel sought medical treatment the next day at Mt. Sinai Eye and Ear Infirmary.

372.   At Mt. Sinai Eye and Ear Infirmary, Dr. Christopher Linstrom diagnosed Plaintiff Appel with hearing loss, explaining that the pressure of the extreme level of the noise from the LRAD had pushed a bone in his ear inwards, impacting and damaging a nerve in his ear.

373.   Dr. Christopher Linstrom prescribed steroidal medication, Prednisone, to try to help heal the damaged nerves in Plaintiff Appel's ear before the nerve damage became permanent.

374.   A test that date indicated that Plaintiff Appel's hearing was not balanced, and was softer in his right ear than his left ear.

375.   A few days later, Plaintiff Appel returned to see Dr. Melissa Magnolia at the Eye and Ear Infirmary for a follow up visit.

376.   The prognosis was improved, and Plaintiff Appel was told that the nerve damage was healing and his ears were recovering.

377.   Because of his experience with the LRAD, Plaintiff Appel became very concerned about hearing loss and nerve damage and no longer feels comfortable going to protests.

378.   Plaintiff Appel is very worried that an LRAD will be directed at him again, and that the condition in his ears will worsen.

379.   Because of his fears of further pain and hearing damage from the NYPD's use of an LRAD, Plaintiff Appel has avoided marches which he would have otherwise attended and participated in.

380.   Plaintiff Appel still experiences ringing in his ears.

**FIRST GROUND FOR RELIEF**
**UNREASONABLE SEIZURE – EXCESSIVE FORCE**
**FOURTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

381.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

382.   Defendants Maguire and Poletto terminated or severely limited Plaintiffs' freedom of movement utilizing the LRAD.

383.   Defendants seized Plaintiffs without privilege or lawful justification.

384.   Defendants had no judicial warrant authorizing Plaintiffs' seizures.

385.   Plaintiffs were conscious of the confinements and did not consent to them.

386.   Defendants used force against Plaintiffs by deploying the LRAD against them.

387.   Defendants did not have lawful cause to detain or arrest Plaintiffs.

388.   Nor was it objectively reasonable for Defendants to believe that they did have such cause to detain or arrest Plaintiffs.

389.   The levels of force employed by Defendants Maguire and Poletto in using the LRAD, and in particular in using its "deterrent" tone without prior warning, unreasonably close to people, for unreasonably long periods of time, were objectively unreasonable.

390.   As seizures of and uses of force against Plaintiffs, the NYPD's uses of the LRAD were unjustified and unreasonable under the circumstances.

391.   The LRAD was used as a weapon without reasonable notice and without providing a meaningful opportunity to disperse beyond the range of the LRAD and therefore avoid injury.

392.   The LRAD was used in circumstances where there was no imminent threat to public safety or property and/or where its use was not necessary to protect public safety or property.

393.    Defendants' uses of the LRAD were not only in contravention of best practices regarding crowd control and use of force, but also in violation of the NYPD's use of force requirements that "All members of the service at the scene of a police incident must:…(b) use minimal necessary force," as reflected in the relevant provisions of the NYPD's Patrol Guide, Section 203-11, that was in effect at all times relevant herein (emphasis in original).

394.    Because the LRAD is designed to target large areas, it necessarily targets more than one person, if more than one person is within that area.

395.    When the LRAD is implemented to force behavior modification or compliance (for example, to compel people to stop moving in a direction or to move in a particular direction), it impacts their ability to move freely.

396.    Put more simply, use of the LRAD as a weapon seizes not just one individual, but all people in an area, and in so doing does away with the requirements of individualized probable cause and individualized justifications for appropriate and proportionate use of force.

397.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**SECOND GROUND FOR RELIEF**
**VIOLATIONS OF PLAINTIFFS' FIRST AMENDMENT RIGHTS**
**FIRST AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

398.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

399.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected conduct and/or speech, including their protected conduct and/or speech in being near, participating in, or observing and/or documenting protests and police responses to them.

400.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected conduct.

401.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

402.    Each Plaintiff suffered actual chill in that each Plaintiff was prevented and /or deterred from or impeded in participating in protected conduct on the date of and after the incident.

403.    In addition to being retaliatory, the restrictions imposed by Defendants Maguire and Poletto on Plaintiffs' First Amendment rights complained of herein were:

a.    Not content-neutral and lacked narrowly tailoring to promote a compelling government interest; and/or

b.    Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression; and/or

c.    Afforded Defendants unbridled discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns).

404.    The uses of force and other regulations imposed on Plaintiffs by Defendants Maguire and Poletto interfered with Plaintiffs' rights to speech, expression, assembly, and/or to engage in observing and/or documenting newsworthy events including, but not limited to, protests against police brutality and police responses to them.

405.    With respect to those Plaintiffs who intended to observe and document with a view toward disseminating documentation of protests and/or police responses thereto and/or otherwise newsworthy images, video, sounds, and/or commentary, those uses of force and other regulations prevented such Plaintiffs from engaging in the "gathering" of such images, video,

sounds, and/or commentary, which is a necessary and protected prerequisite to the protected dissemination those Plaintiffs ultimately intended to engage in.

406.    Even assuming, *arguendo*, that the physical regulations on freedom of movement imposed on Plaintiffs when they were fired on by the LRAD were content neutral, absent a very small subset of extremely exigent circumstances, the use of an LRAD for crowd control purposes will almost always result in overbroad or over-inclusive regulation of protected conduct, because the restrictions imposed by the haphazard applications of the LRAD's force are almost always not narrowly tailored to serve significant governmental interests, and almost always fail to provide ample alternatives for expression.

407.    Additionally, the NYPD's practices with respect to LRAD uses  - including the lack of written guidelines and policies and appropriate training and supervision regarding LRAD use - fail to provide adequate safeguards to prevent NYPD officers on the streets from enjoying and exercising unbridled, unreviewable discretion to suppress protected speech and conduct, thus violating constitutional prohibitions against viewpoint discrimination and other, related guarantees.

408.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

### THIRD GROUND FOR RELIEF
### VIOLATIONS OF PLAINTIFFS' RIGHTS TO EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS
### FOURTEENTH AMENDMENT THROUGH 42 U.S.C. § 1983

409.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

410.     Defendants' acts and omissions described elsewhere herein violated Plaintiffs'
rights to enjoy equal protection of the laws as well as their substantive due process rights,
including their liberty interests.

411.     As a result of the acts and omissions complained of herein, Plaintiffs suffered the
injuries and deprivations of their constitutional and common law rights discussed herein.

## FOURTH GROUND FOR RELIEF
## MUNICIPAL LIABILITY

412.     Plaintiffs incorporate by reference the allegations set forth in all preceding and
following paragraphs as if fully set forth herein.

413.     At all times relevant herein, the NYPD has lacked written crowd control, disorder
control, and crowd management policies, documentation requirements, or supervision
mechanisms, and has not properly trained its officers and agents, related to LRAD use.

414.     At all times relevant herein, the NYPD has lacked written policies, and has not
properly trained its officers and agents, defining "breach of the peace" or describing when there
is imminent or clear and present danger of such a breach of the peace.

415.     Upon information and belief, NYPD policies, training, and practice in December
of 2014 permitted, authorized, and/or encouraged NYPD officers to use LRADs for:

a.  Seizures and arrests, including of perceived "groups," in connection with
    peaceful, expressive assemblies, where no breach of the peace has occurred
    and where there was no imminent, clear and present danger of such a breach
    of the peace

b.  Treatment of perceived "groups" as a "unit" for crowd control purposes
    without first having given them fair warning

c.  Treatment of perceived "groups" as a "unit" for crowd control purposes
    without first having given them lawful and

    i.   Clearly audible dispersal orders, meaning

    ii.  Clearly identified as such

    iii.  Providing specific time periods that are reasonable under the circumstances within which compliance can be accomplished without fear of use of force or arrest; and

    iv.  Providing specific, clear means of safe egress

d.  Seizures, including seizures of perceived "groups", without such forewarning, and without individualized determinations of probable cause, meaning individualized suspicion of wrongdoing as opposed to mere perceived presence associated with the perceived "group"

e.  Arrests, including mass arrests, of perceived "groups", without such forewarning, and without individualized determinations of probable cause

f.  Uses of force against perceived "groups", without such forewarning, and without individualized determinations of reasonableness

g.  Other restrictions on First Amendment rights that are not content-neutral or that are content- neutral but lack narrow tailoring and fail to provide alternate channels for the protected expression or conduct, such as to enforce evincing a "zero tolerance" approach to perceived traffic infractions in connection with demonstrations, or orders to "move on" or to disperse that shut down protected communication and expression

h.  Other restrictions on the rights to move freely, liberty rights, privacy rights, rights to be left alone, other related Substantive Due Process guarantees, and/or rights to Equal Protection of perceived participants in, or bystanders near, persons perceived to be engaged in peaceful protest, demonstration, or assembly activities

416.    At all times relevant herein, the NYPD has lacked written policies, training, documentation requirements, and supervision mechanisms related to LRAD uses *qua* restrictions on First Amendment rights of participants in protected expression and association, as well as bystanders and observers, including bystanders and observers who wish to observe, record, or otherwise document the police activities of uniformed NYPD officers performed in public places.

417.    United States Department of Justice ("DOJ") submissions in federal litigation[36]

relating to the rights to observe and document the activities, including the arrest activities, of

uniformed police performing police duties in public places, reflect that the rights to observe

and/or document those activities are so fundamental that the United States felt compelled to

inform the courts in those cases of its "position on the basic elements of a constitutionally

adequate policy on individuals' right to record police activity," insisting that any resolution of

the injunctive relief claims at issue in the *Sharp* case, for example,

> include policy and training requirements that are consistent with the important
> First, Fourth, and Fourteenth Amendment rights at stake when individuals record
> police officers in the public discharge of their duties. These rights, subject to
> narrowly-defined restrictions, engender public confidence in our police
> departments, promote public access to information necessary to hold our
> governmental officers accountable, and ensure public and officer safety.

*Sharp* Letter at p. 1; *see also id.* at p. 2 (recommending that appropriate policies "should

affirmatively set forth the contours of individuals' First Amendment right to observe and record

police officers"); pp. 5-7 (recognizing that "[t]he right to record police activity is limited only by

'reasonable time, place, and manner restrictions'" (internal citations omitted)).

389.    And in the *Garcia* SOI, the DOJ urged the Court to "find that both the First and

Fourth Amendments protect an individual who peacefully photographs police activity on a public

street" and, in recognition of its "strong interest in ensuring that individuals' constitutional rights

are protected when they observe and document police carrying out their duties in a public

setting", expressed its

---

[36]      *See, e.g.,* Statement of Interest of the United States dated January 10, 2012, ECF No. 24
in *Sharp v. Baltimore City Police Dept.*, Civil No. 1:11-cv-02888-BEL (D.Md.), and May 12,
2012 letter filed by United States Department of Justice – Civil Rights Division – Special
Litigation Section in *Sharp*, (the "*Sharp* Letter"); Statement of Interest of the United States dated
March 4, 2013, ECF No. 15 in *Garcia v. Montgomery County, Maryland, et al.*, 8:13-cv-03592-
JFM (D. Md.) (the "*Garcia* SOI").

concern[] that discretionary charges, such as disorderly conduct, loitering, disturbing the peace, and resisting arrest, are all too easily used to curtail expressive conduct or retaliate against individuals for exercising their First Amendment rights. The United States believes that courts should view such charges skeptically to ensure that individuals' First Amendment rights are protected. Core First Amendment conduct, such as recording a police officer performing duties on a public street, cannot be the sole basis for such charges. Third, the First Amendment rights to record police officers performing public duties extends to both the public and members of the media, and the Court should not make a distinction between the public's and the media's rights to record here.

*Garcia* SOI at pp. 1-2.

418.    At all times relevant herein, Defendant Bratton has been the Commissioner of the NYPD and as such he has final policymaking authority over all aspects of the NYPD, including related to LRAD uses.

419.    In connection with plans to police Black Lives Matter and other anti-police brutality protests in late 2014, Defendant Bratton and/or other policymakers for Defendant City developed, adopted, and/or endorsed formal policies – which continue to the present - of deploying LRADs for use in crowd control and other police responses to perceived protests, without first having conducted appropriate testing, created and implemented written guidelines and training, including reporting requirements, regarding their use, and creating and implementing appropriate supervision structures for NYPD agents who use LRADs, although Defendants Bratton and City knew or should have known that outfitting police with a dangerous sound weapon such as an LRAD, without taking such steps, would lead to injuries, including Plaintiffs'.

420.    For example, Defendants Bratton and City knew or should have known that purchasing LRADs, and directing and allowing NYPD officers to use LRADs without doing some or all of the following things, would lead to injuries, including Plaintiffs':

a.  Conducting appropriate **research** into prior documented LRAD uses for crowd control purposes, including, but not limited to, the LRAD uses at the 2009 G20 in Pittsburgh, Pennsylvania that led to injuries and the proposed  2010 G20 in Toronto, Canada

b.  Conducting appropriate **testing** regarding safe use of LRADs as "megaphones" as well as LRADs' "deterrent" tone

c.  Promulgating written **guidelines** regarding LRAD use covering at least:

   i.  Safe operation of an LRAD

   ii.  That, how, and when LRAD use counts as a use of force, as well as how the LRAD, *qua* use of force, fits into the use of force continuum, including the NYPD's use of force guidelines and their reporting requirements

   iii.  That, how, and when using the LRAD can amount to a "group" seizure

   iv.  When, how (including at what volumes, distances, frequencies), and under which specific and limited circumstances, the LRAD may be used as a crowd control tool, taking into account specific objective factors bearing on the First, Fourth, and Fourteenth Amendment rights of participants in expressive assemblies as well as observers and bystanders, including the rights and privileges enjoyed by Plaintiffs and others similarly situated to be on or around streets and sidewalks in the City of New York, to associate, to assemble, to express themselves, and to gather and disseminate information freely, without interference from police

d.  Designing and implementing **training** consistent with those written guidelines in safe and appropriate use of the LRAD, and guaranteeing that the training is given to officers who are to be charged with LRAD uses;

e.  Ensuring that there are appropriate requirements and structures in place for **documenting** LRAD uses and guaranteeing that documentation is created; and

f.  Ensuring that there are appropriate requirements and structures in place for **supervising** agents who use LRADs, and actually supervising them.

421.   Defendant Bratton and/or other policymakers directed that the policies and/or practices that caused Plaintiffs' injuries be adopted and employed, approved in adopting and employing the policies, and/or acquiesced in their adoption and employment.

422.    To the extent Defendants may not consider the deployment of officers with LRADs at liberty to use them without appropriate restrictions, without having taken due care by taking some or all of those steps, or other reasonable measures, as "official policies", between late 2014 and the present, as practices complained of, the deployment and use LRADs is now so consistent and widespread, that Defendant Bratton and other NYPD policymakers had actual or constructive knowledge that LRADs are routinely deployed and used in policing perceived demonstrations and other First Amendment assemblies, without appropriate research, testing, guidelines, training, documentation, and/or supervision.

423.    In fact, as seen above, although Defendant Bratton and other policymakers knew of the LRAD uses that injured Plaintiffs in December of 2014, and despite the extensive December 12, 2014 written complaint describing those injuries, providing video of the LRAD uses, and linking Plaintiffs' injuries to Defendants' failures to ensure proper research, testing, guidelines, training, documentation, and/or supervision related to LRADs and LRAD uses, Defendant Bratton and other policymakers not only failed to take steps to cure those problems, but also defended them in a public statement to *The New York Times* and then actually increased the frequency of LRAD deployments – and uses - at perceived demonstrations, protests, and other, similar assemblies that the NYPD considers "special events".

424.    Defendant Bratton and other policymakers, including NYPD Deputy Commissioner of Legal Matters Lawrence Byrne, acquiesced in, approved of, ratified, and/or condoned the LRAD uses that injured Plaintiffs on December 5, 2014, and the lack of proper research, testing, guidelines, training, documentation, and/or supervision that led to Plaintiffs' injuries.

425.    On December 4-5, 2014, as a DCU supervisor who was assigned to use the LRAD in connection with policing the protests that night, Defendant Maguire was responsible for developing and implementing final policy for the NYPD in the areas of when and how to use the LRAD.

426.    On December 4-5, 2014, as a DCU agent who was assigned to use the LRAD in connection with policing the protests that night, Defendant Poletto was responsible for developing and implementing final policy for the NYPD in the areas of when and how to use the LRAD.

427.    Upon information and belief, on December 4-5, 2014, Defendants Maguire and Poletto did not consult any supervisors to obtain permission or direction before using the LRAD.

428.    On December 4-5, 2014, the decisions made by Defendants Maguire and Poletto to use the LRAD, and regarding how to use the LRAD, were effectively final policy with respect to those LRAD uses.

429.    As a result of those NYPD policies and practices regarding LRAD uses adopted in late 2014, since late 2014, NYPD agents have consistently deployed and used LRADs at perceived protests and demonstrations, without sufficient research, testing, guidelines, training, documentation, and/or supervision, threatening further injuries such as those suffered by Plaintiffs to Plaintiffs and others who may wish to attend perceived demonstrations, protests, and other events at which the NYPD deploys LRADs .

430.    Defendants City, Bratton, and Maguire failed properly to train and/or supervise Defendants Maguire and Poletto regarding LRAD uses, including the December 2014 LRAD uses that injured Plaintiffs, and Defendants City and Bratton have failed properly to train and/or supervise NYPD officers charged with using LRADs since 2014.

431.    Defendants' failure to train and/or supervise NYPD agents related to LRAD uses evince a hostility and/or deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of perceived protesters, bystanders, and other members of the public who come into contact with NYPD officers brandishing and using LRADs and who are thus exposed to being injured by the LRAD, including Plaintiffs.

432.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

### FIFTH GROUND FOR RELIEF
### ASSAULT AND BATTERY
### UNDER THE LAWS OF THE STATE OF NEW YORK

433.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

434.    Defendants Maguire and Poletto committed assaulted within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

435.    Defendants Maguire and Poletto committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

436.    Defendants Maguire and Poletto did thereby inflict assault and battery upon the Plaintiffs.

437.    Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

438.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

439.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

### SIXTH GROUND FOR RELIEF
### FALSE ARREST/FALSE IMPRISONMENT
### UNDER THE LAWS OF THE STATE OF NEW YORK

440.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

441.    By the actions described above, all of the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement and it was without their consent.

442.    Defendants' acts and omissions were the direct and proximate cause of injury and damage to the Plaintiffs and violated their rights as guaranteed by the laws and Constitution of the State of New York.

443.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

444.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**SEVENTH GROUND FOR RELIEF**
**NEGLIGENCE**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

445.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

446.    Defendants owed Plaintiffs duties to exercise care in performing their police duties, including in operating the LRAD.

447.    Defendants breached those duties and jointly, severally, and negligently caused injuries, and damage to the Plaintiffs.

448.    The acts and conduct of the officer-defendants were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

449.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

450.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**EIGHTH GROUND FOR RELIEF**
**CONSTITUTIONAL TORTS**
**UNDER THE CONSTITUTION OF THE STATE OF NEW YORK**

451.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

452.     Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 8, 9, 11, and 12 of the New York State Constitution.

453.     A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

454.     As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

**NINTH GROUND FOR RELIEF**
**NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION & TRAINING**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

455.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

456.     Upon information and belief, Defendant City negligently hired, screened, retained, supervised, and trained the police officials described above.

457.     The acts and conduct of the police officials were the direct and proximate cause of injury and damage to the Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

458.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

459.    As a result of the acts and omissions complained of herein, Plaintiffs suffered the injuries and deprivations of their constitutional and common law rights discussed herein.

## JURY DEMAND

460.    Plaintiffs demand a trial by jury in this action on each and every one of their damage claims.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Permanent injunctive relief in the form of an Order enjoining Defendants from deploying and using LRADs without first conducting and/or designing and implementing research, testing, guidelines, training, documentation requirements, and/or supervision sufficient to ensure that Plaintiffs and others who are similarly situated will not continue to suffer the injuries complained of herein, and that Plaintiffs and others who are similarly situated will not suffer such injuries in the future;

B.    A declaratory judgment declaring that the NYPD's December 5, 2014 LRAD uses complained of violated, and that subsequent and future LRAD deployments and actual or threatened uses without appropriate testing, written guidelines, training, documentation requirements, and/or supervision, violate and/or will violate:

     i.    Plaintiffs' rights protected under the First Amendment to the United States Constitution and the attendant provisions of the New York State Constitution;

     ii.    Plaintiffs' rights protected under the Fourth Amendment to the United States Constitution and the attendant provisions of the New York State Constitution to be free from unreasonable searches and seizures;

     iii.    Plaintiffs rights protected under the Fourth Amendment to the United States Constitution and the attendant provisions of the New York State Constitution to be free from unreasonable uses of force against them;

     iv.    Plaintiffs' rights to be free from assaults within the meaning of New

York common law;

v.      Plaintiffs' rights to be free from batteries within the meaning of New York common law; and

vi.     Plaintiffs' other rights protected under the United States Constitution and the attendant provisions of the New York State Constitution, including, but not limited to, Plaintiffs' rights to move freely, liberty rights, privacy rights, rights to be left alone, other related Substantive Due Process guarantees, and/or their rights to Equal Protection;

C.      Compensatory damages against the Defendants jointly and severally;

D.      Punitive damages against the individual Defendants;

E.      Attorney's fees and costs pursuant to 42 USC § 1988; and

F.      Such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            August 1, 2016

                        Respectfully submitted,

                        _____
                        Gideon Orion Oliver
                        277 Broadway, Suite 1501
                        New York, NY  10007
                        (646) 263-3495

                        _____
                        Elena L. Cohen
                        365 Fifth Avenue, Room 5202
                        New York, NY  10016
                        (203) 541-0617