16 cv 1652 (RWS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANIKA EDREI, SHAY HORSE, JAMES CRAVEN,
KEEGAN STEPHAN, MICHAEL NUSBAUM, and
ALEXANDER APPEL,

                                        Plaintiffs,

                    -against-

THE CITY OF NEW YORK, et al.,

                                        Defendants,

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

*ZACHARY CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*
*Of Counsel Ashley Garman*
*Tel:  (212) 356-3539*
*Matter No. 2016-007721*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .............................................. 1

RULE 12(B)(6) STANDARD FOR DISMISSAL ................................................................. 5

ARGUMENT

 POINT I: THE EXCESSIVE FORCE AND UNLAWFUL SEIZURE
   CLAIMS FAIL ......................................................................................... 6

  A. Plaintiffs' Were Not "Seized" Within the Meaning of the Fourth
   Amendment ...................................................................................... 6

  B. The Use of the 100X Did Not "Shock the
   Conscience" ...................................................................................... 8

  C. The Use of the 100X Was Objectively Reasonable ............................. 11

  D. At a Minimum, Maguire and Poletto are Entitled to Qualified
   Immunity ........................................................................................... 11

 POINT II: THE FIRST AMENDMENT CLAIMS FAIL .................................................. 14

  A. Plaintiffs' First Amendment Retaliation Claim Fails as Pled ............................ 14

  B. Any Claim Premised on a Time Place and Manner Restriction
   Fails .................................................................................................. 16

  C. Maguire and Poletto are Entitled to Qualified Immunity .................................... 18

 POINT III: THE DUE PROCESS AND EQUAL PROTECTION CLAIMS
  FAIL ......................................................................................................... 19

 POINT IV: PLAINTIFFS' *MONELL* THEORIES MUST BE DISMISSED
  AS PLED ................................................................................................... 20

 POINT V: PLAINTIFFS CANNOT MAINTAIN A CLAIM AGAINST
  BRATTON .................................................................................................. 25

 POINT VI: PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED .................... 26

  A. Plaintiffs' Assault and Battery Claims Fail ............................................................ 26

B.  Plaintiffs' Common Law False Arrest and Imprisonment Claims Fail...................................................................................................27

C.  Plaintiffs' New York State "Constitutional Tort" Claims Fail.............................28

D.  Plaintiffs' Negligence and Negligent Hiring and Retention Claims Fail...................................................................................................28

E.  At a Minimum, Maguire and Poletto are Entitled to State Law Immunity...............................................................................................30

CONCLUSION ...........................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ashcroft v. al-Kidd,
563 U.S. 731 (2011) ............................................................................................. 18

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ......................................................................... 5, 15, 16, 26

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ............................................................................................. 5

Bernard v. United States,
25 F.3d 98 (2d Cir. 1994) ................................................................................... 29

Biswas v. City of N.Y.,
973 F. Supp. 2d 504 (S.D.N.Y. 2013) ................................................................ 28

Board of Comm'rs of Bryan Cty. v. Brown,
520 U.S. 397 (1997) ........................................................................................... 13

Bogart v. City of New York,
13 Civ. 1017 (NRB), 2016 U.S. Dist. LEXIS 128350 (S.D.N.Y. Sept. 6, 2016) ................*passim*

Busch v. City of New York,
2003 U.S. Dist. LEXIS 27571 (E.D.N.Y 2003) ................................................. 29

Casson v. City of New York,
269 A.D.2d 285 (N.Y. App. Div. 1st Dep't 2000) .............................................. 12

City of Los Angeles v. Heller,
475 U.S. 796 (1986) ........................................................................................... 20

Claybrook v. Birchwell,
199 F.3d 350 (6th Cir. 2000) ................................................................................ 8

Connick v. Thompson,
563 U.S. 51 (2011) ....................................................................................... 23, 24

Day v. Armstrong,
99-281, 2000 U.S. App. LEXIS 31029 (2d Cir. Nov. 30, 2000) ........................ 26

Dewitt v. Home Depot U.S.A., Inc.,
10 Civ. 3319 (KAM), 2012 U.S. Dist. LEXIS 130963 (E.D.N.Y. Sept. 12, 2012) .................... 29

Dinler v. City of N.Y.,
2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sep. 30, 2012) ................................. 17

**Cases**                                                                                          **Pages**

Dorsett v. Cnty. of Nassau,
    732 F.3d 157 (2d Cir. 2013)......................................................................... 14

Dumont v. Litton Loan,
    12 Civ. 2677 (ER), 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014)................................. 5

Escobar v. City of New York,
    05 Civ. 3030(ENV)(CLP), 2007 U.S. Dist. LEXIS 45952 (E.D.N.Y. June 25,
    2007) ...................................................................................................... 26

Fabrikant v. French,
    691 F.3d 193 (2d Cir. 2012)......................................................................... 14

Garcia v. Bloomberg,
    865 F.Supp.2d 478 (S.D.N.Y. 2012)........................................................... 21, 23

Garcia v. Doe,
    779 F.3d 84 (2d Cir. 2015) .......................................................................... 12

Garcia v. Jane & John Does 1-40,
    764 F.3d 170 (2d Cir. 2014).......................................................................... 17

Graham v. Connor,
    490 U.S. 386 (1989) ............................................................................... 6, 11

Green v. City of New York,
    465 F.3d 65 (2d Cir. 2006)........................................................................... 25

Hershey v. Goldstein,
    938 F. Supp. 2d 491 (S.D.N.Y. 2013) ............................................................ 28

Hunter v. Bryant,
    502 U.S. 224 (1991) (per curiam) ................................................................ 12

Jocks v. Tavernier,
    316 F.3d 128 (2d Cir. 2003).......................................................................... 27

John Gil Constr., Inc. v. Riverso,
    99 F. Supp. 2d 345 (S.D.N.Y. 2000), aff'd, 7 F. App'x 134 (2d Cir. 2001)................. 20

Karoon v. New York City Transit Auth.,
    241 A.D.2d 323 (1st Dep't 1997).................................................................... 30

Keith v. City of New York,
    11 Civ. 3577 (KPF), 2014 WL 6750211, 2014 U.S. Dist. LEXIS 166469
    (S.D.N.Y. Dec. 1, 2014)............................................................................... 26

Koplyay v. Cirrus Logic,
    13 Civ. 790 (CM), 2013 U.S. Dist. LEXIS 171109 (S.D.N.Y. Dec. 2, 2013)............... 5

**Cases**                                                                                                  **Pages**

LaTrieste Restaurant & Cabaret v. Vill. of Port Chester,
    40 F.3d 587 (2d Cir. 1994)................................................................................................. 20

Lonegan v. Hasty,
    436 F.Supp. 2d 419 (E.D.N.Y. 2006) ............................................................................ 19

Martzloff v. City of New York,
    238 A.D.3d 115 (N.Y. App. Div. 1st Dep't 1997)................................................... 12, 27

Maryland v. King,
    __ U.S. __, 133 S. Ct. 1958 (2013) .............................................................................. 13

Maxwell v. City of New York,
    380 F.3d 106 (2d Cir. 2004)........................................................................................... 11

McCullough v. Wyandanch Union Free Sch. Dist.,
    187 F.3d 272 (2d Cir. 1999)........................................................................................... 12

Medeiros v. O'Connell,
    150 F.3d 164 (2d Cir. 1998)................................................................................. 7, 8, 10

Mercado v. City of New York,
    2011 U.S. Dist. LEXIS 140430 (S.D.N.Y. Dec. 5, 2011)............................................ 22

Monell v. Department of Social Services of the City of New York,
    436 U.S. 658 (1978) ............................................................................................. *passim*

Mullenix v. Luna,
    136 S. Ct. 305 (2015) .................................................................................................... 12

Noonan v. City of New York,
    14 Civ. 4084 (LTS), 2015 U.S. Dist. LEXIS 83451 ..................................................... 28

O'Neil v. Krzeminski,
    839 F. 2d 9 (2d Cir. 1987)............................................................................................. 29

Occupy Nashville v. Haslam,
    769 F.3d 434 (6th Cir. 2014)......................................................................................... 18

Papineau v. Parmley,
    465 F.3d 46 (2d Cir. 2006)............................................................................................ 14

Perez v. City of New York,
    No. 07 Civ. 10319 (RJS) (KNF), 2009 U.S. Dist. LEXIS 50066 (S.D.N.Y. June
    8, 2009) .......................................................................................................................... 26

Pluma v. City of New York,
    13 Civ. 2017 (LAP), 2015 U.S. Dist. LEXIS 48134 (S.D.N.Y. Mar. 31, 2015) ........... 6

**Cases**                                                                     **Pages**

Pluma v. City of New York,
  13 Civ. 2017 (LAP), 2016 U.S. Dist. LEXIS 44227 (S.D.N.Y. Mar. 21, 2016) .................. 10, 11

Plumhoff v. Rickard,
  134 S. Ct. 2012 (2014) ....................................................................................... 12

Reynolds v. Giuliani,
  506 F.3d 183 (2d Cir. 2007) ................................................................................ 25

Ricciuti v. N.Y.C. Transit Auth.,
  941 F.2d 119 (2d Cir. 1991) ................................................................................ 22

Rincon v. City of New York,
  2005 U.S. Dist. LEXIS 4335 (S.D.N.Y. 2005) ..................................................... 9

Roberts v. Babkiewicz,
  582 F.3d 418 (2d Cir. 2009) .................................................................................. 5

Romano v. Howarth,
  998 F.2d 101 (2d Cir. 1993) .................................................................................. 9

San Leandro v. Phillip Morris,
  75 F.3d 801 (2d Cir. 1996) .................................................................................... 5

Savino v. City of New York,
  331 F.3d 63 (2d Cir. 2003) .................................................................................. 28

Shamir v. City of New York,
  13 Civ. 5652 (CM), 2014 U.S. Dist. LEXIS 97805 (S.D.N.Y. July 15, 2014) ........................... 30

Sira v. Morton,
  380 F.3d 57 (2d Cir. 2004) .................................................................................... 5

Southerland v. City of New York,
  667 F.3d 87 (2d Cir. 2011) .................................................................................. 19

Spagnola v. Chubb Corp.,
  574 F.3d 64 (2d Cir. 2009) .................................................................................... 5

Stephenson v. Doe,
  332 F.3d 68 (2d Cir. 2003) .................................................................................. 11

Tierney v. Davidson,
  133 F.3d 189 (2d Cir. 1998) ............................................................................. 9, 10

Torres-Cuesta v. Berberich,
  511 F. App'x 89 (2d Cir. 2013) ........................................................................... 27

| **Cases** | **Pages** |
| --- | --- |

Valencia v. Sung M. Lee,
    316 F.3d 299 (2d Cir. 2003) ................................................................. 26

Villa v. City of New York,
    11 Civ. 1669 (RJS), 2013 U.S. Dist. LEXIS 49830 (S.D.N.Y. 2013) ....................................... 11

Ward v. Rock Against Racism,
    491 U.S. 781 (1989) ........................................................................... 17

Webster v. City of New York,
    333 F. Supp. 2d 184 (S.D.N.Y. 2004) ..................................................... 8

Young v. Cty. of Fulton,
    160 F.3d 899 (2d Cir. 1998) ................................................................. 18

**Statutes**

42 U.S.C. § 1983 ........................................................................ *passim*

**Constitutional Authorities**

U.S. Const., First Amendment ............................................................ *passim*

U.S. Const., Fourth Amendment .......................................................... *passim*

U.S. Const., Fourteenth Amendment ..................................................... 1, 4

N.Y. State Const. Art. I §§8,11,12 ...................................................... 28

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ............................................... 1, 5

## PRELIMINARY STATEMENT

This matter relates to the use of a communication device by members of the New York City Police Department during a December, 2014, protest in midtown Manhattan.  The six plaintiffs to this matter were attending or otherwise present at the protest and claim that their constitutional and common law rights were violated when defendant officers activated the high-pitched "deterrent tone" of a hand-held, portable long range communication system (the "LRAD") repeatedly for nearly three minutes, causing them pain in their ears and physical discomfort.  In their First Amended Complaint ("FAC"), plaintiffs assert claims pursuant to 42 U.S.C. § 1983 and New York state law against the City of New York, former NYPD Commissioner William Bratton, Lieutenant John Maguire and Police Officer Mike Poletto, alleging, among other claims, that the use of the LRAD by Maguire and Poletto during the protest constituted excessive force and violated plaintiffs' 1st, 4th and 14th Amendment rights.  Defendants now seek dismissal of the FAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), as plaintiffs have failed to plausibly allege any of their claims.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On the evening of December 4th into December 5, 2014, plaintiffs Anika Edrei, Shay Horse, James Craven, Keegan Stephan, Michael Nusbaum and Alexander Appel were all participating in, observing or documenting a protest taking place in Manhattan in response to the decision by a Staten Island grand jury not to indict NYPD Officer Daniel Pantaleo in connection with the death of Eric Garner. Ex. B[1] (FAC), ¶¶1, 109. Some time after 1:00AM on December 5th, as protesters were marching east on 57th Street, NYPD officers made multiple arrests near Madison Avenue and East 57th Street (the "Intersection"). Id., ¶¶111, 142, 207-8, 260-1, 298, 328, 352-56.   A crowd of

---

[1] Unless otherwise indicated, all exhibits referenced herein are annexed to the Declaration of Ashley R. Garman dated October 25, 2016, (the "Garman Declaration").

people gathered around to observe the arrests.  Id., ¶¶113, 148, 261, 299.  Video footage[2] depicts a large number of protesters in the street, blocking traffic at the Intersection.  Ex. C (Video 1), at 00:20-1:45.  Plaintiffs Edrei and Horse, both photojournalists, attempted to take photographs of the arrests, positioned in such a way that they were not interfering with the officers.  Ex. B (FAC), ¶¶144-5, 213-14.  Plaintiffs Craven, Stephen, Nusbaum and Appel also saw the arrests taking place.  Id., ¶¶260-1, 298, 328, 356.

Unidentified persons threw objects – including what plaintiffs believed to be glass bottles – towards the scene where the officers were making arrests.  Ex. B (FAC), ¶¶115, 149, 212, 262, 329.  Video footage depicts people hurling garbage bags into the air and onto the street. Ex. C (Video 1), at 1:49-59.  Pepper spray was deployed towards the crowd, without warning.  Ex. B (FAC), ¶117, 211, 301.   People who had been observing the arrests, including Edrei, Stephen and Appel, began running or otherwise moving away from the Intersection.  Id., ¶¶118, 151-2, 305, 358-9.   Police yelled for everyone to get on the sidewalk.  Id., ¶215.

Defendants Maguire and Poletto, members of the NYPD's Disorder Control Unit, were standing in the roadway on 57th Street and were holding an LRAD Corporation-manufactured 100X Model Long Range Acoustical Device (hereinafter, the "100X").[3]  Ex. B (FAC), ¶¶1, 78, 119-21.  While plaintiffs characterize LRADs, generally, as "more a sound weapon than a traditional loudspeaker or megaphone," Ex. B (FAC), ¶4, plaintiffs concede that the LRAD is marketed as a "'mass notification' solution," id., ¶9 – a communication device – which "allow[s] law enforcement personnel to quickly communicate instructions and directions to large groups."  Id.  The 100X is a

---

[2] The videos submitted as Exhibits C and D to the Garman Declaration are incorporated by their explicit reference in the FAC.  See Ex. B (FAC), ¶315; see also Garman Declaration, ¶¶5-6.

[3] A photograph of the 100X is contained in the Product Sheet, which is incorporated by its explicit reference in the FAC.  See Ex. B (FAC), ¶80; Ex. E (Product Sheet).

handheld, battery-powered, portable version of the LRAD.  Ex. E (Product Sheet).  In addition to having a "loudspeaker" type function to communicate verbal instructions, the 100X also has a high-pitched, volume-adjustable "deterrent tone" which can be activated.  Ex. B (FAC), ¶¶9, 11-12; see also, generally, Ex. D (Video 2).

Without warning, Maguire and Poletto began to activate the 100X's deterrent tone at the direction of people on 57th Street.  Ex. B (FAC), ¶¶120, 153-4, 216-8.  Maguire and Poletto walked the length of 57th Street between Madison and Park Avenues, repeatedly activating the deterrent tone while at the same time using the 100X to broadcast messages identifying themselves as NYPD and directing people to get or stay on the sidewalk and out of the street or be placed in custody.  Id., ¶¶122, 125.   While plaintiffs allege that Maguire and Poletto activated the deterrent tone "almost continuously" for the nearly three minutes it took them to walk the length of 57th Street between Madison and Park, id., ¶125, the video footage belies this claim.  See, generally, Ex. D (Video 2).  Additionally, while plaintiffs allege that people ran away or "fled" from the sound of the 100X, Ex. B (FAC), ¶¶162, 332, the video footage depicts a scene in which people simply walked away from the direction of the officers activating the 100X, Ex. D (Video 2), 00:00-50; others stood on the sidewalk shouting or raising their middle fingers in the air as the officers passed, see, e.g., id., at 00:59-1:05; and still others threw garbage in the street, Ex. C (Video 1), at 3:06-3:17.   One unidentified woman can even be seen talking on what appears to be a wireless headset as the deterrent tone is being activated behind her. Ex. D (Video 2), at 00:51-00:55.

When the officers began using the 100X, Nusbaum, a filmmaker and photographer, put in earplugs that he had brought with him and began filming the officers using the 100X.  Ex. B (FAC), ¶¶320, 336-8.  The other plaintiffs immediately moved away from the sound and were all able to leave the area where the 100X was being used.  Id., ¶¶163-4, 230-1, 272, 308, 361-6.  As he was moving away, Horse turned around and yelled a "critical comment" to Maguire and Poletto, stepped

off the curb to take a photograph of them and then returned to the sidewalk.  Id., ¶¶223-4, 228. Maguire and Poletto then turned towards Horse and "fired" the 100X while pointing it at him.  Id., ¶229. Horse ran away down the sidewalk.  Id., ¶230.

As a result of being exposed to the sound of the 100X, plaintiffs have each suffered lasting physical injuries,[4] as well as fear and emotional injuries that have adversely affected their respective careers as photojournalists, photographers and filmmakers and/or have deterred them from, or made them apprehensive of, attending protests,  Ex. B (FAC),  ¶¶187-96,  245-49, 281-84, 316-19, 343, 377-79.   Plaintiffs allege that Bratton and the City knew or should have known that LRADs were "dangerous weapons" as early as 2004 (when the NYPD purchased a larger, vehicle-mounted model of the LRAD, the 3300 Model, id., ¶57, DCU Briefing at 1), but failed to conduct adequate studies of the LRAD, to develop written protocols and training materials regarding its use and to establish "appropriate" reporting, monitoring and oversight, id., ¶104.

Plaintiffs commenced this action on March 3, 2016, and filed the FAC on August 1, 2016, Garman Decl., ¶2-3.  In the FAC, plaintiffs assert claims against the City, Bratton, Maguire and Poletto under 42 U.S.C. § 1983 for excessive force, 1st and 14th Amendment violations and municipal liability, as well as common law claims[5] for assault and battery, false arrest/imprisonment, negligence and negligent hiring, screening, retention, supervision and training (hereinafter, "Negligent Hiring, Retention and Training"), and claims for violations of various provisions of the New York State Constitution.  See, generally, Ex. B (FAC).  Defendants now move to dismiss plaintiffs' FAC in its entirety, with prejudice.

---

[4] For example, Edrei developed a migraine, sinus pain, confusion, dizziness and disorientation, Ex. B (FAC) ¶¶158, 165-72; she had a headache, facial pressure and was "very sensitive to sounds" for up to a week after the incident, id., at ¶¶ 175-8, and continues to experience ringing in her ears and sensitivity to noise.  Id., at ¶¶179, 182-3. The other plaintiffs reported similar symptoms.  See e.g., id., at ¶¶235-244, 273-9, 311-14, 341, 345, 367-70, 380.  Horse, Craven and Appel sought medical attention in the days after the incident.  Id., ¶¶239-42, 277-9, 371-6.  Horse was diagnosed with tinnitus in both ears and with vertigo, id., ¶241; Appel was diagnosed with hearing loss caused by nerve damage; he was told at a follow-up visit these injuries were healing, id., ¶372-6.

[5] Plaintiff Appel does not assert state law claims.

4

## RULE 12(b)(6) STANDARD FOR DISMISSAL

A pleading may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations and citations omitted). A court should therefore dismiss a complaint when it appears that a plaintiff has failed to plead a plausible claim of relief. Spagnola v. Chubb Corp., 574 F.3d 64, 67 (2d Cir. 2009).

In deciding a motion to dismiss, courts will consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted). Additionally, it is well-settled that when the plaintiff relies on a partial or incomplete version of a document, website or other source material, the court may consider the full content of that document or material in deciding a motion to dismiss. San Leandro v. Phillip Morris, 75 F.3d 801, 809 (2d Cir. 1996); see also, e.g., Dumont v. Litton Loan, 12 Civ. 2677 (ER)(LMS), 2014 U.S. Dist. LEXIS 26880, *73-4 n35 (S.D.N.Y. Mar. 3, 2014) (article, blog, press release); Koplyay v. Cirrus Logic, 13 Civ. 790 (CM), 2013 U.S. Dist. LEXIS 171109 at *9 (S.D.N.Y. Dec. 2, 2013) (press releases and investor calls).

**ARGUMENT**

**POINT I:  THE EXCESSIVE FORCE AND UNLAWFUL SEIZURE CLAIMS FAIL**

At the core of the FAC is plaintiffs' contention that the use of the 100X by Maguire and

Poletto caused plaintiffs to be unlawfully "seized" and constituted a use of excessive force, in

violation of the 4th Amendment.  At the outset, notwithstanding plaintiffs' characterization of the

100X as a "dangerous weapon," the 100X is not an instrumentality of force but is, as it is marketed,

a "long range communication system," Ex. E (Product Sheet) at 1.  Even assuming, <u>arguendo</u>, that

the use of the 100X could constitute "force," plaintiffs have nonetheless not pleaded a cognizable

excessive force claim here.  At a minimum, Marguire and Poletto did not violate clearly established

law and are therefore entitled to qualified immunity.

**A.  <u>Plaintiffs Were Not "Seized" Within the Meaning of the Fourth Amendment</u>**

A claim of excessive force in the context of an arrest or investigatory stop is analyzed under

the 4th Amendment, the test being one of "objective reasonableness."  <u>Graham v. Connor</u>, 490 U.S.

386, 394, 397 (1989).  However, because "[v]iolation of the 4[th] Amendment requires an intentional

acquisition of physical control," <u>Pluma v. City of New York</u>, 13 Civ. 2017 (LAP), 2015 U.S. Dist.

LEXIS 48134, *8 (S.D.N.Y. Mar. 31, 2015) ("<u>Pluma I</u>") (quoting <u>Brower v. Cnty of Inyo</u>, 489 U.S.

593, 596 (1989)), in order for the 4th Amendment standard to apply to plaintiff's force claim,

plaintiffs must plausibly allege that they suffered a "constitutionally cognizable seizure."  <u>Id.</u>,

(quoting <u>Medeiros v. O'Connell</u>, 150 F.3d 164, 167 (2d Cir. 1998)).  Plaintiffs have not done so

here.

A "seizure" for the purposes of the 4th Amendment requires, <u>inter alia</u>, government action

that "restrains the freedom of a person to walk away..."  <u>Pluma I</u>, 2015 U.S. Dist. LEXIS 48134, *8

(quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985)).  "'[P]olice can be said to have seized an

individual only if, in view of all of the circumstances surrounding the incident, a reasonable person

6

would have believed that he was not free to leave.'"  Bogart v. City of New York, 13 Civ. 1017 (NRB), 2016 U.S. Dist. LEXIS 128350, *23-24 (S.D.N.Y. Sept. 6, 2016) (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)) (internal citations and quotation marks omitted). Additionally, the detention itself must be willful.  Medeiros, 150 F.3d at 167-8 (quoting Brower, 489 U.S. at 596).

Here, plaintiffs have not alleged that the use of the 100X caused them to believe that they were not free to leave or restrained their ability to walk away.  Indeed, with the exception of plaintiff Nusbaum, who elected to remain in order to videotape Maguire and Poletto using the 100X, Ex. B (FAC), ¶¶337-8, plaintiffs specifically allege that their response to the sound of the 100X was to *physically move away* from where the 100X was being used, id., ¶¶163-4, 230-1, 271-2, 308, 361-6.  That the plaintiffs claim to have suffered ear pain and other physical ailments as a result of the sound of the 100X is of no moment, because the fact that a plaintiff was injured and/or later sought medical attention as a result of a government action does not automatically render it a "seizure."  Bogart, 2016 U.S. Dist. LEXIS 128350, *26 (citing Webster v. City of New York, 333 F. Supp. 2d 184, 196 (S.D.N.Y. 2004); Bove v. City of New York, 98 Civ. 8800 (HB), 1999 U.S. Dist. LEXIS 12112, 1999 WL 595620, at *5 (S.D.N.Y. Aug. 6, 1999)).

Furthermore, plaintiffs have not alleged facts from which it could be reasonably inferred that Maguire and Poletto intended to curtail anyone's – let alone plaintiffs' – freedom of movement.  Given that the officers were using the 100X's microphone to direct people to get onto the sidewalk and out of the street, id., ¶122, it is plain that their intention was not to restrain anyone's movement but rather to *stimulate* movement out of a street that was open to traffic.  See Medeiros, 150 F.3d at 168-69 (no 4th Amendment seizure where a hostage was hit by a ricocheting bullet during a police shootout with a suspect) ("[F]ar from seeking to restrain [plaintiff's] freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril.").  Nor have plaintiffs pleaded facts

from which they could establish that Maguire and Poletto intended to target plaintiffs specifically with the 100X.[6]  Indeed, to the extent that plaintiffs claim that they were on the sidewalk and/or not blocking traffic when the 100X was deployed, see, e.g., Ex. B (FAC) ¶¶161, 306, they cannot plausibly allege that they were the intended targets of the instructions being communicated via the 100X, and it is well-settled that "[t]he 4th Amendment 'addresses misuse of power. . . . not the accidental effects of otherwise lawful government conduct." Medeiros, 150 F.3d at 168 (internal quotation marks and citations omitted) (alteration in original).  See also Claybrook v. Birchwell, 199 F.3d 350, (6th Cir. 2000) ("[T]he 4th Amendment does not apply to Section 1983 claims which seek remuneration for physical injuries inadvertently inflicted upon an innocent third party by police officers' use of force while attempting to seize a perpetrator, because the authorities could not 'seize' any person other than one who was a deliberate object of their exertion of force.").

Because plaintiffs cannot demonstrate that they were seized, they cannot maintain their excessive force claims predicated on the 4th Amendment.

**B.  The Use of the 100X Did Not "Shock the Conscience"**

Because they were not seized, plaintiffs' force claims are properly analyzed not under the 4th Amendment "objective reasonableness" standard but under the more-stringent "shocks the conscience" standard of the 14th Amendment's Due Process Clause. Bogart, 2016 U.S. Dist. LEXIS 128350, *22-23 (citing Rodriguez v. Phillips, 66 F.3d 470, 477 (2d Cir. 1995); Tierney v. Davidson, 133 F.3d 189, 199 (2d Cir. 1998)); see also Webster v. City of New York, 333 F. Supp. 2d 184, 196 (S.D.N.Y. 2004).  In determining whether an alleged use of force "shocks the conscience," courts in this Circuit consider: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury inflicted, and (4) "whether force was

---

[6] The one possible exception is plaintiff Horse.  Horse alleges that after he yelled a "critical comment" to Maguire and Poletto and took a photograph of them, the officers turned towards him and "fired" the 100X while pointing it at him. Ex. B (FAC), ¶¶228-9.  However, Horse's freedom of movement was not restrained by this act, as evidenced by the fact that he then ran away. Id., at ¶230.

applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Tierney, 133 F.3d at 199 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Plaintiffs cannot demonstrate based on the facts alleged in the FAC and the video footage incorporated by reference therein that the use of the 100X here "shocked the conscience." As a preliminary matter, plaintiffs' force claim fails because, to the extent that the use of the 100X to communicate instructions could be considered "force" at all (which defendants deny), such "force" was *de minimis* at best. In order to prevail on a claim for excessive force, a plaintiff must establish "through evidence, that the 'alleged use of force is objectively sufficiently serious or harmful enough to be actionable.'" Rincon v. City of New York, 2005 U.S. Dist. LEXIS 4335, *11 (S.D.N.Y. 2005) (citing United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). A "*de minimis* use of force will rarely suffice to state a Constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993). Here, the *de minimis* nature of the purported force in this case is illustrated by the way in which, as evidenced by the video, people walked away from the sound of the 100X, see e.g., Ex. D (Video 2), 00:00-50 – they did not "flee" as plaintiffs allege nor did the vast majority of them even cover their ears – and by the fact that a woman can be seen speaking into a what appears to be a wireless headset as the deterrent tone is activated behind her, id., at  00:51-00:55.  Plaintiffs' excessive force claim fails for this reason alone.

With respect to the need for Maguire and Poletto to utilize the 100X, including the alert tone, plaintiffs themselves concede that in the moments before the 100X was first activated, people were throwing glass bottles at officers as they were making arrests at the Intersection, Ex. B (FAC), ¶¶115, 149, 212; furthermore the video footage unquestionably shows protesters in the street, blocking traffic, Ex. C (Video 1) at 00:20-1:45, as well as garbage bags being thrown and littering the streets, id., at 1:49-59, 2:59-3:30.  Given these circumstances, the minimal "force" imposed by

the sound of the 100X was plainly proportional to the need of the officers to protect protesters, bystanders and the officers themselves from flying objects, to allow the officers to make arrests without interference and to clear the streets to allow traffic to safely continue.  See Pluma v. City of New York, 13 Civ. 2017 (LAP), 2016 U.S. Dist. LEXIS 44227, *18-24  (S.D.N.Y. Mar. 21, 2016) ("Pluma II") (applying "objective reasonableness" standard and dismissing excessive force claim premised on use of pepper spray on a crowd of demonstrators where video evidence depicted demonstrators, in the moments before pepper spray was utilized, pushing police officers, pulling down police barricades, interfering with arrests and refusing to comply with orders to get back) ("Based on this [video] evidence, no reasonable fact finder could conclude 'that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances.'") (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 124 (2d Cir. 2004)); see also Tierney, 133 F.3d at 199 (officers' use of force in grabbing each of the two plaintiffs by an arm or wrist during a lawful search of a premises and in striking of one of the plaintiffs on the forearm with a nightstick when she attempted to interfere with the arrest of a suspect did not "shock the conscience" but rather was *de minimis*, necessary, appropriate, and benign.").

Finally, plaintiffs have not plausibly alleged facts from which it could be inferred that Maguire and Poletto used the 100X's deterrent tone "maliciously and sadistically for the very purpose of causing harm." Tierney, 133 F.3d at 199.  A substantive due process claim in the § 1983 context requires more than negligence or even recklessness.  Medieros, 150 F.3d at 169 (noting that "the Supreme Court recently ruled that were 'the officer's instinct was to do his job as a law enforcement officer, not to induce…lawlessness, or to terrorize, cause harm, or kill,' the officer's conduct did not shock the conscience.") (quoting County of Sacramento v. Lewis, 523 U.S. 833 (1998)) (alterations in original).  Here, as set forth above, Maguire and Poletto used the 100X to warn people to get out of the street, during a protest where individuals were in the street, blocking

traffic, and throwing glass bottles and garbage at the officers and into the street – in other words, to do their job, not to induce lawlessness, terrorize or harm plaintiffs.  Plaintiffs having not pleaded conscious-shocking conduct, they cannot maintain an excessive force claim.

## C.  The Use of the 100X Was Objectively Reasonable

Even if plaintiffs had plausibly alleged a "seizure," rendering their force claims subject to the less-stringent 4th Amendment standard, their force/unlawful seizure claims still fail. An officer's application of force in the seizure context is excessive if it is objectively unreasonable in light of the facts and circumstances confronting the officer.  Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham, 490 U.S. at 397).  The test is an objective one, to be assessed as an officer on the scene without the benefit of knowing how events unfolded, and with deference to the "split-second judgments" in "tense, uncertain, and rapidly evolving" situations that the police officers faced.  Graham, 490 U.S. at 396-7.  Given the circumstances here – i.e., the threat to public safety and order created by the presence of protesters in a street open to traffic, some of whom were throwing glass bottles and garbage – the use of the 100X to clear people out of the street was plainly objectively reasonable.  See, e.g., Pluma II, 2016 U.S. Dist. LEXIS 44227, *23.

## D.  At a Minimum, Maguire and Poletto are Entitled to Qualified Immunity

At a minimum, Maguire and Poletto are entitled to qualified immunity for any purported "force" in connection with their use of the 100X.  The Second Circuit has held that "the qualified immunity defense is generally available against excessive force claims [where] a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." Villa v. City of New York, 11 Civ. 1669 (RJS), 2013 U.S. Dist. LEXIS 49830, at *20 (S.D.N.Y. 2013) (citing Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995)); see also Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) ("[E]ven officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of

11

protection from the sometimes hazy border between excessive and acceptable force." (internal quotation marks omitted)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam).

Under the doctrine of qualified immunity, public officials are protected from liability for civil damages when either: (a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2015).   As the U.S. Supreme Court recently held, what is "clearly established" should not be defined at a high level of generality.  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).   Rather, the dispositive question is whether the violative nature of the particular conduct at issue is clearly established.  Id.  To overcome qualified immunity, "[e]xisting precedent must have placed the state or constitutional question... beyond debate."  Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014).   "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.  The unlawfulness must be apparent."  McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999).

Here, given the dearth of holdings in this Circuit (or any court, for that matter) that temporary exposure to uncomfortably loud noises can constitute force,[7] it is far from apparent that the use of the 100X could constitute force at all, let alone that its use in this particular situation constituted excessive force in violation of the 4th or 14th Amendments.  Indeed, plaintiffs allege that the NYPD's regular use of the 100X during demonstrations was a new phenomenon, beginning in

---

[7] Indeed, the New York Supreme Court Appellate Division has held that "[s]ound is not a substance but a physical phenomenon, such as light or gravity."  Martzloff v. City of New York, 238 A.D.3d 115, 117 (N.Y. App. Div. 1st Dep't 1997)  (N.Y. state procedural rule governing the accrual date of personal injury actions  "caused by the latent effects of exposure to any substance..." does not apply to firing range employees' allegations of hearing loss as a result of exposure to sound of gunfire, because sound is not a "substance"); see also Casson v. City of New York, 269 A.D.2d 285, 286 (N.Y. App. Div. 1st Dep't 2000) (applying Martzloff to similar allegations by police officers).

late 2014, "just days before" the December 5, 2014, incident that is the subject of the FAC.  Ex. B (FAC), ¶¶70-2.  As the U.S. Supreme Court noted in Maryland v. King, __ U.S. __, 133 S. Ct. 1958 (2013), courts have routinely upheld police procedures that entail some degree of intrusion upon 4th Amendment-protected interests but that are simply extensions of long-accepted methods made more effective by advances in technology.  In King, the Court upheld a Maryland law authorizing law enforcement authorities to collect DNA samples from arrestees charged with certain serious crimes through use of a "buccal swab" to the inside of the cheek.  Tracing the history of police booking procedures used to identify arrestees from the use of physical measurements to photographing and, later, fingerprinting, the Court found that the DNA testing by the buccal swab procedure was akin to, but superior to, these prior methods and is justified by the same legitimate law enforcement-related concerns of accurately processing and identifying persons taken into custody.  Id., 133 S. Ct. at 1967-80 (noting that "[l]aw enforcement agencies routinely have used scientific advancements in their standard procedures for the identification of arrestees").

The LRAD is, as DNA was to fingerprinting in King, a technologically-advanced analog of other long-accepted police methods for communicating warnings and instructions to the public (i.e., sirens, loudspeakers, megaphones).  Thus, at a very minimum, Maguire and Poletto reasonably believed that the use of the 100X to get the attention of protesters and to communicate to them to get out of the street – in much the same way that the police, fire truck and ambulance sirens that we accept as a hazard of daily New York City life are used to clear the way for emergency response vehicles – was lawful.  The purported unlawfulness of Maguire and Poletto's use of the 100X not being "apparent," and the right to be free from temporary exposure to uncomfortably loud noises during a protest not "clearly established," Maguire and Poletto are entitled to qualified immunity. Brown, 2016 U.S. Dist. LEXIS 53365 *23-5 (S.D.N.Y. Apr. 20, 2016) (granting qualified immunity where plaintiff, during disorderly conduct arrest, refused to comply with officers' orders and was

allegedly pepper sprayed at a distance of one foot; even though the Patrol Guide requires a range of a minimum of three feet, the unlawfulness of the officers' actions was not "apparent" and the violation of any right was not "clearly established").

## POINT II: THE FIRST AMENDMENT CLAIMS FAIL

### A.   Plaintiffs' First Amendment Retaliation Claim Fails as Pled

"To plead a 1st Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the 1st Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cnty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). Plaintiffs' 1st Amendment retaliation claim fails as any use of the 100X was reasonable and justified under the circumstances and cannot provide a basis liability; qualified immunity shields the actions of the officer defendants; and plaintiffs cannot not plausibly allege that the actions of the officers were motivated by plaintiffs' exercise of their 1st Amendment rights.

First Amendment retaliation claims are generally framed as retaliation by 4thAmendment seizure following an arrest.  Established precedent in this Circuit states that where a 4th Amendment seizure by arrest is justified, a 1st Amendment retaliation claim cannot lie.  Fabrikant v. French, 691 F.3d 193, 215-216 (2d Cir. 2012); Papineau v. Parmley, 465 F.3d 46, 59 (2d Cir. 2006) ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest.") (quotations omitted).  Here, plaintiffs have framed their retaliation claim in reference, not to an arrest, but to a 4th Amendment seizure by excessive force.  At the outset defendants should be entitled to qualified immunity on such a freshly manufactured, hybrid, theory, which regardless is duplicative of the 4th Amendment theory.  In the limited circumstances where the Court has been confronted with a 1st Amendment retaliation claim attached to a claim of excessive force absent an arrest, the Court has still reasoned that where the action of the police was

14

lawful, the 1st Amendment retaliation theory cannot survive.  See Bogart, 2016 U.S. Dist. LEXIS 128350, *21.

Here, plaintiffs cannot argue that protestors were not present in the roadway, nor against the lawfulness of the police orders.  The only complaint proffered is about the volume at which amplified orders and sound was issued.  At this preliminary step, plaintiffs' claim cannot survive.  The police action was concededly lawful, and issued in response to a scene were individuals were throwing bottles at the police while in the roadway, Ex. B (FAC), ¶¶115, 149, 212, and in response the police issued verbal and amplified orders to get out of the street, id., ¶¶160, 215, 221, 333, 363.  In this context, based on the facts presented the police acted properly in an attempt to clear the roadway and maintain order at a public demonstration, two of the express duties of the NYPD under NYC Charter § 435(a).  In that context even the use of the 100X's deterrent tone is a proper and lawful police action, and not a subject of liability for 1st Amendment retaliation.

Additionally, plaintiffs have failed to set forth any pleadings that plausibly establish that the actions by defendants were motivated by plaintiffs' 1st Amendment conduct.  As alleged, the use of the 100X was accompanied by a tumultuous situation characterized by protestors in the roadway and throwing objects at the police.  Ex. B (FAC), ¶¶115, 149, 212.  In response the police issued verbal orders to get out of the road, id., ¶ 215, while defendants walked the street issuing additional amplified orders to get out of the road punctuated by the deterrent tone, id., ¶ 160, 221, 333, 363.  Given the context as alleged by plaintiff, the use of the LRAD and deterrent tone is far more likely explained by the need to clear the street, restore some order, and an attempt to obtain compliance with repeated attempts to clear the street.  Iqbal, 556 U.S. at 681-2 ("Taken as true, these allegations are consistent with [unlawful discrimination].  But given more likely explanations, they do not plausibly establish this purpose.")  Accordingly, plaintiffs' 1st Amendment retaliation claim fails as a matter of law and must be dismissed.

B.    **Any Claim Premised on a Time Place and Manner Restriction Fails**

In stating their 1st Amendment claim plaintiffs present the language of a time, place, and manner restriction 1st Amendment challenge as an alternative basis, reciting the legal elements of three separate theories, separated by a casually used "and/or."  Ex. B (FAC), ¶403.  Plaintiffs have failed to present plausible factual allegations sufficient to maintain a 1st Amendment time, place and manner claim under any theory, and this claim must be therefore be dismissed.  Iqbal, 566 U.S. at 681-2 (disregarding legal elements pled as a cause of action, and requiring factual allegations to be "more likely," i.e. plausible, than non-actionable reasons).

Plaintiffs' alternatively-pled time place and manner theories are undefined and ill-focused.  Plaintiffs supports this claim by making bare reference to "uses of force and other regulations imposed on plaintiffs," however this is done with no attempt to define what "other regulations," if any, plaintiffs are even referencing.  Ex. B (FAC), ¶404.  As set forth above, the use of a sound amplification device to broadcast lawful police orders simply does not constitute a use of force, and any defendants would be entitled to qualified immunity even if such a novel theory was considered.  This is particularly true where there was no restriction on any movement or statement by any plaintiff.  In fact, the use of the 100X, at most, allowed the officers to provide clear orders not to engage in unlawful conduct during a protest without imposing any restriction on lawful expression or movement in anyway.

Even if it was sufficiently set forth and supported by plausible factual pleadings, plaintiff's time, place and manner claim still fails.  Plaintiffs have attempted to repurpose a claim used to challenge legislative and administrative restrains on speech to a device.  Setting forth a time, place and manner claim against an LRAD makes no more sense than setting it forth against a bullhorn, a police jacket, a barricade, or a stapler.  Quite clearly this inanimate object is content-neutral.  The use of that or any of the above police equipment, when employed as alleged here, to keep protestors

from unlawfully entering the street, are not time, place and manner restrictions.   Plaintiffs

essentially concede this point in their pleadings, as legally they must.  Ex. B (FAC), ¶406.

> "The principal inquiry in determining content neutrality, in speech cases generally
> and in time, place, or manner cases in particular, is whether the government has
> adopted a regulation of speech because of disagreement with the message it conveys.
> The government's purpose is the controlling consideration. A regulation that serves
> purposes unrelated to the content of expression is deemed neutral, even if it has an
> incidental effect on some speakers or messages but not others. Government
> regulation of expressive activity is content neutral so long as it is justified without
> reference to the content of the regulated speech."

Ward v. Rock Against Racism, 491 U.S. 781, 791-92 (1989) (quotations omitted).  Additionally,

plaintiffs allege that the LRAD not sufficiently narrow.  Ex. B (FAC), ¶407.  That legal conclusion

misconstrues the meaning of narrow tailoring.[8]   A restriction on the time, place and manner of

expression "need not be the least restrictive or least intrusive means doing so.   Rather, the

requirement of narrow tailoring is satisfied so long as the [] regulation promotes a substantial

government interest that would be achieved less effectively absent the regulation."  Ward, 491 U.S.

798-99 (1989) (permitting the City to control volume at a public event).  Here, past demonstrations

and litigation have amply demonstrated that LRADs serve a substantial government interest that

would be achieved less effectively without them.  At large scale events in New York City police

orders, even through bullhorns, have been subject to challenges both on the street and in the

courtroom by protestors who claim they could not hear police directives.  Dinler v. City of N.Y.,

2012 U.S. Dist. LEXIS 141851, at *25-26 (S.D.N.Y. Sep. 30, 2012) ("[D]uring Galati's

announcement, protesters can be heard saying, 'We can't hear you!' Police also walked through the

crowd making similar announcements. [S]everal individual Plaintiffs contend that they did not hear

all of the warnings.") (citations omitted); See Garcia v. Jane & John Does 1-40, 764 F.3d 170, 174

(2d Cir. 2014) ("[P]laintiffs allege that the officers knew that they had not given any warnings or

---

[8] To the extent that phrase, dealing with statutory construction, can even be applied to a sound amplification device in a sensible way.

orders to disperse that would have been audible to the vast majority of those assembled.").  Given these examples of protestors chanting over police orders given by bullhorn in protests from at least 2004 through 2012, and litigating that orders were inaudible for years afterwards, louder and clearer amplification of police orders serves a legitimate governmental function.

### C. **Maguire and Poletto are Entitled to Qualified Immunity**

Finally, at a minimum, to the extent plaintiffs have plausibly pled 1st Amendment retaliation and/or a time, place and manner claims against defendants Maguire and Poletto, those defendants are nonetheless entitled to qualified immunity.  "[I]n the light of pre-existing law the unlawfulness must be apparent.   In other words, existing precedent must have placed the statutory or constitutional question . . . beyond debate." Occupy Nashville v. Haslam, 769 F.3d 434, 442-3 (6th Cir. 2014) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2023, (2014). Defendants were at least arguably reasonable to believe the use of the 100X to amplify lawful police orders was proper, and that in a chaotic situation where they needed to clear the roadway and stop objects from being hurled at the police the deterrent tone would safely and effectively draw attention to those lawful orders and assist in clearing the roadway.   Additionally, no pre-existing precedent clearly established the use of an LRAD, or other amplification in response to unlawful activity, as improper at the time.   Likewise, the application of a time, place and manner allegation against a device, instead of a rule or regulation, not only lacks precedent, it is, respectfully, bizarre.   Certainly no precedent has shown that the use of a sound amplification device violates 4th Amendment principles, let alone through a gauzily claimed restraint on movement violates the 1st Amendment as well.   See Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citations omitted) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").   Accordingly, Maguire and Poletto acted at least arguably reasonably in using the 100X, and are entitled to qualified immunity. See Young v. Cty. of Fulton, 160 F.3d 899,

903 (2d Cir. 1998) (stressing the importance of controlling Supreme Court and Second Circuit precedent to render a right sufficiently established to overcome qualified immunity.)

### POINT III: THE DUE PROCESS AND EQUAL PROTECTION CLAIMS FAIL

Plaintiffs conclusorily allege that conduct "described elsewhere" in the FAC "violated Plaintiffs' rights to enjoy equal protection of the laws as well as their substantive due process rights...." Ex B (FAC), ¶410.   Plaintiffs cannot maintain claims under either of these 14th Amendment-derived theories, however.   As set forth above, plaintiffs have not pleaded facts sufficient to demonstrate conduct that "shocks the conscience" and therefore cannot maintain a substantive due process claim.   Furthermore, the substantive due process claim is premised, explicitly, on the very same conduct that underlies plaintiffs' 1st and 4th Amendment-derived[9] claims.   As such, the substantive due process claim is duplicative of these claims and must be dismissed.   See Southerland v. City of New York, 667 F.3d 87, 103 (2d Cir. 2011); (quoting Kia P. v. Mcintyre, 235 F.3d 749, 757 (2d Cir. 2000) ("Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiffs' claims under that explicit provision and not the more generalized notion of substantive due process.")); see also Lonegan v. Hasty, 436 F.Supp. 2d 419, 440 (E.D.N.Y. 2006) (dismissing substantive due process claims "because they arose from the same conduct by defendants, and seek a remedy for the same injuries, as their 4th Amendment claims").

Nor can plaintiffs maintain a claim for violation of their equal protection rights.   "[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

---

[9] Of course, as set forth herein, defendants contend that plaintiffs have no viable 4th Amendment claims because they were not "seized" and that therefore the substantive due process analysis governs plaintiffs' excessive force claim. See Point I, supra.   However, should the  Court determine that plaintiffs have adequately pleaded a 4th Amendment "seizure," plaintiffs' substantive due process claim must fail as duplicative.

constitutional rights, or malicious or bad faith intent to injure a person." LaTrieste Restaurant & Cabaret v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (citing LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980), cert. denied, 450 U.S. 959 (1981)).  Here, there are no factual allegations relating to how plaintiffs were singled out as compared to other purportedly similarly situated individuals.  Indeed, the FAC explicitly states just the opposite – that Maguire and Poletto activated the 100X towards a group of people on 57[th] Street, Ex. B (FAC), ¶120, that the 100X "seized" all people in the area, id., ¶396, and that the use of the 100X was necessarily "overbroad and over-inclusive,"  id., ¶406.  These contentions are contrary to the notion that plaintiffs were somehow treated differently as compared with others who were similarly situated.  There are no allegations of fact about the different classes of people who were allegedly present at the protest but not subjected to the sound of the 100X.  Plaintiffs' equal protection claim must therefore be dismissed.  See John Gil Constr., Inc. v. Riverso, 99 F. Supp. 2d 345, 353 (S.D.N.Y. 2000) (dismissing selective enforcement claim because "vague and speculative statements are insufficient to state a claim"), aff'd, 7 F. App'x 134 (2d Cir. 2001).

### POINT IV: PLAINTIFFS' *MONELL* THEORIES MUST BE DISMISSED AS PLED

At the outset, as set forth above, plaintiffs have not plausibly alleged any underlying violation of their constitutional rights, and their municipal liability claim fails for that reason alone. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). Even if plaintiffs had done so, their municipal liability claim still fails as they have not plausibly alleged the existence of a City policy or practice that is the moving force behind the alleged constitutional violations.

To hold a municipality liable under § 1983 for the allegedly unconstitutional acts of its employees, a plaintiff must prove (1) that the alleged actions by the employees were the result of a specific official policy, custom, or practice of the municipal defendant; (2) that this policy, practice, or custom caused plaintiffs' alleged injuries; and (3) that those alleged injuries constituted a

violation of plaintiffs' constitutional rights.  Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691-4 (1978).

Plaintiffs set forth nine distinct theories of Monell liability in the hope that some of them can survive the instant motion.  Ex. B, FAC, ¶¶415(a)-(h), 430-31.  Plaintiffs contend "[u]pon information and belief" that NYPD policy in December of 2014 permitted and/or encouraged officers to use LRADs for a laundry list of eight purportedly improper purposes.  Id., ¶¶415(a)-(h).[10]  As their ninth Monell theory, plaintiffs contend that the City and Bratton failed to propely train and/or supervise Maguire and Poletto related to use of the LRAD.  Id., ¶¶430-31.

With respect to the first eight of plaintiffs' nine theories, the FAC contains no factual support whatsoever for the existence of each purported City policy, and plaintiffs' conclusory allegations as to the existence of such policies – asserted "upon information and belief," without a scrap of factual support for such belief – are insufficient.  Any theories that cannot be tied to specific factual pleadings are not sufficiently supported to make those broad conspiratorial theories plausible.  "[P]laintiffs have neither plausibly alleged that the officers intended to discourage protesting nor explained why, had they intended to do so, they would have arrested only the protesters who [violated the law]."  Garcia v. Bloomberg, 865 F.Supp.2d 478, 492-3 (S.D.N.Y. 2012) (dismissing as implausible plaintiffs' broad conspiratorial policy to allegedly deter Occupy Wall Street protests).  Nor can the December 5, 2014, incident that is the subject of plaintiffs' complaint, standing alone, establish the existence of any policy, as it is well-settled that "a single

---

[10] These purposes are: (1) unwarranted seizures and arrests in connection with peaceful, expressive assemblies, Ex. B (FAC), ¶415(a); (2) treating groups as a unit for crowd control purposes without first having given them fair warning, id., ¶415(b); (3) treating groups as a unit for crowd control purposes without first having given them lawful, audible and clear dispersal orders, a reasonable time to disperse and a means by which to do so, id., ¶415(c); (4) seizures without forewarning and without individualized determinations of probable cause as opposed to mere perceived presence among a group, id., ¶415(d); (5) arrests, including mass arrests, without forewarning and without individualized determinations of probable cause, id., ¶415(e); (6) use of force against groups without forewarning and without individualized determinations of reasonableness, id., ¶415(f); (7) "[o]ther restrictions on 1st Amendment rights" that are not content-neutral or that are content-neutral but are not narrowly tailored and do not provide alternate channels for expression, id., ¶415(g); and (8) "[o]ther restrictions on the rights to move freely, liberty rights, privacy rights, rights to be left alone, other related Substantive Due Process guarantees, and/or rights to Equal Protection" of individuals engaging in, or present near, peaceful protests or assemblies, id., ¶415(h).

incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991).

Here, each of the theories of municipal liability asserted in paragraphs 415(a)-(h) of the FAC is set forth in the sort of bare-bones and conclusory manner that requires dismissal. Significantly, not only have plaintiffs failed to plead any facts to support their contention that NYPD policies authorized and/or encouraged the use of LRADs in the eight purportedly unlawful manners enumerated in paragraph 415(a)-(h), plaintiffs cannot possibly do so. By their own admission, LRAD devices were only used "a few" times from 2004 (when the NYPD first purchased LRAD Model 3300 devices) to the time of the December 5, 2014, incident that is the subject of plaintiffs' complaint here, despite the fact that during that time period, according to plaintiffs, "the NYPD policed thousands of 1st Amendment assemblies involving street and sidewalk marches." Ex. B (FAC), ¶¶57, 65-7, 70-2.  Nor do plaintiffs allege that any of these prior uses of LRADs were in any way improper or resulted in constitutional violations. To the extent that plaintiffs contend that the NYPD has routinely used LRADs in connection with protests and other assemblies *since* December, 2014, see id., ¶¶70-2, 419, 429, such assertion, even if true, cannot establish the existence of a policy or practice in place on December 5, 2014, and any subsequently-developed policy cannot possibly have caused the alleged violations of plaintiffs' constitutional rights.

Additionally, even if plaintiffs had plausibly alleged the existence of the policies set forth in paragraphs 415(a)-(h) of the FAC, they have not pled any causal connection between any one of their myriad Monell theories and the constitutional injuries they claim to have suffered. "To establish Monell liability, the causal link must be strong; that is, the policy must be the 'moving force' behind a constitutional violation." Mercado v. City of New York, 2011 U.S. Dist. LEXIS 140430, at *23 (S.D.N.Y. Dec. 5, 2011) (quoting Monell, 436 U.S. at 691, 694).  Plaintiffs allege no

connection whatsoever between the purported violations of their constitutional rights resulting from the officers' use of the 100X on December 5, 2014, and the broad policies plaintiffs allege in paragraphs 415(a)-(h).  Most strikingly for example, plaintiffs' fifth theory relates to a purported policy of using LRADs to effect arrests, including mass arrests, without individualized determinations of probable cause, Ex. B (FAC), 415(e); however, here none of the plaintiffs claims to have been arrested. "The plaintiffs cannot bridge the gap between the broad, conspiratorial policy they attribute to the City and the violations that they have plausibly alleged in this case." <u>Garcia</u>, 865 F. Supp. 2d at 492.  The first eight <u>Monell</u> theories fail for this additional reason, and must be dismissed.

Plaintiffs' ninth theory of <u>Monell</u> liability is an alleged failure of the City and Bratton to properly train and/or supervise Maguire and Poletto related to use of the 100X, which plaintiffs contend amounted to deliberate indifference to plaintiffs' constitutional rights.  Ex. B (FAC), ¶¶430-1.  Specifically, plaintiffs claim that the City failed to conduct "appropriate" research about, and testing of, its LRADs and to create an implement written guidelines, training, reporting requirements and supervision for their use. <u>Id.</u>, ¶¶419-20.  Again, however, even if plaintiffs had adequately pleaded an underlying violation of their constitutional rights (which they have not), there is insufficient factual material in the FAC to support their <u>Monell</u> claim premised on an alleged failure to train/supervise.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011).  To prevail on such a theory, a plaintiff must demonstrate that the municipality's failure to train its employees in a relevant respect amounts to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" <u>Id.</u>, (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)) (alteration in original).  As the U.S. Supreme Court has noted, the deliberate

indifference standard is stringent; to meet it, a plaintiff must show both that (1) municipal policymakers are on actual or constructive notice that a particular omission in their training program causes the municipality's employees to violate citizens' constitutional rights, and (2) despite being on notice, policymakers choose to retain the deficient training program.  Id. (citing Board of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 407, 410 (1997)).

Here, plaintiffs' failure to train/supervise claim fails because they have not plausibly alleged that the City was on notice, as of December 5, 2014, that the purported absence of formal written guidelines, training materials and policies specific to the use of the LRAD caused City employees to violate citizens' constitutional rights.  In order to establish the requisite notice on the part of policymakers, a plaintiff must demonstrate "[a] pattern of similar constitutional violations by untrained employees," because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Connick, 563 U.S. at 62.

Here, plaintiffs contend that the NYPD did not start using the LRAD regularly at demonstrations until "late 2014," Ex. B (FAC), ¶¶70-72, 419, 429 – just "days before" the incident that is the subject of the FAC, id., ¶71 – and that the NYPD used the LRAD in only "a few incidents" prior to that time, id., ¶¶64-7, and do not contend that any constitutional violations occurred during those "few incidents." Accordingly, the NYPD's use of the 100X prior to December 5, 2014, cannot have put the City on notice that any alleged absence of LRAD-specific written guidelines or training materials caused the officers operating the LRAD to unlawfully suppress 1st Amendment activities or to subject people to unreasonable force in violation of the 4th Amendment.

Furthermore – and it cannot be emphasized enough – plaintiffs' characterization of the LRAD as a "sound weapon" capable of use as an instrument of "assault" aside, the LRAD is not an

instrumentality of force, but a communication device.  Nor is the 100X – the portable, handheld model used by Maguire and Poletto during the incident at issue here – capable of the same output as the larger, vehicle-mounted models referenced by plaintiffs throughout the FAC, which, defendants note, has been artfully pleaded to conflate the 100X with the larger models.  For example, while plaintiffs make much in the FAC of the test results from the NYPD's 2010 testing of its LRADs, Ex. B (FAC), ¶¶73-7, those results are completely irrelevant to this matter because, as plaintiffs concede, the tests were conducted on the larger, mounted LRAD 3300 Model, id., ¶73, not the handheld device used here.  As the videos of this incident plainly demonstrate, the comparatively-diminutive 100X is not a "weapon" nor was it used as such on December 5, 2014, and any purported risk to the public posed by its use is not at all "so obvious and so great that failure to train on the applicable constitutional limitations constitutes deliberate indifference as a matter of law." Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006) (citation omitted).[11]

Because plaintiffs have not plausibly alleged that the City was on notice of any deficiency in its training related to the LRAD, plaintiffs' failure to train/supervise theory of Monell liability fails and must be dismissed.

### POINT V:  PLAINTIFFS CANNOT MAINTAIN A CLAIM AGAINST BRATTON

While plaintiffs name former Commissioner Bratton as a defendant in this matter in both his individual and official capacities, plaintiffs have failed to plausibly allege that Bratton was

---

[11] Furthermore, plaintiffs do not claim (nor can they) that the City provided no training whatsoever to Maguire and Poletto in the operation of the LRAD, nor do they claim that the officers were not trained regarding the use of force and seizure of persons, generally, or in performing crowd control/responding to demonstrations.  Rather, plaintiffs' contention is that there are no *written* guidelines, training materials or other written policies regarding the use of the 100X, specifically, and no requirements that LRAD use be reported in writing.  See e.g., Ex. B (FAC), ¶¶94-104.  However, even if the LRAD could conceivably implicate individuals' 4th or 1st Amendment rights if used improperly, the LRAD is not so far-flung from the older, widely-used and accepted communication devices (e.g., bullhorns or megaphones) over which it constitutes a technological improvement so as to so obviously necessitate additional specific written guidelines for its lawful use.  Because "the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to [show deliberate indifference]," Reynolds v. Giuliani, 506 F.3d 183, 193 (2d Cir. 2007) (quotations omitted), the City's alleged failure to provide written guidelines and training materials specific to LRAD use cannot, in and of itself, amount to deliberate indifference.

personally involved in the use of the 100X during the December 5, 2014, incident, and can therefore not proceed against him individually.[12]  It is well established that to state a § 1983 claim "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.  A plaintiff's obligation to plausibly allege a defendant's personal involvement in the claimed constitutional violation is not excused when that defendant holds a supervisory position.  Day v. Armstrong, 99-281, 2000 U.S. App. LEXIS 31029, at *4 (2d Cir. Nov. 30, 2000).  Here, plaintiffs do not allege that Bratton was on the scene at the time of the deployment of the 100X by Maguire and Poletto or had any involvement in its use at that particular moment.[13]   Plaintiffs having failed to plead facts establishing Bratton's personal involvement in the alleged deprivations of their constitutional rights, their claims against Bratton individually fail and must be dismissed.

## POINT VI:  PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED[14]

### A.  Plaintiffs' Assault and Battery Claims Fail

Plaintiffs have not pleaded facts that support a finding that Maguire and Poletto intentionally

---

[12] Additionally, plaintiffs' claims against Bratton in his official capacity should be dismissed as duplicative of the Monell claims.  A "state official sued in his official capacity is not a person within the meaning of Section 1983, and, consequently, is not subject to liability for depriving a person of constitutional rights." Perez v. City of New York, No. 07 Civ. 10319(RJS)(KNF), 2009 U.S. Dist. LEXIS 50066, at *11 (S.D.N.Y. June 8, 2009) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)).  Rather, a claim against a municipal employee in his official capacity is "equivalent of a damage suit against the municipality itself." Escobar v. City of New York, 05 Civ. 3030(ENV)(CLP), 2007 U.S. Dist. LEXIS 45952, at *3 (E.D.N.Y. June 25, 2007).

[13] Moreover, "purpose rather than knowledge is required to impose [] liability on the subordinate for unconstitutional [conduct];  the same holds true for an official charged with violations arising from his or her superintendent responsibilities." Iqbal, 556 U.S. at 677.  Plaintiffs' allegations that Bratton "ratified and endorsed" Maguire's and Poletto's conduct after the fact cannot possibly have contributed to the purported violations of plaintiffs' constitutional rights, Ex. B (FAC) ¶¶17-20.

[14] If the Court dismisses all of plaintiffs' federal claims, it should decline jurisdiction over the remaining state law claims.  "[W]here a federal district court 'dismisse[s] all claims over which it has original jurisdiction,' that court has discretion over whether to exercise supplemental jurisdiction over the plaintiff's remaining state law causes of action. Keith v. City of New York, 11 Civ. 3577 (KPF), 2014 WL 6750211, 2014 U.S. Dist. LEXIS 166469, *68 (S.D.N.Y. Dec. 1, 2014) (quoting 28 U.S.C. § 1367(c)(3)), aff'd., 641 Fed. Appx. 63, 2016 U.S. App. LEXIS 4208 (2d Cir. Mar. 7, 2016).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered… will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia v. Sung M. Lee, 316 F.3d 299, 305 (2d Cir 2003) (quoting Cohill, 484 U.S. at 350 n.7).

placed plaintiffs "in fear of imminent harmful or offensive contact," so as to render them liable for assault, see Torres-Cuesta v. Berberich, 511 F. App'x 89, 91 (2d Cir. 2013), or that they "intentionally made wrongful physical contact" with plaintiffs, and thus committed battery, see id., because the officers neither intended to subject plaintiffs to physical contact nor did they actually do so.  As set forth above, the officers used the 100X intending not to place plaintiffs in fear of imminent contact but to warn pedestrians to get out of the roadway.  Furthermore, plaintiffs were not ever subjected to "physical contact."  They claim that the sound of the 100X hurt their ears and caused other physical ailments; however, as the New York State Appellate Division has held, sound is not a "substance," Martzloff, 238 A.D.2d at 117  ("Sound is not a substance but a physical phenomenon, such as light or gravity.").  Thus, the officers' creation of a sound that plaintiffs happened to hear cannot be considered "physical contact."

Furthermore, is well settled that "the test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a 4[th] Amendment excessive force claim." Tatum v. City of New York, 06 Cv. 4290 (BSJ) (GWG), 2009 U.S. Dist. LEXIS 3512, *29 (S.D.N.Y Jan. 19, 2009) (citation omitted).  As set forth above, even if the 4th Amendment governed plaintiffs' excessive force claims (which defendants deny, because plaintiffs weren't "seized"), Maguire and Poletto's use of the 100X was objectively reasonable given the circumstances.  Thus, even if the sound of the 100X could be considered "physical contact," any such contact with plaintiffs was justified and therefore not actionable.   Plaintiffs' assault and battery claims must be dismissed.

## B. Plaintiffs' Common Law False Arrest and Imprisonment Claims Fail

A § 1983 claim for false arrest is "substantially the same" as a claim for false arrest under state law. See Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). In order to state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the

plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." <u>Savino v. City of New York</u>, 331 F.3d 63, 75 (2d Cir. 2003) (quoting <u>Bernard v. United States</u>, 25 F.3d 98, 102 (2d Cir. 1994)).   Here, as set forth above, plaintiffs were not ever confined – indeed, five of them immediately moved away from the sound of the 100X, and the sixth, Nusbaum, freely chose to stay and videotape the officers.   Nor did the officers intend to confine plaintiffs, but rather intended to warn pedestrians to get and stay out of the roadway.   Accordingly, plaintiffs' false arrest and imprisonment claims fail as a matter of law and must be dismissed.

### C.      Plaintiffs' New York State "Constitutional Tort" Claims Fail

Plaintiffs seek redress for the deprivation of various rights under the New York State Constitution, including Article I §§ 8, 9, 11, and 12.   These include the right to speak freely, peaceably assemble, to equal protection of laws, and to security against unreasonable seizures.   Ex. B (FAC), ¶¶451-54.   However, "the state constitutional tort is usually available only in cases in which a plaintiff... has no alternative remedy." <u>Biswas v. City of N.Y.</u>, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013).   <u>See also</u> <u>Hershey v. Goldstein</u>, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013) ("District courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983."); <u>Bogart</u>, 2016 U.S. Dist. LEXIS 128350, at *37-8 (dismissing claims under N.Y. State Const. Art. I §§8,11,12); <u>See</u> <u>Noonan v. City of New York</u>, 14 Civ. 4084 (LTS), 2015 U.S. Dist. LEXIS 83451, *26-27(S.D.N.Y. June 26, 2015) (dismissing state constitutional claims with analogs in either common law or § 1983).   Here, any state constitutional claims must be dismissed as redundant as plaintiffs have already asserted applicable claims under common law as well as under the 1st, 4th and 14th Amendments.

### D.      Plaintiffs' Negligence and Negligent Hiring and Retention Claims Fail

A party may not recover on inconsistent theories of liability where the complaint only alleges one theory of liability. See Busch v. City of New York, 2003 U.S. Dist. LEXIS 27571 (E.D.N.Y 2003). "Various federal courts within this circuit have held, [], that under New York State law, when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." Tatum, 2009 U.S. Dist. LEXIS 3512, *31 (citing Clayton v. City of Poughkeepsie, 06 Civ. 4881 (SCR), 2007 U.S. Dist. LEXIS 55082, *18-19 (S.D.N.Y. Jun. 21, 2007)); see also O'Neil v. Krzeminski, 839 F. 2d 9, n. 1 (2d Cir. 1987) ("A required element of the tort is an intention to use force.  Negligence is not a basis of liability for constitutional torts."); Bernard v. United States, 25 F. 3d 98, 102 (2d Cir. 1994) ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care[.]")

"Plaintiff cannot argue that defendants engaged in intentional conduct that forms the basis of an assault and § 1983 excessive force claim and also argue that defendants were negligent towards plaintiff." Bogart, 2016 U.S. Dist. LEXIS 128350, at *37-8 (quoting Mazurkiewicz v. N.Y.C. Transit Auth., 810 F. Supp. 563, 570-71 (S.D.N.Y. 1993). "[O]nce intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.... There is, properly speaking, no such thing as a negligent assault." (quotation marks omitted)) Id. (quoting Mazzaferro v. Albany Motel Enters., 515 N.Y.S.2d 631, 632-33 (3d Dep't 1987)).

Here, because plaintiffs plead intentional conduct on the part of the officers, no inference can be drawn that such conduct was "inadvertent, accidental, or anything but willful." Dewitt v. Home Depot U.S.A., Inc., 10 Civ. 3319 (KAM), 2012 U.S. Dist. LEXIS 130963, *33 (E.D.N.Y. Sept. 12, 2012) (citations omitted).  Accordingly, as they make no allegation of anything but

intentional conduct, their negligence claim against Maguire and Poletto must be dismissed.

The Negligent Hiring, Retention and Training claim against the City fails because the officers are alleged to have acted at all times within the scope of their employment, Ex. B (FAC), ¶50, and "[g]enerally, where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of *respondeat superior*, no claim may proceed against the employer for negligent hiring or retention." Karoon v. New York City Transit Auth., 241 A.D.2d 323, 324 (1st Dep't 1997) (citations omitted).

### E.    At a Minimum, Maguire and Poletto are Entitled to State Law Immunity

At a minimum, Maguire and Poletto are immune from suit for their exercise of the discretion and judgment inherent in their jobs as police officers. "New York law... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." Shamir v. City of New York, 13 cv 5652 (CM), 2014 U.S. Dist. LEXIS 97805 (S.D.N.Y. July 15, 2014) (quoting Papineau, 465 F.3d at 63).  Here, plaintiffs have failed to allege facts from which it could be inferred that Maguire and Poletto were acting in bad faith or with no reasonable basis; accordingly, at a minimum they are entitled to immunity.

### CONCLUSION

For these reasons defendants ask that the Court dismiss the FAC with prejudice, and grant such other relief as the Court deems just and proper.

Dated:     New York, New York
           October 25, 2016

                         ZACHARY CARTER
                         Corporation Counsel of the City of New York
                         *Attorney for Defendants*
                         100 Church Street
                         New York, New York 10007
                         (212) 356-2579

                    By: _____

Ashley Garman
Senior Counsel
Special Federal Litigation Division


TO:    The Honorable Robert W. Sweet
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Gideon Orion Oliver, Esq.
277 Broadway, Suite 1501
New York, New York 10007

Elena Louisa Cohen, Esq.
365 Fifth Avenue, Room 5202
New York, New York 10016