UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANIKA EDREI, et al.,

                                   Plaintiffs,

                   -v-

THE CITY OF NEW YORK, et al.,

                                   Defendants.

**DECLARATION OF GIDEON
ORION OLIVER IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

**Index No. 16 Civ. 1652 (RWS)**

---

## DECLARATION OF GIDEON ORION OLIVER

GIDEON ORION OLIVER, an attorney duly admitted to practice before this Court,

hereby declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney of record for Plaintiffs ANIKA EDREI, SHAY HORSE,

JAMES CRAVEN, KEEGAN STEPHAN, MICHAEL NUSBAUM, and ALEXANDER

APPEL in this action.

2.      I make this Declaration in Opposition to Defendants' Motion to Dismiss the

First Amendment Complaint (Dkt. No. 18, the "FAC") in this action. I adopt the style of

referring to documents used in the FAC throughout.

## DOCUMENTS REFERRED TO AND
## INCORPORATED BY REFERENCE INTO THE FAC

3.      Attached as Exhibit 1 is a true copy of the Amnesty International report

referred to in Paragraph 6 and n. 1 of the FAC, "On the Streets of America: Human Rights

Abuses in Ferguson," AMNESTY INTERNATIONAL REPORT, October 24, 2014, *available at*

http://www.amnestyusa.org/research/reports/on-the-streets-of-america-human-rights-

abuses-in-ferguson?page=show ("Amnesty International Ferguson Report") (last accessed

March 2, 2016).

4.      As noted in Paragraph 6 of the FAC, the Amnesty International Ferguson Report concludes that "[u]sed at close range, loud volume and/or excessive lengths of time, LRADs can pose serious health risks which range from temporary pain, loss of balance and eardrum rupture, to permanent hearing damage. LRADs also target people relatively indiscriminately, and can have markedly different effects on different individuals and in different environments." Amnesty International Ferguson Report at p. 14.

5.      The Amnesty International Ferguson Report concludes that "[f]urther research into the use of LRADs for law enforcement is urgently needed." Amnesty International Ferguson Report at p. 14.

6.      Attached as Exhibit 2 is a true copy of the LRAD 100X Datasheet referred to in Paragraphs 8 and 9 and n. 3 and 4 of the FAC.

7.      The LRAD 100X Datasheet states that the 100X model can give "powerful, intelligible communication up to 600 meters" away, can "safely communicate beyond standoff distances to determine intent," "can be directed into buildings and vehicles to deliver clear instructions;" and is a "focused, directional sound pattern for targeted communication."

8.      The LRAD 100X Datasheet states that the 100X model can "create instant acoustic standoff perimeter."

9.      The LRAD 100X Datasheet states that the 100X model's "warning tone provides a safe alternative to other non-lethal solutions, modifying behavior and increasing response time to scale force escalation."

10.     The LRAD 100X Datasheet states that the 100X model is capable of a continuous output of 137 decibels, which is "20-30 decibels (dB) louder than competing megaphones," and "four to six times louder than systems of comparable size and weight."

11.     Attached as Exhibit 3 is a true copy of the LRAD CORPORATION WHITE PAPER referred to in Paragraph 10 and n. 5 of the FAC (the "White Paper.")

12.     The White Paper states that "LRADs can save lives through communicating clear, unambiguous messages over long distances when local infrastructure has been disrupted and urban and rural areas have become inaccessible;" can "[c]ommunicate messages across parks, large open areas, and bodies of water;" gives "authorities the ability to clearly broadcast instructions or warnings over long distances . . ;" and that the Corporation "provides directed audio solutions that place . . . sound exactly where needed.".

13.     The White Paper notes that the "Pittsburgh Police Department used an LRAD to communicate with and disperse unruly crowds during the G20 Summit in 2009," and includes a photograph of the Department with an LRAD.

14.     The White Papers states that "[i]n hostile areas, LRAD creates standoff and safety zones . . .".

15.     The White Papers states that the LRAD can "[h]elp control or disperse crowds."

16.     The White Paper states that the operator of the LRAD has "[f]ull control of the audio output using a volume control knob," and that the "[l]oudness of the LRAD broadcasts can be adjusted quickly to the situation."

17.     The White Paper states that "[i]f necessary, operators can employ LRAD's warning tone ensuring maximum effectiveness in gaining attention and compliance."

18.     Attached as Exhibit 4 is a true copy of the LRAD CORPORATION "Law Enforcement Solutions: Saving Lives Through Clear Communication" marketing document referred to in Paragraphs 12-13 and 87 and n. 7 and 27 of the FAC.

19.     The "Law Enforcement Solutions" marketing document includes a photograph of a police officer with an LRAD, and the caption: "SWAT team employing LRAD to drive suspects from a house without using lethal force or placing officers in harm's way."

20.     The "Law Enforcement Solutions" marketing document states that "LRAD broadcasts reach through walls and infrastructure to communicate instructions and consequences clearly and effectively to the suspect during negotiations," and that if a "suspect is not complying, SWAT officers have the option to use the LRAD's powerful deterrent tone before deploying non-lethal options such as tear gas and flash bangs to enforce compliance."

21.     The "Law Enforcement Solutions" marketing document repeats that "Pittsburgh Police Department used an LRAD to communicate with and disperse unruly crowds during the 2009 G20 Summit," and includes a photograph of the Pittsburgh Police Department deploying an LRAD during the 2009 G20 Summit, the same event during which the Pittsburgh Police Department injured Karen Piper. *See* Paragraphs 33, 53-60 below.

22.     The "Law Enforcement Solutions" marketing document repeats that "LRAD can create standoff and safety zones."

23.     The "Law Enforcement Solutions" marketing document states that "unlike tear gas, Tasers, rubber bullets, pepper spray, and other non-lethal and lethal responses, LRAD can be modulated in response to a subject's actions."

24.     As noted in paragraph 12 of the FAC, the "Law Enforcement Solutions" marketing document states that

> When LRAD's deterrent tone is used at close range, protesters sense audible discomfort, cover their ears and move away. Just the act of covering ears with hands reduces the sound pressure level (SPL) by approximately 25dB and could prevent protestors from throwing projectiles. LRAD can be

quickly modulated in response to protesters actions by controlling the audio
output through a prominently positioned volume control knob. Law
enforcement agencies with concerns about the deterrent tone and [sic] can
easily disable this option.

25.     The "Law Enforcement Solutions" marketing document quotes Pittsburgh's

Deputy Director of Emergency Management and Homeland Security, stating in relation to

the LRAD use at the 2009 G20 summit, the same event during which the Pittsburgh Police

Department injured Karen Piper. *See* Paragraphs 33, 53-60 below: "Every police officer I

talked to thought it worked famously, the bottom line is we could maintain order with the

protesters without hurting them."

26.     As noted in paragraph 13 of the FAC, the "Law Enforcement Solutions"

marketing document employs a diagram (reproduced in the FAC) to illustrate an LRAD

blasting waves of "intense communication" over a 2-3 block area of Times Square, and

"clear communication" from around 41st Street to beyond 54th Street.

27.     Attached as Exhibit 5 is a true copy of the March 2016 Physicians for

Human Rights and International Network of Civil Liberties Organizations "Lethal in

Disguise: The Health Consequences of Crowd-Control Weapons" Report ("PHR/INCL

Report") referred to in Paragraphs 27-30 and n. 9 of the FAC.

28.     The PHR/INCL Report includes a chapter on "acoustic weapons," which

focuses on LRADS. PHR/INCL at pp. 71-77.

29.     The PHR/ INCL Report uses "sonic weapon," "acoustic weapon" and

"LRAD" interchangeably and as synonyms, beginning its "Weapon Profile" with the note

that "Acoustic or sonic weapons (also known as long-range acoustic devices, sound cannons,

acoustic weapons, sonic bullets and noise bazookas) are devices that deliver very loud sound

over long distances." PHR/INCL at p. 72.

30.     The PHR/ INCL Report notes that acoustic weapons/LRADs "can be designed to deliver painful audible or inaudible sound waves, or to act more like very loud voice amplifiers to deliver voice messages or other sounds." *Id.*

31.     Under "mechanism of action," the PHR/INCL Report explains that "[a]coustic weapons function by delivering loud, painful, and even dangerous levels of noise. In comparison with conventional speakers, acoustic weapons use hundreds of modern (piezoelectric) transducers to create highly concentrated and amplified sound." PHR/INCL at p. 73.

32.     The PHR/INCL Report documents four uses of LRADs, two of which were by the NYPD. PHR/INCL at p. 74.

33.     The first documented use of the LRAD in the PHR/INCL Report is by the Pittsburgh Police Department in connection with the G-20 summit of 2009, and the report details the subsequent lawsuit by Karen Piper against the Police Department, which the Department settled and agreed to develop a policy for LRAD use. PHR/INCL at p. 74

34.     The first documented use of the LRAD in New York City in the PHR/INCL Report is November 2011, when the LRAD was reportedly used by the NYPD in connection with policing the Occupy Wall Street movement. *Id.*

35.     The third documented use of the LRAD in the PHR/INCL Report is August of 2014, in Ferguson, Missouri, in connection with protests over the police shooting of teenager Michael Brown. *Id.*

36.     The last uses of LRAD force discussed in the PHR/INCL Report are the December 5, 2014 LRAD uses at issue in this lawsuit. *Id.*

37.     The PHR/INCL Report notes that

Sales of LRADs to U.S. police departments have grown since the wave of Black Lives Matter protests around the United States protesting police killing

s of African-Americans, raising concerns that the inappropriate deployment of LRADs against protesters will only increase.

*Id.*

38.     The PHR/INCL Report finds the following regarding the health effects of acoustic weapons/LRADs:

> Sound cannons are used to emit painful, loud sounds that have the potential to cause significant harm to the eardrums and delicate organs of the ears and/or cause hearing loss. Use of earplugs or firmly blocking the ears with hands can decrease the sound by 20 – 30 dB, but this may not be enough to avoid significant injury. Manufacturer guidelines indicate that sound cannons should only be used from at least a 10 – 20 metre distance. Significantly, there is a risk of injury to law enforcement officers, particularly those operating the device, who are advised to wear ear protection. In addition to auditory effects, acoustic weapons may also injure internal membranes (infrasonic devices).
>
> There is little medical literature on the effects of acoustic weapons on people. Some literature notes that acoustic weapons were first developed by the military and any early evaluations of their health effects are biased and, in some cases, have unclear findings. The weapons can be indiscriminate, causing harm or pain to protesters, bystanders, and law enforcement, despite the narrow beam in which sound is concentrated. The sound is designed to be controlled by police officers, who can alter the frequency, level, quality, and length of the alarm. Abuse or lack of operator knowledge about the health effects can easily lead to incorrect use of the weapon and exacerbate injuries. Serious questions remain about the safety and efficacy of acoustic weapons in crowd-control contexts.

*Id.* at p. 76.

39.     Attached as Exhibit 6 is a true copy of the LRAD 100X Product Sheet referred to in Paragraph 80 and n. 21 of the FAC.

40.     The LRAD 100X Product Sheet states that it can provide "powerful, intelligible communication up to 600 meters" with a maximum continuous output of 136 dB at 1 meter, A-weighted, and the capacity to overcome 88dB of background noise at 250 meters, which is "10-20 decibels . . . louder than the most competitive megaphones [and] four to six times louder [than] . . . [s]ystems of comparable size and power."

7

41.     The LRAD 100X Product Sheet states that its "warning tone provides a non-lethal deterrent, shapes behavior, and supports intent determination while preserving time for force escalation."

42.     Attached as Exhibit 7 is a true copy of the June 1, 2010 Letter of Canadian Civil Liberties Association (the "CCLA") to Chief of Police William Blair ("CCLA Letter") referred to in Paragraphs 81, 84 and 93 and n. 22, 25 and 31 of the FAC.

43.     The CCLA Letter expresses the CCLA's concerns over the Toronto Police Service's purchase and planned use of LRADs, including portable and truck-mounted models.

44.     The CCLA Letter expresses the organization's concerns "about the safety implications of deploying an untested, unapproved weapon that can cause permanent physical damage."

45.     The CCLA Letter notes that the Toronto Police classified LRADs as a "communication tool" rather than a "weapon," and this classification was incorrect because:

> [i]t is undeniable that the LRAD has the ability to function as a communication tool. The device, however, is designed not only to communicate, but also to disperse crowds by "[transmitting] powerful deterrent tones." The level of sound produced by these devices exceeds both the threshold for human discomfort (between 85 and 95 dB) and the normal human pain threshold (between 120 and 140 dB). New technology that is designed to induce individual compliance through human discomfort and pain cannot be defined solely as a "communication tool."

46.     The CCLA expressed concern about the lack of objective testing of LRADs, noting that

> [p]ast experience with [Tasers] has underscored the need for independent and objective scientific research into the effects of new weapons technologies *prior* to their use on the public. . . . The introduction of any new weapon into police arsenals requires a process of objective scientific research into the short-term and long-terms physical effects of the weapon's use, consultation with the public who are potential targets of such weapons, and policy debates. Reliance on research by the manufacturer is insufficient.

8

47.     The CCLA Letter also expresses concern about hearing damage from

LRADs, noting that the

> devices  purchased by [the Toronto Police] produce sound at levels of up to
> 143 dB. Exposure to noise at 125 dB for even a fraction of a second exceeds
> Ontario's allowable workplace health and safety guidelines, and the World
> health Organization's guidelines state that "[t]o avoid acute mechanical
> damage to the inner ear, adults should never be exposed to more than 140
> dB peak sound pressure" and children should not be exposed to more than
> 120 dB. . . . At lower levels of sound exposure, there is a cumulative effect
> that can cause permanent damage; listening to noises of 110 dB for thirty
> seconds a day places an individual at significant risk of hearing loss.  Finally,
> LRAD's manufacturer has acknowledged that the device can cause
> permanent hearing damage if individuals are exposed for longer periods.

48.     The CCLA Letter further expresses concerns that the LRAD targets a

anyone in its path, rather than specific individuals, particularly in the context of crowds,

noting that:

> Pain tolerance varies among the population, and certain groups-including children-
> are more vulnerable to hearing loss.  Moreover, individuals within large crowds may
> be unable to move out of the LRAD's range due to physical disability or the sheer
> volume of people in a given area. The indiscriminate nature of this device does not
> allow the police to accommodate and respond to individuals' differing reactions,
> increasing the possibility that at-risk populations will be hurt.

49.     The CCLA Letter calls for independent assessment and study prior to LRAD

use; protocols regarding deployment developed based upon independent science and public

consultation; and comprehensive reporting, monitoring and oversight mechanisms to

account for how LRAD are used in the field.

50.     The CCLA requested at minimum that Toronto police disable the LRAD's

deterrent/alert function, noting that the Vancouver Police Service had disabled the deterrent

tone on the LRAD(s) it had purchased.

51.     Even if it were just to be used for communication, the CCLA urged that "the

LRAD should be subject to independent expert study to ensure that the maximum allowable

volume is limited to a safe level, and that the weapon can continually operate according to- and not above- the manufacturer's specified standards."

52. Finally, the CCLA Letter requested that "guidelines for use [of the LRAD], including impact on vulnerable populations, should be made public so that individuals can determine when they are at risk of negative health effects."

53. Attached as Exhibit 8 is a true copy of the Complaint in *Karen Piper v. City of Pittsburgh, et al.*, 11 –cv-01215 (JFC)(MPK) (USDC, Western District of Pennsylvania) referred to in Paragraphs 90-91 and n. 29 of the FAC.

54. The *Piper* Complaint states that the "LRAD is a military-style weapon, and it was used for the first time in the United States when the Pittsburgh Police directed it on civilians in September 2009." *Piper* Complaint ¶ 1.

55. The *Piper* Complaint alleges that Ms. Piper "suffered permanent hearing loss, nausea, pain and discomfort when the LRAD was activated without any warning" by the Pittsburg police in September of 2009. *Id.*

56. The Complaint alleges that Defendant City of Pittsburgh and its officials, in deploying the LRAD as they did, violated Piper's rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and that the City of Pittsburgh used the device negligently. *Id.*

57. Attached as Exhibit 9 is a true copy of the text of the ACLU of Pennsylvania website press statement regarding the *Piper* litigation settlement referred to in Paragraph 92 and n. 30 of the FAC.

58. According to the ACLU press release, the City of Pittsburgh settled by the *Piper* case for the sum of $72,000.

59.     According to the ACLU press release, as a result of the case the City of Pittsburgh also began "developing a policy governing LRAD deployment to ensure its careful and controlled use."

60.     According to the ACLU press release, Piper stated: "I am grateful that my case will serve as a deterrent to future users of the LRAD. The LRAD should have no place on our American Streets."

61.     Attached as Exhibit 10 is a true copy of the October 1, 2015 "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices" Report by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD Report") referred to in Paragraphs 99-100 and n. 32 of the FAC.

62.     The OIG-NYPD Report "reached several conclusions regarding NYPD use-of-force policies, training, and discipline" as of October 2015, including that:

- NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force.
- NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter.
- NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public.
- NYPD training does not adequately focus on de-escalation.
- In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force.

OIG-NYPD Report at pp. 3-4.

63.     The OIG-NYPD report recommended ways to improve NYPD use-of force policies, practices, training, and discipline, including:

- NYPD should adopt a more precise use-of-force Patrol Guide procedure that includes greater clarity on what is meant by "force," "excessive force," and "deadly physical force.
- NYPD should revise its use-of-force policy to create a new reporting form

that requires officers to capture all incidents of force using descriptive
language.

- [NYPD] should include de-escalation principles as part of its use-of-force
procedures in the Patrol Guide.
- [NYPD] should bolster its efforts to train officers in de-escalation and do
more to reinforce its importance.
- NYPD should add a specific Police Academy course on de-escalation and
incorporate such tactics more heavily in its classroom and practical training
environments.
- NYPD should publish an annual report addressing the use of force by
officers. . . . Such a report would promote greater transparency and
accountability while allowing NYPD to consolidate and learn from data on
use of force.

OIG-NYPD Report at pp. 3-5.

64.     The OIG-NYPD Report specifically recommended 15 steps for the NYPD

to take to "improve NYPD's tracking of force data and to curb excessive force through

better training and enhanced accountability of the disciplinary system," organized into four

areas related to NYPD polices and practices: (1) use-of-force policy; (2) reporting and

documentation mechanisms for use of force; (3) training on force and de-escalation; and (4)

disciplinary system:

Use-of-Force Policy:

1. The NYPD Patrol Guide should include definitional language that
provides officers and the public with greater clarity regarding what is meant
by "force," "excessive force," and "deadly physical force."

2. NYPD should update Patrol Guide §203-11 governing use of force and
require officers to de-escalate all encounters where appropriate.

Reporting and Documentation:

3. NYPD should create a separate, uniform use-of-force reporting form.

4. With respect to the newly created form, NYPD should require all
officers—whether the   subject of a force investigation or a witness to a use
of force—to document and report all force incidents. When completing this
document, officers should use descriptive language to articulate the events
leading up to the use of force in encounters with the public, the reason why
the force was used, and the level and type of force used.

5. NYPD should create a database to track comprehensive Department-wide information on use of force, including data compiled from the use-of-force forms.

6. NYPD should compile data and publish, on an annual basis, a report addressing Department-wide metrics on use of force, including but not limited to information from the new use-of-force reporting form. This report would track and collect various components related to the issue of use of force, including those addressed in this Report, such as officer tenure, assignments, age, type of force used, pertinent information regarding members of the public subjected to force, as well as officer injuries, disciplinary trends and outcomes, and other data deemed necessary for a comprehensive understanding of the issue.

Training

7. NYPD training should place a stronger and more thorough emphasis on de-escalation tactics and philosophy, by adding specific Police Academy and in-service courses on de-escalation that incorporate both classroom and scenario-based training.

8. NYPD should incorporate a formal evaluation system for all scenario-based trainings concerning the use of force.

9. NYPD should increase funding and personnel at the Police Academy with respect to training for both recruits and in-service officers.

10. NYPD should implement training to instruct officers to intervene in situations where other officers escalate encounters, use excessive force, and/or commit other misconduct.

11. NYPD should review use-of-force trends to identify which categories of officers (e.g., by years of service and/or duty assignments) are most in need of de-escalation and use-of-force in-service training, and then implement such instruction.

Discipline

12. In disciplinary cases where there are multiple disciplinary counts, each count should have an accompanying, distinct penalty, as opposed to an aggregated penalty for all counts.

13. NYPD should collect, review, and compare data regarding disciplinary penalties imposed in use-of-force cases and report on the effects of disciplinary penalties on the frequency of incidents of excessive force. NYPD should publish data in the previously mentioned annual report

(Recommendation #6) on the number and percentage of cases in which the
Police Commissioner reduces or declines discipline.

14. NYPD should set forth, in writing, in its disciplinary paperwork the
extent to which an officer's placement on force monitoring has or has not
impacted the penalty imposed.

15. NYPD should share a subject officer's force monitoring history with
CCRB's Administrative Prosecution Unit (APU) since this information is a
critical element that must be taken into consideration when CCRB
recommends penalties.

OIG-NYPD Report at pp. 58-61.

65.     The OIG-NYPD Report noted deficiencies in NYPD policies and training,

particularly in regards to force de-escalation, concluding that "OIG-NYPD's investigation

suggests that NYPD officers rarely use de-escalation and that the Department's policies and

training currently do not adequately address de-escalation as a useful tactic for officers in the

field." OIG-NYPD Report at p. 28.

66.     After noting that the "OIG-NYPD's review of [Civilian Complaint Review

Board] cases found that officers too often did not de-escalate encounters, failed to intervene in

encounters where other officers used excessive force against members of the public, and

escalated encounters themselves,' (p. 29), the Report stated the need for written de-escalation

policies for NYPD officers, and provided a detailed analysis of model use-of-force policies from

other police departments. OIG-NYPD Report at pp. 34-38.

67.     The OIG-NYPD Report noted deficiencies in training particularly related to

de-escalation, finding that for Academy training "there is . . . too little focus on de-escalation

during NYPD's training sessions;" that "NYPD spends only a portion of a four-and-a-half-

hour course teaching de-escalation out of 468 classroom hours—less than one percent of the

curriculum;" and that "there is currently no Academy course specifically devoted to learning

and practicing de-escalation techniques;" and for in-service training that there were "no

concrete examples, scenarios, or anecdotes in order to teach officers how to de-escalate a

situation and [instructors] did little to reinforce the importance of de-escalation." OIG-

NYPD Report at pp. 43-44.

68.     The OIG-NYPD Report also found deficiencies in training regarding

practical "scenario and simulation training," noting that

> the lack of practical training is felt among recruits and instructors. Multiple NYPD
> personnel who were interviewed at the Academy acknowledged the brevity of the
> scenario and simulation trainings, and expressed a desire for these programs to be
> lengthened and further developed. NYPD recruits also commented on how they
> were only able to run through the practical training exercises once or twice, due to
> time and logistical constraints, and as a result, felt they were unable to fully grasp the
> concepts being taught.

OIG-NYPD Report at p. 43.

69.     The OIG-NYPD Report includes as appendices the following NYPD Patrol

Guide provisions that were in effect at the time the OIG-NYPD Report was issued:

a.   Appendix A - P.G. 203-11 – Setting forth NYPD policy regarding "Use of
     Force" – Issued 8/1/13 – requiring, among other things, that
     "**EXCESSIVE FORCE WILL NOT BE TOLERATED"** and requiring
     that **"[a]ll members of the service at the scene of a police incident
     must:…(b) Use minimum force necessary."** (emphasis in original).

b.   Appendix A – P.G. 212-95 – Setting forth NYPD policy regarding "Use of
     Pepper Spray Devices" - Issued 8/1/13.

c.   Appendix A – P.G. 212-117 – Setting forth NYPD policy regarding "Use of
     Conducted Energy Devices ("CED")" - Issued 8/1/13.

70.     Attached collectively as Exhibit 11 are a true copies of the following NYPD

Patrol Guide Provisions issued on May 31, 2016 after the October 2015 OIG-NYPD Report

was publicly released:

a.   P.G. 221-01 – Setting forth the NYPD's revised "Force Guidelines" – Issued
     5/31/16.

b. Interim Order ("I.O.") No. 30 of 2016 – Setting forth NYPD policy regarding "Use of Oleoresin Capsicum Pepper Spray Devices" - Issued 8/1/13.

c. Interim Order ("I.O.") No. 41 of 2016 – Setting forth NYPD policy regarding "Use of Conducted Electrical Weapons ("CEW")" - Issued 8/1/13.

71.   Attached as Exhibit 12 is a true copy of the NYPD PG Provision Section 221-02 referred to in Paragraph 100 and n. 34 of the FAC, setting forth NYPD policy regarding "Use of Force" – Issued 6/27/16.

72.   Attached as Exhibit 13 is a true copy of the June 2016 NYPD "Use of Force: Revised NYPD Policy" NYPD training document referred to in Paragraph 102 and n. 35 of the FAC.

73.   Attached as Exhibit 14 is a true copy of the Statement of Interest of the United States dated January 10, 2012, ECF No. 24 in *Sharp v. Baltimore City Police Dept.*, Civil No. 1:11-cv-02888-BEL (D.Md.) (the "*Sharp* SOI") referred to in Paragraph 417 and n. 36 of the FAC.

74.   According to the United States Department of Justice ("DOJ") as expressed in the *Sharp* SOI, "[t]he right to record police officers while performing public duties in a public place…[is] not only required by the Constitution[, it is] consistent with our fundamental notions of liberty, promote[s] the accountability of our governmental officers, and instill[s] public confidence in the police officers who serve us daily." *Sharp* SOI at p. 1.

75.   The DOJ also takes the position in the *Sharp* SOI that "the First Amendment is implicated when a private citizen records officers in the public discharge of their duties, and [police must] take steps to ensure that the First Amendment is upheld." *Sharp* SOI at p. 4; *see also id.* at pp. 4-5 ("Sharp's recording of his friend's arrest by BPD officers is unquestionably protected by the First Amendment, and Defendants concede this point.")

76.     The DOJ also states in the *Sharp* SOI that "Federal courts have recognized that recording devices are a form of speech through which private citizens may gather and disseminate information of public concern, including the conduct of law enforcement officers." *Sharp* SOI at p. 5 (citing cases).

77.     The DOJ notes in the *Sharp* SOI that "[t]he right to record police activity is limited only by 'reasonable time, place, and manner restrictions.'" *Sharp* SOI at p. 5 (citing cases) (citation omitted).

78.     The DOJ also states in the *Sharp* SOI that "[s]uppressing constitutionally protected speech" by unreasonably restricting a person's right to observe and/or document police activity in a public forum violates "'*both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas.'" *Sharp* SOI at p. 7 (citation omitted) (emphasis in original).

79.     Additionally, the DOJ recommends in the *Sharp* SOI *that* "[a]t a minimum, Defendants should develop a comprehensive policy that specifically addresses individual's [sic] First Amendment right to observe and record officer conduct. This policy should be implemented through periodic training, and the effectiveness of the policy and training should be tested routinely through quality assurance mechanisms. Moreover, BPD should track allegations that an officer has interfered with a citizen's First Amendment right to observe and/or record the public performance of police duties." *Sharp* SOI at p. 10.

80.     Attached as Exhibit 15 is a true copy of the May 12, 2012 letter filed by United States Department of Justice – Civil Rights Division – Special Litigation Section in *Sharp*, (the "*Sharp* Letter") referred to in Paragraphs 417 and 389 [mis-numbered, at p. 56 of the FAC] and n. 36 of the FAC.

81.     Articulating "the United States' position on the basic elements of a constitutionally adequate policy on individuals' right to record police activity" in the *Sharp* Letter, the DOJ insisted that any resolution of the injunctive relief claims at issue in that case related to bystander observation and recording of police activity in traditional public for a "should include policy and training requirements that are consistent with the important First, Fourth, and Fourteenth Amendment rights at stake when individuals record police officers in the public discharge of their duties. These rights, subject to narrowly-defined restrictions, engender public confidence in our police departments, promote public access to information necessary to hold our governmental officers accountable, and ensure public and officer safety." *Sharp* Letter at p. 1.

82.     The *Sharp* Letter also states that appropriate policies "should affirmatively set forth the contours of individuals' First Amendment right to observe and record police officers engaged in the public discharge of their duties", recognizing that "[r]ecording governmental officers engage in public duties is a form of speech through which private individuals may gather and disseminate information of public concern, including the conduct of law enforcement officers." *Sharp* Letter at pp. 2-3 ("[t]he application of this right to the conduct of law enforcement officers is critically important because officers are 'granted substantial discretion that may be used to deprive individuals of their liberties'").

83.     The *Sharp* Letter recognizes that "[t]he right to record police activity is limited only by 'reasonable time, place, and manner restrictions.'" *Sharp* Letter at pp. 3, 5 (citing cases) (citation omitted).

84.     The *Sharp* Letter recommends that policies passing constitutional muster "should explain the nature of the constitutional right at stake and provide officers with practical guidance on how they can effectively discharge their duties without violating that

right. For example, policies should affirmatively state that individuals have a First Amendment right to record police officers and include examples of the places where individuals can lawfully record police activity and the types of activity that can be recorded." *Sharp* Letter at p. 3.

85.    The *Sharp* Letter also recommends that policies passing constitutional muster "should describe the range of prohibited responses to individuals observing or recoding the police" and that "policies should prohibit interference with recording of police activities except in narrowly circumscribed circumstances….Officers should be advised not to threaten, intimidate, or otherwise discourage an individual from recording police officer enforcement activities or intentionally block or obstruct cameras or recording devices." *Sharp* Letter at p. 5.

86.    The *Sharp* Letter further recommends that policies passing constitutional muster should "clearly describe when an individual's actions amount to interference with police duties…and, when possible, provide specific examples in order to effectively guide officer conduct and prevent infringement on activities protected by the First Amendment." *Sharp* Letter at p. 5.

87.    The *Sharp* Letter opines: "A person may record public police activity unless the person engages in actions that jeopardize the safety of the officer, the suspect, or others in the vicinity." *Sharp* Letter at p. 6 (citing cases).

88.    Relatedly, the *Sharp* Letter recommends that the "set forth with specificity the narrow circumstances in which a recording individual's interference with police activity could subject the individual to arrest." *Sharp* Letter at p. 7.

89.    The *Sharp* Letter further opines: "[A]n individual's recording of police activity from a safe distance without any attendant action intended to obstruct the activity or

threaten the safety of others does not amount to interference." *Sharp* Letter at p. 6 (citing cases).

90.     The *Sharp* Letter recognizes that "[t]ime, place, manner restrictions on First Amendment speech must 'leave open ample alternatives for communication of the information'". *Sharp* Letter at p. 6 (internal citations omitted) (emphasis added).

91.     The *Sharp* Letter recommends that BPD policy be amended to provide that BPD officers should "'recommend a less-intrusive location to the bystander from which he/she may continue to observe, photograph, or video record the police activity'" where "a bystander's actions are 'approaching the level of a criminal offense.'" Sharp Letter at pp. 6-7.

92.     The *Sharp* Letter further recommends that in order to pass constitutional muster policies "should provide clear guidance on supervisory review" and recommend that "[a] supervisor's presence at the scene should be required" at a minimum "before an officer takes any significant action involving citizen-recorders or recording devises, including…an arrest." *Sharp* Letter at p. 7.

93.     And finally in this connection, the *Sharp* Letter further recommends that "[p]olice department should not place a higher burden on individuals to exercise their right to record police activity than they place on members on the press," noting that "[t]his principal is particularly important in the current age where widespread access to recording devices and online media have provided private individuals with the capacity to gather and disseminate newsworthy information with an ease that rivals that of the traditional news media" and recognizing that "'[m]any of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper'"). *Sharp* Letter at p. 10 (citing cases) (citation omitted).

94.     Attached as Exhibit 16 is a true copy of the Statement of Interest of the United States dated March 4, 2013, ECF No. 15 in *Garcia v. Montgomery County, Maryland*, *et al.*, 8:13-cv-03592-JFM (D. Md.) (the "*Garcia* SOI") referred to in Paragraphs 389 [mis-numbered, at p. 56 of the FAC] and n. 36 of the FAC.

95.     In the *Garcia* SOI, the DOJ urged the Court to "find that both the First and Fourth Amendments protect an individual who peacefully photographs police activity on a public street" and, in recognition of its "strong interest in ensuring that individuals' constitutional rights are protected when they observe and document police carrying out their duties in a public setting", expressed its "concern[] that discretionary charges, such as disorderly conduct, loitering, disturbing the peace, and resisting arrest, are all too easily used to curtail expressive conduct or retaliate against individuals for exercising their First Amendment rights. The United States believes that courts should view such charges skeptically to ensure that individuals' First Amendment rights are protected." *Garcia* SOI at pp. 1-2.

96.     The *Garcia* SOI recognizes that "recording police officers in the public discharge of their duties is protected First Amendment activity" and that "[i]t is now settleeed law that the First Amendment protects individuals who photograph or otherwise record officers engaging in police activity in a public place" and that "[b]ecause recording officers in the public discharge of their duties is protected speech, when a person is arrested for recording police officers in a public place, both the First and Fourth Amendments are implicated. Arrests involving such activity should receive the highest level of scrutiny, particularly if the charges involved are highly discretionary, such as disorderly conduct or loitering." *Garcia* SOI at p. 4.

97.     The *Garcia* SOI reaffirmed that a person's arrest while "peacefully photographing what" they "perceived to be police officers using excessive force on a public street" implicates the First Amendment in that "[b]y forcible arresting Mr. Garcia…, Defendants stopped Mr. Garcia from photographing a matter of public interest and prevented him from distributing those photographs to the public." *Garcia* SOI at p. 5.

98.     The *Garcia* SOI makes clear that "Because recording public police activity is protected by the First Amendment, courts have viewed and should view discretionary charges brought against individuals engaged in protected speech with considerable skepticism. Several cases that have arisen recently regarding the recording of public police activity have involved discretionary charges such as disorderly conduct, loitering, disturbing the pace, and resisting arrest, being brought against the person engaged in recording. …The use of such charges against individuals recording public police activity chills protected First Amendment speech." *Garcia* SOI at pp. 8-9.

99.     The *Garcia* SOI reports that "[c]ourts have routinely rejected officers' attempts to criminalize protected speech through the use of charges that rely heavily on the discretion of the arresting officer on both First and Fourth Amendment grounds." *Garcia* SOI at p. 9 (citing cases).

100.     The *Garcia* SOI further notes that "[t]he First Amendment protections afforded members of the public and press when recording public police activity are coextensive." *Garcia* SOI at p. 11 (citing cases).

101.     The *Garcia* SOI further notes that "[c]ourts have long held that recordings made by private citizens of police conduct or other items of public interest are entitled to First Amendment protection." *Garcia* SOI at pp. 11-12 (citing cases).

102.     As is relevant to the present motion, there are three categories of documents that Plaintiffs have either explicitly incorporated by reference into the FAC or relied heavily on in drafting the FAC: (1) The Exhibits A and B to the FAC; (2) The reports referred to, relied on, and/or incorporated by reference into the FAC, cited to and discussed above; and (3) videos taken by Plaintiffs, discussed in paragraphs 103-106 below.

103.     Defendants attached what they characterized as "a copy of a video of a portion of the incident" as Exhibit C to the October 25, 2016 Declaration of Ashley Garman (Dkt. No. 37), which they refer to throughout their papers as "Video 1." Plaintiff James Craven is the author of that video footage, and Plaintiffs refers to it throughout their papers as the "Craven Video."

104.     Defendants attached what they characterized as "a copy of a video of a portion of the incident" as Exhibit D to the October 25, 2016 Declaration of Ashley Garman (Dkt. No. 37), which they refer to throughout their papers as "Video 2." Plaintiff Michael Nusbaum is the author of that video footage, and Plaintiffs refers to it throughout their papers as the "Nusbaum Video."

105.     Attached as Exhibit 17 is a true copy of video footage captured on December 4-5, 2014 by non-party Jeff Durkin depicting some portion of the incident. Plaintiffs refer to that footage throughout as the "DurkinVideo."

106.     While Defendants argue that Exhibits C and D to the Garman Decl. are "incorporated by their specific reference in the FAC", *see* Defs' MOL at p. 2 n. 2, the cited provision of the FAC, Paragraph 315, does not explicitly incorporate the videos by reference. However, to the extent that Plaintiffs affirmatively rely on the videos in these papers, it is appropriate for the Court to consider them in connection with this motion, to the extent that the Court scrupulously views the videos in the light most favorable to

Plaintiffs unless they "utterly discredit" Plaintiffs' version of events. In that connection, to the extent that Plaintiffs characterize the video in these papers, the Court should view any such characterizations in the light most favorable to Plaintiffs.

## ADDITIONAL DOCUMENTS NOT REFERRED TO OR INCORPORATED BY REFERENCE INTO THE FAC, WHICH MAY NEVERTHELESS BE RELEVANT TO THE COURT'S DETERMINATION OF DEFENDANTS' MOTION

107.    Attached as Exhibit 18 is a true copy of the Chicago Police Department's General Order GO 03-02-02 – "Force Options" – issued and effected March 11, 2015.

108.    The Chicago Police Department "Force Options" General Order explains the levels of force options appropriate for Chicago Police Department members.

109.    Notably, the department explicitly classifies LRADs as a "pain compliance technique," "designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject." P. 2/6.

110.    Specifically, the Department's order describes "using a Long Range Acoustic Device (LRAD) to emit high decibel focused sound waves to cause pain and discomfort." *Id.*

111.    In Chicago, "any use of the LRAD requires authorization from the Superintendent or the designee of the Superintendent." *Id.*

112.    This directive also notes that the "LRAD is not considered a pain compliance technique when used to deliver verbal messages or warnings at a decibel level not intended to cause pain or discomfort." *Id.*

113.    The rights peacefully to observe and document police actions in the performance of their duties in public places have long been enshrined in often-ignored

NYPD policy.[1] In 1977, the NYPD entered into a Stipulation and Order in *Black v. Codd*, 73

Civ. 5283 (JMC) (SDNY, June 1, 1977). The Stipulation and Order states:

> [I]t is the policy of the New York City Police Department and the defendants
> that when a person (or persons) is detained, stopped or arrested in public
> areas, a person or persons not involved in the conduct of which the first
> person is stopped or arrested may remain in the vicinity of the stop or arrest
> as an onlooker or onlookers, subject to the safety of the person stopped, the
> third persons, the general public, and officers of the Police Department, and
> to provisions of law e.g. P.L. § 195.05.

114.     The Stipulation and Order defines an "onlooker" as a "person remaining in

the vicinity of a stop or arrest" and states that onlookers "shall not be subject to arrest for

violation of Penal Law § 195.05 unless the officer has probable cause to believe a violation

of § 195.05 exists."  It further states that "[t]aking photographs" and "[r]emaining in the

---

[1]      Upon information and belief, the version of the NYPD's Patrol Guide Section 208-03 (governing
Arrests – General Processing) in effect on the date of the incident provided, in pertinent part:

**OBSERVERS AT THE SCENE OF POLICE INCIDENTS**

As a rule, when a police officer stops, detains or arrests a person in a public area, persons
who happen to be in or are attached to the area are naturally in position to and are allowed
to observe the police officer's actions. This right to observe is, of course, limited by reasons
of safety to all concerned and as long as there is no substantive violation of law. The
following guidelines should be utilized by police officers whenever the above situation exists:

   a.   A person remaining in the vicinity of a stop or arrest shall not be subject to arrest
        for Obstructing Governmental Administration (Penal Law, § 195.05) unless the
        officer has probable cause to believe he person or persons are obstructing
        governmental administration.

   b.   None of the following constitutes probable cause for arrest or detention of an
        onlooker unless the safety of officers or other persons is directly endangered or the
        officer reasonably believes they are endangered or the law is otherwise violated:

        (1)  Speech alone, even though crude and vulgar
        (2)  Requesting and making notes of shield numbers or names of
             Officers
        (3)  Taking photographs, videotapes or tape recordings
        (4)  Remaining in the vicinity of the stop or arrest.

   c.   Whenever an onlooker is arrested or taken into custody, the arresting officer shall
        request the patrol supervisor to the scene, or if unavailable, report the action to
        the supervisor where the person is taken.

This procedure is not intended in any manner to limit the authority of the police to establish
police lines, e.g., crowd control at scenes of fires, demonstrations, etc.

vicinity of the stop or arrest" explicitly do not "constitute[] probable cause for arrest or detention of an onlooker unless safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated." The Stipulation and Order also requires that the arresting officer shall "report the action" of a bystander arrest to a supervisor at the precinct. The Stipulation and Order has historically been ignored.  *See, e.g., Tonge v. Kelly*, 19993 WL 16121 (EDNY, 1993) ("the City failed for ten years to maintain the formal guidelines to which it had agreed and to inform its police recruits and officers in its Patrol Guide of the standards established in the *Codd* consent order").

115.    Attached as Exhibit 19 is a true copy of a document purporting to be contain NYPD Disorder Control Unit "Disorder Control General Assignment Guidelines and Tactics for Police Officers While Assigned to a Civil Disorder Incident" (the "Disorder Control Guidelines").[2]

116.    *Inter alia,* the Disorder Control Guidelines:

a.  Note that "initial impressions" including displaying "disorder control equipment…ready for immediate use" and "[a] strong military appearance" … "is a force multiplier and psychological advantage."

b.  Echo the NYPD Patrol Guide's requirements to "[u]se minimum force necessary."

c.  Require that officers "[c]learly distinguish between participants to be arrested and innocent passerby/oblookers."

d.  Require officers to "[b]e aware of dangers from high ground (i.e. air mail)."

---

[2]     *See* Robbins, Christopher. (Nov. 26, 2011). *Gothamist*. "NYPD Disorder Control Memo Obtained by OWS Encourages "Strong Military Appearance." Available online at http://gothamist.com/2011/11/26/nypd_disorder_control_memo_obtained.php (last accessed December 5, 2016).

e.  Prohibit engaging in "unauthorized pursuits of looters/bottle throwers" and instead require officers to "let people escape unless" their "team is effecting arrests."

117.   In *Allen v. City of New York*, No. 03 Civ. 2829 (KMW)(GWG), 2007 WL 24796, at *23 (SDNY Jan. 3, 2007), the Court noted certain evidence cited by Plaintiffs as proof of Defendants' "improper motivation" for arresting them:

> The evidence provided of improper motivation is that the NYPD stated it was engaging in a "proactive arrest policy" in order to "set a 'tone' with the demonstrators and their possible plans at other demonstrations,"[…] that the NYPD "purposely staged massive amounts of police personnel and equipment around the WEF to 'cause them [protestors] to be alarmed'[".]

118.   Counsel respectfully submits that, against the backdrop of the FAC and the facts set forth above, to the extent that NYPD has policies and/or training covering the following topics, such training may be relevant within the meaning of Fed.R.Evid. 401 and the subject of discovery related to Plaintiffs' claims:

a.  **Uses of force**, including:

  i.  The progressive scale of force.
  ii.  Force escalation and de-escalation.
  iii.  Using the minimum force necessary.
  iv.  Avoiding using force to punish.
  v.  Use of pepper spray and other, similar weapons.

b.  **Crowd and disorder control**, including:

  i.  Treatment of bystanders, onlookers, photographers, journalists, and/or members of the press at the scene of arrests.
  ii.  Appropriate precautions to be taken and responses in case debris and/or bottles are thrown at police (also called "air mail by police").
  iii.  Not "engag[ing] in unauthorized pursuit of looters/bottle throwers – let people escape unless your team is effecting arrests."
  iv.  The need to "[c]learly distinguish between participants to be arrested and innocent passerby/onlookers."
  v.  Treatment of a perceived "group" as a unit for crowd control purposes and the role fair notice should play in such treatment. *See, e.g.,* FAC 415-416.

c.  **Policing First Amendment assemblies**, including:

     i.   Ensuring that First Amendment rights of participants in and bystanders and observers of First Amendment assemblies are appropriately protected and that any and all content-neutral restrictions on them are narrowly tailored to serve significant governmental interests and provide ample alternatives for expression. *See, e.g.,* FAC 415.

     ii.   Encouraging police facilitation of First Amendment assemblies and/or preventing police interruption of them absent clear and present danger of a real and substantial breach of the peace. *See, e.g.,* FAC 414.

     iii.   Ensuring that First Amendment rights of journalists and others engaging in similar documentation of protest and/or police response to protest, including arrest activity, intending dissemination of the same protected under freedom of the press principles. *See, e.g.,* FAC 417-418.

    d.  **LRAD uses for crowd control purposes**, including LRAD uses *qua* uses of force. *See, e.g.,* FAC 420.

DATED:     Brooklyn, New York
             December 5, 2016

                                    _____
                                    Gideon Orion Oliver
                                    Co-Counsel for Plaintiffs
                                    277 Broadway, Suite 1501
                                    New York, NY  10007
                                    646-263-3495