16 cv 1652 (RWS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANIKA EDREI, SHAY HORSE, JAMES CRAVEN, KEEGAN STEPHAN, MICHAEL NUSBAUM, and ALEXANDER APPEL,

                                      Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

                                      Defendants,

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

*ZACHARY CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel Ashley Garman*
*Tel: (212) 356-3539*
*Matter No. 2016-007721*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT........................................................................................1

ARGUMENT......................................................................................................................1

      POINT I:   THE FAC DOES NOT STATE A VIABLE FOURTH
                      AMENDMENT CLAIM..............................................................................1

      POINT II:  THE FAC DOES NOT STATE A VIABLE FIRST
                      AMENDMENT CLAIM..............................................................................6

      POINT III: THE FAC DOES NOT STATE A *MONELL* CLAIM...........................9

      POINT IV:THE CLAIMS AGAINST BRATTON IN HIS
                      INDIVIDUAL CAPACITY FAIL..............................................................12

      POINT V: PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED........................13

CONCLUSION................................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Anthony v. City of N.Y.,
 339 F.3d 129 (2d Cir. 2003) ...................................................................................... 9, 10

Breitkopf v. Gentile,
 41 F. Supp. 3d 220 (E.D.N.Y. 2014) .......................................................................... 11, 12

Chamberlain v. City of White Plains,
 986 F.Supp.2d 363 (S.D.N.Y. 2013) .......................................................................... 11

Chambers v. Time Warner, Inc.,
 282 F.3d 147 (2d Cir. 2002) ...................................................................................... 1

Connick v. Thompson,
 563 U.S. 51 (2011) .................................................................................................... 11, 12

Depew v. City of N.Y.,
 15 Civ. 3821 (AT), Dkt. No. 31 (S.D.N.Y. Dec. 13, 2016) ......................................... 9

Escobar v. City of New York,
 05 Civ. 3030(ENV)(CLP), 2007 U.S. Dist. LEXIS 45952 (E.D.N.Y. June 25, 2007) .......................................................................................................................... 10

Fabrikant v. French,
 691 F.3d 193 (2d Cir. 2012) ...................................................................................... 9

Garcia v. Does,
 779 F.3d 84 (2d Cir. 2014) ........................................................................................ 7

Gonzalez v. City of N.Y.,
 14 Civ. 7721 (LGS), 2015 U.S. Dist. LEXIS 151810 (S.D.N.Y. Nov. 9, 2015) ......... 6

Goodman v. City of N.Y.,
 14 Civ. 5261 (CM), 2015 U.S. Dist. LEXIS 37063 (S.D.N.Y. Feb. 18, 2015) .......... 6

Jones v. Parmley,
 465 F.3d 46 (2d Cir. 2006) ........................................................................................ 7

Mandola v. Cnty. of Nassau,
 13-cv-3064 (DLI)(ST), 2016 U.S. Dist. LEXIS 136614 (E.D.N.Y. Sept. 30, 2016) .. 2, 4

Mediavilla v. City of N.Y.,
 14 Civ. 8624 (VSB), Dkt. No. 91 (S.D.N.Y. Sept. 29, 2016) .................................... 4, 7, 8

Pluma v. City of N.Y.,
	13 Civ. 2017 (LAP), 2015 U.S. Dist. LEXIS 48134 (S.D.N.Y. Mar. 31, 2015) ............................6

Pluma v. City of N.Y.,
	13 Civ. 2017 (LAP), 2016 U.S. Dist. LEXIS 44227 (S.D.N.Y. Mar. 21, 2016) ............................5

Salmon v. Blesser,
	802 F.3d 249 (2d Cir. 2015)................................................................................................2, 3, 4

Scott v. Harris,
	550 U.S. 372 (2007)..................................................................................................................5

Sheppard v. Beerman,
	18 F.3d 147 (2d Cir. 1994).................................................................................................2, 3, 4

Singer v. Fulton County Sheriff,
	63 F.3d 110 (2d Cir. 1995)........................................................................................................9

Vanderwoude v. City of New York,
	12 Civ. 9046 (KPF), 2014 U.S. Dist. LEXIS 79064 (S.D.N.Y. Jun. 10, 2014) .......................10

Waller v. City of Middletown,
	89 F. Supp. 3d 279 (D. Conn. 2015).......................................................................................10

Ward v. Rock Against Racism,
	491 U.S. 781 (1989)..................................................................................................................7

Webster v. City of N.Y.,
	333 F. Supp. 2d 184 (S.D.N.Y. 2004).......................................................................................4

Wiles v. City of N.Y.,
	13 Civ. 2898 (TPG), 2016 U.S. Dist. LEXIS 148024 (S.D.N.Y. Oct. 25, 2016) .................. *passim*

Wray v. City of N.Y.,
	490 F.3d 189 (2d Cir. 2007).....................................................................................................12

**Other Authorities**

United States Constitution, 1st Amendment............................................................................ *passim*

United States Constitution, 4th Amendment ........................................................................... *passim*

United States Constitution, 14th Amendment ...............................................................................4

New York City Charter § 435(a) ..............................................................................................4, 13

## PRELIMINARY STATEMENT

Notwithstanding plaintiffs' attempt to obfuscate the issues at hand, including by submitting with their Opposition a barrage of materials[1] untethered to the facts of this case, this matter is fairly simple. Defendants' use of a communication device to clear East 57th Street for traffic during a December 5, 2014, protest – in which people were undisputedly walking in the street and throwing glass bottles and garbage – did not effect a seizure of plaintiffs, did not shock the conscience and did not unlawfully curtail plaintiffs' 1st Amendment or other constitutional rights. At a minimum, the novelty of plaintiffs' legal arguments demonstrates the defendant officers' entitlement to qualified immunity. For the additional reasons set forth herein, defendants' motion should be granted.

## ARGUMENT

## POINT I: THE FAC DOES NOT STATE A VIABLE FOURTH AMENDMENT CLAIM

Plaintiffs argue at length that because sound waves make physical contact with the eardrum, sound can properly be considered "force" for the purpose of a constitutional tort claim. See, generally, Cohen Decl. While defendants by no means concede this, plaintiff's argument misses the mark because defendants' motion does not rise or fall on whether or not an LRAD can be an instrument of "force." Rather, the issues bearing on whether or not plaintiffs have adequately stated a violation of their 4th Amendment rights here are: (1) did the use of the 100X cause plaintiffs to be "seized" under the 4th Amendment?; (2) if so, was the seizure objectively reasonable under the circumstances?; and (3) if there was no seizure, did the use of the 100X violate the 14th Amendment's "shock the conscience" standard? Moreover, the issue of whether or not the

---

[1] Plaintiffs submit as Exhibits 18 and 19 to the Oliver Declaration documents they concede were "not referred to or incorporated by reference into the FAC," Oliver Decl., ¶¶107-17, as well as two "demonstrative exhibits" with the Decker Declaration which were prepared by counsel ostensibly in connection with plaintiffs' opposition to defendants' motion, Decker Decl., ¶¶3-5. Plaintiffs also submit the Cohen Declaration (to "say something about how sound and similar physical phenomena work," Cohen Decl., ¶6), many paragraphs of which are purportedly "supported" by citations to materials not referred to in any fashion in the FAC, id., ¶¶7-14. All such materials not attached to or incorporated by reference in the FAC should be disregarded by the Court in deciding this motion. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-54 (2d Cir. 2002).

defendant officers are entitled to qualified immunity with respect to plaintiffs' 4th Amendment claims hinges, again, not on a scientific or existential examination of the nature of sound but on the question of whether the officers violated clearly established law when they used the 100X in the manner alleged in the FAC. Each of these issues must be resolved in defendants' favor.

Plaintiffs argue that the FAC contains sufficient facts such that they "could develop a record showing that the police displays and firings of the LRAD forced them to submit to the authority of the police directions," thereby causing them to be "seized." Op. Mem., pp. 8-9. However, even if plaintiffs' movement along East 57th Street away from the Intersection was a response compelled by the 100X's "deterrent tone" and/or the officers' orders,[2] this did not amount to a seizure because "a police order to leave an area, without more, does not effect a seizure of the person so ordered." Salmon v. Blesser, 802 F.3d 249, 251 (2d Cir. 2015) (citing Sheppard v. Beerman, 18 F.3d 147 (2d Cir. 1994)). Rather, the case law in this Circuit is clear that it is *restraint* on movement – as distinct from a requirement that an individual simply move away from one specific area – that works a constitutionally-cognizable seizure of an individual. See Sheppard, 18 F.3d at 153 (No seizure where plaintiff, defendant's law clerk who had just been fired, was removed from courthouse by court officers; district court properly found that plaintiff's liberty was never restrained, because plaintiff was "free to go anywhere else that he desired, with the exception of [defendant]'s chambers and the court house."); Mandola v. Cnty. of Nassau, 13-cv-3064 (DLI)(ST), 2016 U.S. Dist. LEXIS 136614 *30-31 (E.D.N.Y. Sept. 30, 2016) (No seizure where plaintiffs were not permitted to enter their home during police execution of an arrest warrant therein; officers' presence inside and outside the home did not impose any unnecessary restriction upon plaintiffs' movements and "[p]laintiffs

---

[2] Most of the plaintiffs have not even pleaded this much. Edrei, Appel, and Stephan were already moving away from the Intersection *before* the officers began using the 100X, and simply continued to do so once the "deterrent tone" was activated. Garman Decl., Ex. B (FAC), ¶¶117-18, 151-53, 304-5, 358-59. Nusbaum alleges that when the officers began using the 100X, he put in earplugs and began filming them, id., ¶¶320, 336-8; he continued to move along 57th Street alongside the officers, filming them, Op. Mem. p. 4 n. 10. Such actions hardly be said to amount to "submission" to any "show of authority."

were free, at all times to move anywhere except inside their home" during the warrant execution),

      Salmon, cited by plaintiffs, perfectly illustrates this principle. In that case, the 2nd Circuit found that it was error to dismiss plaintiff's 4th Amendment claims where the defendant officer allegedly grabbed plaintiff, who was waiting inside a courthouse, by the collar, violently twisted his arm behind his back, shoved him towards the door of the courthouse and physically threw him out the door. Salmon, 802 F.3d at 253-55. The Court distinguished Sheppard because, in Salmon, the plaintiff claimed to have been physically manhandled and thrown out of the courthouse – he had not been subjected to mere "guiding force" out of the area like the plaintiff in Sheppard. Id., at 253-54. Salmon makes clear that it is not the requirement that an individual leave a particular area that results in a "seizure," but rather the defendant's use of physical force to intentionally restrain such an individual's freedom of movement, however briefly. Id. The 2nd Circuit held:

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. *Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes. . . .*
>
> . . . For such time as Blesser held Salmon by the collar and twisted his arm behind his back, Blesser was intentionally restraining and controlling Salmon's movements, thereby transforming their encounter, even if only briefly, into a detention, which qualifies as a seizure of Salmon's person.

Salmon, 802 F.3d at 253-54 (emphasis added) (citing, inter alia, California v. Hodari D., 499 U.S. 621, 626 (1991) (stating that "word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement")). The Court made clear that it was *not* holding that "any physical contact will transform an order to depart a public place into a Fourth Amendment seizure. But where such an order is accompanied by the use of sufficient force intentionally to

restrain a person and gain control of his movements—as the collar grab and arm twisting allegedly did here—we conclude that a Fourth Amendment seizure is plausibly alleged." Id., at 255.

Here, plaintiffs have claimed no physical restraint of their movements, not even a momentary one. Rather, as in as in Sheppard and Mandola, even if plaintiffs felt obliged to comply with the officers' orders to get out of the street, plaintiffs were free to go anywhere they chose except, arguably, for the immediate area in front of the 100X. At most, plaintiffs' claim that the sound of the 100X made contact with their eardrums, forcing them away from it, amounts only to an allegation of "guiding force" to ensure compliance with the orders to get on the sidewalk, which Salmon makes clear does not amount to a seizure. Accordingly, plaintiffs have not alleged a 4th Amendment seizure.[3]

Because plaintiffs were not seized, the 14th Amendment Due Process Clause's "shocks the conscience" standard applies to their force claims. Webster v. City of N.Y., 333 F. Supp. 2d 184, 196 (S.D.N.Y. 2004). Plaintiffs cannot meet this stringent standard, nor could they even meet the less-stringent 4th Amendment "objective reasonableness" standard, even if the latter standard applied (which it doesn't). Assuming, arguendo, that the use of the 100X could be construed as a use of force, and even further assuming that it somehow caused plaintiffs to be seized, the facts pleaded in the FAC[4] establish that Maguire and Poletto's use of the 100X to instruct people to get onto the sidewalk and out of the street, including by using the deterrent tone together with verbal instructions, was plainly justified by the NYPD's duties under N.Y.C. Charter § 435(a) to preserve order and to direct and control pedestrian traffic. See Mediavilla v. City of N.Y., 14 Civ. 8624 (VSB), Dkt. No.

---

[3] For these same reasons, any claims plaintiffs purport to assert under Section 1983 or New York common law for false arrest/imprisonment fail as a matter of law and must be dismissed.

[4] Plaintiffs concede that in the moments before the 100X was first activated, people were throwing glass bottles at officers making arrests at the Intersection. Garman Decl., Ex. B (FAC), ¶¶115, 149, 212. Furthermore the video footage – which plaintiffs concede the Court may consider in deciding defendants' motion, Op. Mem., p. 5 – unquestionably shows protesters in the middle of 57th Street, Garman Decl., Ex. C (Video 1) at 00:20-1:45, as well as garbage bags being thrown and littering the streets, id., at 1:49-59, 2:59-3:30. Plaintiffs further concede that before Maguire and Poletto began using the 100X, officers yelled for people to get onto the sidewalk. Garman Decl., Ex. B (FAC), ¶215.

4

91, at pp. 20-22 (S.D.N.Y. Sept. 29, 2016) (holding that dispersal orders during Occupy Wall Street demonstration on sidewalk in front of courthouse were lawful and finding that "[t]he City 'certainly has a significant interest in keeping its public spaces safe and free of congestion.'") (quoting Bery v. City of N.Y., 97 F.3d 689, 697 (2d Cir. 1996)) (other citations omitted); see also Wiles v. City of N.Y., 13 Civ. 2898 (TPG), 2016 U.S. Dist. LEXIS 148024, *14-15 (S.D.N.Y. Oct. 25, 2016) (noting that "states have a 'strong interest in . . . promoting the free flow of traffic on public streets and sidewalks," and finding dispersal orders lawful where protestors blocked the sidewalk in front of courthouse to pedestrian traffic).

Furthermore, to the extent that the use of the 100X here could be considered a use of force, the video footage – which depicts people relatively calmly walking away, most not even covering their ears, and also depict people still in the street and/or throwing garbage as the officers are using the 100X, Garman Decl., Ex. C (Video 1), 2:40-3:30; Ex. D (Video 2), 00:00-00:55 – clearly demonstrate that Maguire and Poletto's use of the 100X here was neither unreasonably excessive nor conscience-shocking.[5] While plaintiffs contend that the use of the 100X was nonetheless unreasonable because the facts in the FAC establish the lack of any "clear and present danger," Op. Mem., p. 11, as set forth below, the "clear and present danger" standard does not apply here.

Given the foregoing, the use of the 100X as alleged meets even the 4th Amendment "objective reasonableness" standard, and plainly does not arise to the level of "shocking the conscience." At a minimum, because Maguire and Poletto objectively reasonably believed that their

---

[5] Plaintiffs concede that the Court may consider the videos in deciding defendants' motion, Op. Mem., p. 5, but insist that the Court should "leave[] the factual determination of excessiveness to a jury," id., at p. 10. However, where video evidence clearly contradicts the plaintiff's version of events, the Court may – and in fact must – "view[] the facts in the light depicted by the videotape" rather than accept a "visible fiction." Scott v. Harris, 550 U.S. 372, 380-81 (2007). Accordingly, the Court may consider the videos here in deciding the issue of whether the use of the 100X "shocked the conscience" or, if the Court determines that the 4th Amendment standard applies, whether it was objectively reasonable. See Pluma v. City of N.Y., 13 Civ. 2017 (LAP), 2016 U.S. Dist. LEXIS 44227, *18-24 (S.D.N.Y. Mar. 21, 2016) (dismissing excessive force claim and holding that "[b]ased on this [video] evidence, no reasonable fact finder could conclude that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances.") (internal quotation marks and citation omitted).

use of the 100X was justified, they are entitled to qualified immunity. Accordingly, plaintiff's 4th Amendment claims fail as a matter of law and must be dismissed.[6]

## POINT II: THE FAC DOES NOT STATE A VIABLE FIRST AMENDMENT CLAIM

Even assuming plaintiffs were engaged in conduct protected by the 1st Amendment when the officers began activating the 100X (which defendants do not concede),[7] plaintiffs have not adequately pleaded 1st Amendment claims, under any theory.

Citing Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006) (a.k.a. Pampineau v. Parmley) plaintiffs assert that defendants' use of the 100X, which allegedly interfered with plaintiffs' exercise of their 1st Amendment rights, was lawful only if there existed a "clear and present danger of riot, imminent violence, interference with traffic or other immediate threat to public safety." Op. Mem., p. 15. This is incorrect. As a Court in this District recently noted, the "clear and present danger" standard is appropriate only where the plaintiff's right to protest was *unconditionally* silenced. See Wiles, 2016 U.S. Dist. LEXIS 148024, *13 (citing Cantwell v. Connecticut, 310 U.S. 296, 308 (1940)). In Wiles, the Court found that dispersal orders requiring protesters to leave the sidewalk in front of a courthouse did not amount to an unconditional silencing of the right to protest, because protesters were free to demonstrate in a different location (and in fact did so); thus, the dispersal orders were properly reviewed as a "time, place and manner" restriction on speech, rather than a blanket

---

[6] For these same reasons, Maguire and Poletto's use of the 100X did not constitute an arbitrary restriction on plaintiffs' "rights to remain" and "rights to travel," Op. Mem., p. 12. See Wiles, 2016 U.S. Dist. LEXIS 148024, *22 ("A reasonable officer under these circumstances could have believed that, but for their orders to disperse, pedestrian traffic would have come to a complete standstill in lower Manhattan during rush hour. These orders can hardly be said to be 'purely arbitrary' or 'not calculated in any way to promote the public order....'") (quoting People v. Galpern, 259 N.Y. 279, 284-85 (1932)).

[7] Edrei, Horse, Stephan contend that they were present in order to document, as opposed to participate in, the protest and the police response thereto, see Garman Decl., Ex. B (FAC), ¶¶139, 202, 288. However, as Courts in this District have noted, neither the Supreme Court nor the 2nd Circuit has ruled that there is a 1st Amendment right to photograph or film ongoing police activity; thus such a right is not "clearly established." See, e.g., Gonzalez v. City of N.Y., 14 Civ. 7721 (LGS), 2015 U.S. Dist. LEXIS 151810, *18-19 (S.D.N.Y. Nov. 9, 2015); Pluma v. City of N.Y., 13 Civ. 2017 (LAP), 2015 U.S. Dist. LEXIS 48134, *20 (S.D.N.Y. Mar. 31, 2015) (citing cases); Goodman v. City of N.Y., 14 Civ. 5261 (CM), 2015 U.S. Dist. LEXIS 37063, *17-18 (S.D.N.Y. Feb. 18, 2015). Thus, at a minimum, Maguire and Poletto are entitled to qualified immunity with respect to the non-participant plaintiffs' 1st Amendment claims. See Goodman, 2015 U.S. Dist. LEXIS 37063, *17-18; Gonzalez, 2015 U.S. Dist. LEXIS 151810, *18-19.

restriction warranting application of the "clear and present danger" standard. Id., *13-14. Here, too, there was no unconditional silencing of the protest; significantly, as plaintiffs themselves concede, the protest continued after the 100X had been used, and one of the plaintiffs (Craven) continued to participate. Garman Decl., Ex. B (FAC), ¶¶ 166, 272. Accordingly, Parmley is inapposite,[8] and the "clear and present danger" standard does not apply here.

A time, place and manner restriction on speech is permissible if it is (1) content-neutral; (2) narrowly tailored to serve a significant governmental interest, and (3) leaves open ample, alternative channels for communication of the information. Wiles, 2016 U.S. Dist. LEXIS 148024, *14 (citing Marcavage v. City of N.Y., 689 F.3d 98, 104 (2d Cir. 2012)). Plaintiffs do not contest in their Opposition that the alleged restriction was content-neutral; they instead contend that they have sufficiently alleged that defendants' purported interference with their 1st Amendment rights was overly broad, Op. Mem., p. 18, and left no adequate alternative mode of communication, id., p.19. However, the allegations in the FAC belie these claims.

As set forth in Point I(B) above, there is a substantial government interest in ensuring the free flow of vehicular and/or pedestrian traffic on public roadways and sidewalks. See Wiles, 2016 U.S. Dist. LEXIS 148024, *14; see also Mediavilla, 14 Civ. 8624 (VSB), Dkt. No. 91, at p. 23 ("There is no First Amendment violation when the government regulates by reasonable, appropriate and non-discriminatory measures the time, place and manner of use of the streets for public assemblies...") (internal quotation marks and citation omitted). Courts in this Circuit have found police dispersal orders – which is precisely what Maguire and Poletto were using the 100X to communicate[9] – to be

---

[8] Furthermore, the Second Circuit clarified in Garcia v. Does, 779 F.3d 84 (2d Cir. 2014) that Parmley's holding was limited to the rights attendant to protests occurring on *private property*, see Wiles, 2016 U.S. Dist. LEXIS 148024, *26 (citing Garcia, 779 F.3d at 94 n.11), which have "long been treated as categorically distinct" from protests occurring on public property, as here, id., (citing City of Ladue v. Gilleo, 512 U.S. 43, 58 (1994)).

[9] To the extent that plaintiffs contend that the amplified sound of the 100X in some way differentiates this situation from one in which bullhorns or megaphones were used to deliver dispersal orders, as defendants note in Point II(B) of their original Memorandum, orders communicated through these latter methods have been subject to challenges based on allegations that the orders could not be heard. Accordingly, the issuance of dispersal orders without the use of the 100X

7

sufficiently narrowly-tailored to serve such interests, particularly where, as here, protesters were able to continue on elsewhere. See Wiles, 2016 U.S. Dist. LEXIS 148024, *15 ("The fact that many protestors were able to continue to demonstrate across the street in Foley Square shows that the police's orders did not substantially burden their speech. The police's orders to disperse were therefore "narrowly tailored to serve a significant governmental interest."); see also Mediavilla, 14 Civ. 8624 (VSB), Dkt. No. 91, at pp. 23-24 (noting that "[t]he authority to issue dispersal orders continues to play a commonplace and crucial role in police operations, particularly in urban areas," and holding that officers' dispersal orders in that case "were a reasonable, appropriate and limited means of maintaining order and the free movement of pedestrian traffic" and thus did not violate the 1st Amendment) (internal quotation marks and citations omitted).

Similarly, plaintiffs' concession here that the protest continued on after Maguire and Polleto activated the 100X, Garman Decl., Ex. B (FAC), ¶¶166, 272, is fatal to their argument that there was no ample alternative channel through which to communicate the protest's message. "The alternative channel for communication need not be a 'perfect substitute.'... [A]ll that is required is that the alternative channel be 'within close proximity to the intended audience." Wiles, 2016 U.S. Dist. LEXIS 148024, *15 (citing Marcavage, 689 F.3d at 107). Plaintiffs do not argue that there was any particular significance to the area of East 57th Street between Madison and Park Avenues to the protest's message – nor can they, given that according to the FAC, the December 4-5th protests were taking place "on the streets of Manhattan," and indeed all over the five boroughs, the country and the world. Garman Decl., Ex. B (FAC), ¶¶108, 140, 203, 349-50. Accordingly, plaintiffs cannot make out a viable 1st Amendment claim premised on a time, place or manner theory. At a minimum, for the reasons set forth herein and in defendants' original Memorandum, Maguire and Polleto are

---

would arguably be less effective, and it is well-settled that a regulation of speech is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and is not substantially broader than necessary to achieve that interest. Ward v. Rock Against Racism, 491 U.S. 781, 782-83 (1989).

entitled to qualified immunity on this claim, as based on the facts as pleaded in the FAC, they did not violate any clearly-established 1st Amendment rights of plaintiffs.

Furthermore, plaintiffs' 1st Amendment retaliation claim, premised on a theory that they were subjected to the "force" of the 100X in retaliation for exercising their 1st Amendment rights, necessarily fails if the use of the LRAD was justified, see Fabrikant v. French, 691 F.3d 193, 215-216 (2d Cir. 2012), which it was, as set forth above and in defendants' original Memorandum. A finding that Maguire and Poletto are entitled to qualified immunity on plaintiffs' 4th Amendment claims would likewise bar a retaliation claim. Depew v. City of N.Y., 15-cv-3821 (AT)(AJP), Dkt. No. 31, at p. 8 (S.D.N.Y. Dec. 13, 2016); Wiles, 2016 U.S. Dist. LEXIS 148024, *31.[10]

## POINT III: THE FAC DOES NOT STATE A *MONELL* CLAIM

Plaintiffs contend they have sufficiently pleaded claims under "each of the four familiar theories of Monell liability," Op. Mem., p. 23, but address only two such theories in their Opposition, asserting that the FAC sufficiently alleges: (1) that Maguire, Poletto and Bratton were final policy makers, whose actions caused the purported violations of plaintiffs' constitutional rights; and (2) that the City's alleged failure to train and/or supervise officers with respect to the use of the LRAD constituted deliberate indifference. Even if plaintiffs had plausibly alleged an underlying constitutional violation (which they have not), neither of their Monell theories is viable here.

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." Anthony v. City of N.Y., 339 F.3d 129, 139 (2d Cir. 2003). Plaintiffs contend that, as the officers who physically activated the 100X during the

---

[10] Horse argues that his retaliation claim stands on stronger footing than the other five plaintiffs' claims because the officers activated the 100X in his direction after Horse made a "critical gesture" and a critical comment at them, thereby purportedly evincing retaliatory intent. Op. Mem., p. 20. However, Horse concedes that after making his "critical" comment – and before Maguire and Poletto "fired" the 100X at him – Horse stepped off of the sidewalk into the street. Garman Decl., Ex. B (FAC), ¶¶228-29. Thus, to the extent that the subsequent use of the 100X in Horse's direction implicated the 4th Amendment at all (which defendants do not concede, and explicitly deny as set forth in Point II(A), above), it was justified in light of Horse's failure to remain on the sidewalk as directed; at a minimum, the officers objectively reasonably believed that it was justified. As such, the Court must not even examine the officers' subjective intent. See Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995).

December 5, 2014, incident, Maguire and Poletto "had final authority to establish City policy with respect to the December 5, 2014 use of the LRADs." Op. Mem., pp. 23-24. Accepting this logic, however, "would result in *de facto respondeat superior* liability for municipalities," Vanderwoude v. City of New York, 12 Civ. 9046 (KPF), 2014 U.S. Dist. LEXIS 79064, *58 (S.D.N.Y. Jun. 10, 2014) (citation omitted), because an individual can always be said to have had "final" decision-making ability in the sense that he or she has physical control over his/ her own actions in a given moment. That is not what the law requires for the purposes of subjecting a municipality to Monell liability; rather, "[a]n official has final authority if his decisions at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Anthony, 339 F.3d at 139. An officer who decides in a given moment to make an arrest, or to throw a punch, or to activate an LRAD's deterrent tone, may quite literally be the ultimate decision-maker as to whether or not he will decide to take such an action; that does not render his decision a final decision by the City.

Plaintiffs also contend the failure of Bratton "and other policymakers" to respond to plaintiff's counsel's December 12, 2014, letter regarding the December 5th incident, and the comments of a City spokesperson in the *New York Times* defending the December 5th use of the 100X, amounted to the City's ratification of Maguire's and Poletto's conduct. Op. Mem., p. 24. However, even assuming that this alleged "ratification" of the allegedly unconstitutional actions of Maguire and Poletto after the fact could be construed as some kind of City policy (which defendants deny[11]), such a policy, purportedly implemented a week after the incident, cannot be said to have caused the alleged violations of plaintiffs' constitutional rights on December 5th. Accordingly, plaintiffs' Monell claim based on the alleged actions of "final policy makers" must be dismissed.[12]

---

[11] See Waller v. City of Middletown, 89 F. Supp. 3d 279, 287 n. 3 (D. Conn. 2015) ("The one-off instance of 'ratification and approval' asserted in the complaint... does not suggest 'persistent' 'municipal inaction' and therefore does not support 'an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of Monell.'") (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)).

[12] Given that plaintiffs have not stated a viable Monell claim under a "final policy maker" theory, plaintiffs should not be permitted to substitute Bratton with now-NYPD Commissioner James O'Neill for the purposes of the claims against

Plaintiffs' failure to train theory of Monell liability likewise fails. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011). As set forth in Point IV of defendants' original Memorandum, plaintiffs have failed to plausibly allege that prior to December 5, 2014, the City was on notice of, and failed to remedy, a particular deficiency in its training of officers that caused officers to violate citizen's constitutional rights in a similar manner to the constitutional violations plaintiffs allege. In their Opposition, plaintiffs argue that a single-incident theory of failure to train liability is appropriate here, obviating the requirement that they demonstrate a pattern of similar constitutional violations, because the unconstitutional consequences of the alleged failure to train was patently obvious. Op. Mem., p. 25. While courts in this Circuit have held the single-incident theory to still be viable "in a narrow range of circumstances," see, e.g., Breitkopf v. Gentile, 41 F. Supp. 3d 220, 253 (E.D.N.Y. 2014) (quoting Connick, 563 U.S. at 63); Chamberlain v. City of White Plains, 986 F.Supp.2d 363, 391-92 (S.D.N.Y. 2013), this is not such a circumstance. "'For liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" Breitkopf, 41 F. Supp. 3d at 255 (quoting Harvey v. Campbell Cnty., 453 F. App'x 557, 567 (6th Cir. 2011)).

As a preliminary matter, plaintiffs cannot demonstrate a complete failure to train. Plaintiffs contend that the use of the 100X constituted force, and readily concede that at time of the incident the NYPD provided guidance to its officers on the use of force in the Patrol Guide, which required officers to use only "the minimal necessary force." Garman Decl., Ex. B (FAC), ¶393. While plaintiffs contend that the Patrol Guide's Use of Force policy (both the policy in place at the time

---

the Commissioner in his official capacity. In any event, allowing plaintiffs to substitute O'Neill as a defendant to this action in his official capacity would accomplish nothing, because a claim against a municipal employee in his official capacity is "equivalent of a damage suit against the municipality itself." Escobar v. City of New York, 05 Civ. 3030(ENV)(CLP), 2007 U.S. Dist. LEXIS 45952, at *3 (E.D.N.Y. June 25, 2007).

and as subsequently revised) is deficient in that it does not make explicit reference to the LRAD, id., ¶¶98, 100-103, the fact that training may not be in the precise format a plaintiff would like does not established deliberate indifference as a matter of law. See Connick, 563 U.S. at 68 ("[F]ailure to train is concerned with the substance of the training, not the particular instructional format. The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."); see also Breitkopf, 41 F. Supp. 3d at 255.

Furthermore, plaintiffs have not plausibly alleged that the alleged lack of LRAD-specific training left the officers so grossly untrained such that future misconduct was substantially certain to result. Plaintiffs concede, as they must, that the 100X contained warnings, *directly on the product itself*, regarding its "operation zones," including a graphical depiction of those zones and conspicuous warnings such as "DO NOT ENTER WITHIN 10 METERS DURING CONTINUOUS OPERATION." Garman Decl., Ex. B (FAC), ¶25. The FAC also notes that LRADs contain "a prominently positioned volume control knob" allowing volume to be quickly modulated. Id., ¶12. Particularly given these features of the 100X – which again, is a communication device, not a firearm or a chemical agent – an officer tasked with operation of the 100X is not presented with "a difficult choice of the sort that training or supervision will make less difficult." Wray v. City of N.Y., 490 F.3d 189, 196 (2d Cir. 2007). Plaintiffs' failure to train theory of Monell liability, based on a single-incident theory, thus also fails as a matter of law and must be dismissed.

**POINT IV: THE CLAIMS AGAINST BRATTON IN HIS INDIVIDUAL CAPACITY FAIL**

Plaintiffs simply assert, without reference to any specific facts in the FAC, that "Bratton was personally involved in violating Plaintiffs' rights and is properly named as a party in his individual capacity." Op. Mem., p. 26. However, plaintiffs' theory of individual liability against Bratton appears to mirror their Monell theory that Bratton, after the fact, "ratified" Maguire and Poletto's conduct by allegedly not acting in response to the December 12th letter. Op. Mem. pp. 24-26. Just as

this theory fails for the purposes of plaintiffs' Monell claim, so too does it fail to present a viable theory of individual liability against Bratton. Plaintiffs do not argue, nor can they, that Bratton had any meaningful opportunity to retroactively undo the alleged violations of plaintiffs' constitutional rights purportedly caused by the use of the 100X in their presence on December 5th. The claims against Bratton in his individual capacity must therefore be dismissed.

**POINT V: PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED**

Because plaintiffs have failed to sufficiently plead any claim under federal law, the Court should decline jurisdiction over the state law claims, each of which, for the reasons set forth in Point VI of defendants' original Memorandum, also fails substantively. At a minimum, defendants are entitled to state law immunity for their exercise of discretion in carrying out their duties under N.Y.C. Charter § 435(a) to disperse assemblages obstructing public streets and sidewalks. See Wiles, 2016 U.S. Dist. LEXIS 148024, *34-35 (granting state law immunity and noting that New York law provides even greater protection from liability than the federal doctrine of qualified immunity) ("Directing pedestrian traffic to clear sidewalks of congestion is a duty that requires 'instantaneous judgment calls, rather than a pre-programmed means of achieving a compulsory result.'") (quoting Denis v. Town of Haverstraw, 852 F. Supp.2d 405, 413 (S.D.N.Y. 2012)).

**CONCLUSION**

For these additional reasons, defendants ask that the Court dismiss the FAC with prejudice, and grant such other relief as the Court deems just and proper.

Dated: New York, New York
January 3, 2017

ZACHARY CARTER
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2579

By: _____

Ashley Garman
Senior Counsel
Special Federal Litigation Division

TO: The Honorable Robert W. Sweet
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Gideon Orion Oliver, Esq.
277 Broadway, Suite 1501
New York, New York 10007

Elena Louisa Cohen, Esq.
365 Fifth Avenue, Room 5202
New York, New York 10016