UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X
ANIKA EDREI, et al.,

                    Plaintiffs,

                                              16 Civ. 1652 (RWS)

        - against -

                                              OPINION

CITY OF NEW YORK, et al.,

                    Defendants.
----------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/31/17

        Attorneys for Plaintiffs
        277 Broadway, Suite 1501
        New York, NY 10007
        By:  Gideon Orion Oliver, Esq.
             Elena L. Cohen, Esq.
             Michael Decker, Esq.


        Attorney for Defendants
        ZACHARY CARTER
        Corporation Counsel of the City of New York
        100 Church Street
        New York, NY 10007
        By:  Ashley Garman, Esq.

**Sweet, D.J.**

Plaintiffs Anika Edrei ("Edrei"), Shay Horse ("Horse"), James Craven ("Craven"), Keegan Stephan ("Stephan"), Michael Nusbaum ("Nusbaum"), and Alexander Appel ("Appel") (collectively, the "Plaintiffs") have brought the following lawsuit under 42 U.S.C. § 1983 against Defendants The City of New York ("NYC"), William Bratton ("Bratton"), John Maguire ("Maguire"), and Mike Poletto ("Poletto") (collectively, the "Defendants"). Plaintiffs allege Defendants have violated their rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution, and New York State claims of assault and battery, arrest and false imprisonment, constitutional tort, negligence, and negligent hiring, screening, retention, supervision and training. Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' First Amended Complaint ("FAC"). As set forth below, the motion is granted in part and denied in part.

**Prior Proceedings**

Plaintiffs commenced this action on March 3, 2016. (Dkt. 1.) Plaintiffs filed their FAC on August 1, 2016, which

1

expanded certain allegations from the initial complaint, added
Plaintiff Appel, inserted Defendants Maguire and Poletto for
previous "John Doe" defendants, and added a claim for municipal
liability against NYC. (Dkt. 21.)

The instant motion to dismiss was heard and marked fully
submitted on January 26, 2017. (Dkt. 35.)

**Facts**

The following facts are taken from the Plaintiffs' FAC.
(Dkt. 21.) They are taken as true for purposes of the motion to
dismiss.

i.   Long Range Acoustic Devices ("LRADs") And The X100

LRAD devices were first developed around 2000, initially
for the military as a tool for ships to amplify and project
noise to ward off other ships. (FAC ¶¶ 3, 11.) The device has
also been marketed for non-military, loudspeaker-like purposes:
to produce "highly intelligible voice messages . . . and
powerful alarm tones over large distances." (FAC ¶ 5.) LRADs are
marketed as louder than traditional megaphones by around 20-35
decibels ("dBs"), and have the capacity to disseminate messages

2

to large crowds over ten blocks away. (FAC ¶¶ 9, 13.) In addition to amplifying sound, LRAD devices can possess a high-pitched, volume adjustable "deterrent tone" that is marketed to law enforcement as useful for crowd control by creating audible discomfort when used at close range. (FAC ¶¶ 11-12.)

The 100X Model LRAD ("100X") is a type of LRAD device manufactured by the LRAD Corporation. (FAC ¶¶ 1, 80.) The 100X can project messages up to 600 meters away, produce a maximum continuous output of 136 dB at one meter away, and has the capacity to overcome 88 dBs of background noise at 250 meters. (FAC ¶ 80.)

## ii.  The New York Police Department's ("NYPD") Use Of LRADs

The New York Police Department ("NYPD") has owned and employed LRAD devices since 2004, when it purchased two LRAD Model 3300s ("Model 3300). (FAC ¶ 57.) At the time of purchases, the NYPD stated it intended to use the LRAD devices to disseminate information to large crowds, such as during demonstrations or following terrorist attacks. (FAC ¶ 59.) Between 2004 and 2011, the NYPD used LRADs infrequently, principally as loudspeakers. (FAC ¶¶ 64-65, 67.)

3

In 2010, the NYPD conducted tests using the Model 3300. (FAC ¶ 73.) These tests concluded that when LRAD device volume was at around maximum, it resulted in a sound volume of around 100 to 110 dB at a distance of 320 feet away. (FAC ¶¶ 73-75.) The NYPD did not take readings of the Model 3300 within 320 feet of the device, a zone labeled a "potential danger area." (FAC ¶ 77.)[1]

Sometime between 2010 and 2011, the NYPD purchased an X100. (FAC ¶ 78.) However, the NYPD did not start using LRAD devices regularly at demonstrations until around December 2014. (FAC ¶¶ 71-72, 105.) From the initial purchase of LRADs through to the instant action, the NYPD did not have written policies and training materials in place for police officers using LRAD devices in the field. (See FAC ¶¶ 94-104.)

iii. The December 4 And 5, 2014 Protest

On the evening of December 4, 2014 through the morning of December 5, 2014, protests and demonstrations took place around New York City in response to a Staten Island grand jury's

---

[1] For point of reference, sound levels starting around 85 to 90 dBs and louder can cause human discomfort and damage a person's hearing. (FAC ¶ 80-83.)

4

decision not to indict an NYPD officer for the death of Eric
Gardner. (FAC ¶¶ 107-08.) Plaintiffs were present at one of
these protests in the capacity of photojournalists, filmmakers,
observers, or active protestors. (FAC ¶¶ 1, 109.) At around 1am
on December 5, 2014, each of the Plaintiffs were part of a
protest taking place at the intersection of 57th Street and
Madison Avenue in Manhattan (the "Protest"). (FAC ¶¶ 109-11,
142, 207-08, 260-61, 298, 328, 352-56.) Around this time, police
officers arrested some of the protesters, which Plaintiffs and
others witnessed from the intersection but without interfering.
(FAC ¶¶ 111-14, 144-45, 148, 213-14, 260-61, 298-99, 328, 356;
Declaration of Ashley R. Garman dated October 25, 2016 ("Garman
Decl.") Ex. C at 00:14-01:24.[2]) During the arrests, other
unidentified protesters threw objects, likely glass bottles,
towards where the police were making the arrests. (FAC ¶¶ 115,

[2] Defendants contend that videos taken by Plaintiffs Craven and
Nusbaum were incorporated by reference into the FAC at ¶ 315 and
are properly considered by the Court in their Motion to Dismiss.
(Supp. Mem. at 2 n.2.) Although Plaintiffs disagree as to
whether they incorporated the videos into their FAC, they do not
object to the videos' consideration, and in fact cite to it in
their reply motion papers. (Opp. Mem. at 5.) The Court will
consider them. See Blue Tree Hotels Inv. v. Starwood Hotels &
Resorts, 369 F.3d 212, 217 (2d Cir. 2004) (permitting
consideration of "any documents that are either incorporated
into the complaint by reference or attached to the complaint as
exhibits"); Hershey v. Goldstein, 938 F. Supp. 2d 491, 498 n.1
(S.D.N.Y. 2013) (considering video footage on motion to dismiss
that is referenced in complaint and referenced by defendant in
reply brief).

149, 212, 262, 329.) Other unidentified protesters threw garbage into the air and the street. (Garman Decl. Ex. C at 01:49–01:59.) Some police officers used pepper spray on the crowd. (FAC ¶¶ 117, 211, 301.) Many who had been watching the Protest events began to run in different directions. (FAC ¶¶ 118, 151–52, 305, 358-59.) The police ordered those present at the Protest to return to the sidewalk. (FAC ¶ 215.)

Defendants Maguire and Poletto, members of the NYPD Disorder Control Unit, were at this time standing in the street at 57th Street and Madison Avenue. (FAC ¶¶ 1, 119-21.) In response to these events, the officers began using the X100's deterrent tone and broadcasting a message that identified themselves as NYPD and directed people to get on the sidewalk and out of the street. (FAC ¶¶ 122, 125, 160, 221, 333, 363.) In response to the amplified sound from the X100, Plaintiff Nusbaum used earplugs he brought with him and proceeded to film the officers (FAC ¶¶ 337-38); the other Plaintiffs moved away from the area of the X100 to escape the noise (FAC ¶¶ 163-64, 230-31, 272, 308, 361-6.) During this time, Defendants Maguire and Poletto employed the deterrent tone between fifteen to twenty times over a span of three minutes and at a rate that was "almost continuously." (FAC ¶¶ 125, 219, 271.) At various points during this three minute span, Defendants Maguire and Poletto

6

fired the X100 fewer than ten feet away from Plaintiffs and others, angling the X100 at them. (FAC ¶ 131.)

As a result of their exposure to the X100's sound, Plaintiffs have suffered sustained physical injuries, such as migraines, sinus pain, dizziness, facial pressure, ringing in ears, and sensitivity to noise. (FAC ¶¶ 158, 165-72, 175-79, 182-83, 235-44, 273-79, 311-14, 341, 345, 367-70, 380.) Plaintiff Horse was diagnosed with tinnitus in both ears and vertigo. (FAC ¶¶ 239-42.) Plaintiff Appel was diagnosed with hearing loss caused by nerve damage, although his prognosis is positive. (FAC ¶¶ 371-76.) As a result of their experience during the Protest, Plaintiffs are fearful of and deterred from attending future protests, which has adversely affected their respective careers. (See FAC ¶ 187-96, 245-49, 281-84, 316-19, 343, 377-79.)

**Applicable Standard**

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to

7

'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A claim is facially
plausible when "the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." Iqbal, 556 U.S. at 663
(quoting Twombly, 550 U.S. at 556). In other words, the factual
allegations must "possess enough heft to show that the pleader
is entitled to relief." Twombly, 550 U.S. at 557 (internal
quotation marks omitted).


Additionally, while "a plaintiff may plead facts alleged
upon information and belief 'where the belief is based on
factual information that makes the inference of culpability
plausible,' such allegations must be 'accompanied by a statement
of the facts upon which the belief is founded.'" Munoz-Nagel v.
Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3
(S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3,
604 F.3d 110, 120 (2d Cir. 2010)); Prince v. Madison Square
Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v.
Calderoni, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y.
Mar. 1, 2012)). The pleadings, however, "must contain something
more than . . . a statement of facts that merely creates a

suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555 (citation and internal quotation omitted).

## **Defendants' Motion To Dismiss Plaintiffs' FAC Is Granted In Part And Denied In Part**

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999). For each respective alleged offense, Defendants were plausibly acting under color of state law. Plaintiffs claim that Defendants are liable under Section 1983 for First, Fourth, and Fourteenth Amendment violations, and municipal liability under Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658 (1978). Plaintiffs also allege violations of state and common law. Claims are addressed by FAC count below.

### i.  Unreasonable Seizure and Excessive Force Claims Under The Fourth and Fourteenth Amendment (Count One)

Plaintiffs allege that Defendants Maguire and Poletto's use of the 100X violated Plaintiffs' Fourth and Fourteenth Amendment rights, specifically by causing an unlawful seizure of

9

Plaintiffs' persons and by Defendants' use of excessive force against Plaintiffs. (FAC ¶¶ 383-90).

A person has been "seized" within the meaning of the Fourth Amendment when an "officer, by means of physical force or show of authority, . . . in some way restrain[s] the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Put another way, an encounter between a police officer and an individual "constitutes a 'seizure' for the purposes of the Fourth Amendment . . . 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Sheppard v. Beerman, 18 F.3d 147, 153 (2d Cir. 1994) (quoting United States v. Mendenhall, 446 U.S. 544, 544 (1980)); see also Salmon v. Blesser, 802 F.3d 249, 253 & n.3 (2d Cir. 2015) (observing that the inquiry could also be framed as whether "a reasonable person would feel free to . . . otherwise terminate the encounter," but noting that 'departure is the most obvious way' to terminate encounters" (citations omitted)).

Outside of an unlawful seizure, a plaintiff can still try to state a Section 1983 claim of excessive force under the Fourteenth Amendment's Due Process Clause. Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998); see also Tierney v. Davidson,

10

133 F.3d 189, 199 (2d Cir. 1998) ("Plaintiffs do not assert that they were arrested or seized, and therefore these [Section 1983] claims fall outside the Fourth Amendment protections . . . and are governed instead by the Due Process Clause of the Fourteenth Amendment.") To determine whether an action is unconstitutionally excessive force, a four-part test is used: "[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Tierney, 133 F.3d at 199 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (alteration in original). Excessive force claims must show "conscience-shocking" action by a government actor. Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 252 (2d Cir. 2001). Where an officer's use of force was "de minimis, necessary, appropriate, and benign," a claim of excessive force under the Fourteenth Amendment should not stand. Id. However, the "'[r]ules of due process are not . . . subject to mechanical application,'" and "var[y] according to the different environments in which the alleged excessive force occurs." Ali v. Szabo, 81 F. Supp. 2d 447, 455 (S.D.N.Y. 2000) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848 (1998)).

11

Under the allegations put forward by Plaintiffs, their
Fourth Amendment claims cannot survive. Plaintiffs allege that
the blocking the 57th Street roadway by Defendants Maguire and
Poletto while firing the X100's amplified sound at Plaintiffs
resulted in Plaintiffs' "seizure" because the officers' actions
forced Plaintiffs to move from where they were. (Opp. Mem. at 7;
FAC ¶ 121.) This claim fails for several reasons.

An officer's request to leave an area, even with use of
force, is not a seizure unless "accompanied by the use of
sufficient force intentionally to restrain a person and gain
control of his movements." Salmon, 802 F.3d at 255 (reversing
dismissal of seizure claim when officer ejected plaintiff from
courthouse by grabbing plaintiff's collar and "violently"
twisting plaintiff's arm). While exposed to the X100, none of
the Plaintiffs have plausibly alleged that their movements were
restrained. Rather, Plaintiffs state that while the X100 was
used by Defendants Maguire and Poletto, each Plaintiff moved
around the Protest area or left the vicinity of the X100 as each
desired, generally to escape the noise. (See FAC ¶¶ 164, 220,
223, 268, 272, 308, 337-38, 364, 366.) Other than being
requested to leave the street and inclined to leave the Protest
intersection by the noise, the Plaintiffs have not alleged they

12

were not "free to go anywhere else that [they] desired."

Sheppard, 18 F.3d at 153 (rejecting Fourth Amendment seizure

claim when plaintiff was required to leave a courthouse at

officer's command). Under the FAC, it cannot be plausibly argued

that Defendants Maguire and Poletto "gain[ed] control" of

Plaintiffs' moments. Salmon, 802 F.3d at 255. Therefore,

Plaintiffs' unreasonable seizure claim is dismissed.


    With regard to their excessive force claim under the

Fourteenth Amendment, however, Plaintiffs have put forward a

cognizable claim. As a preliminary matter, Defendants contest

whether the use of the X100 and amplified sound can constitute

force. (Supp. Mem. at 12 & n.7.) The parties have not provided,

and the Court has been unable to locate, case law addressing

LRAD-type devices and the use of high-volume sound alone by the

police. In support of their position, however, Defendants point

to two New York Supreme Court cases which stand for the

proposition that "sound is not a substance but a physical

phenomenon." Martzloff v. City of New York, 238 A.D.3d 115, 117

(N.Y. App. Div. 1st Dep't 1997); see also Casson v. City of New

York, 269 A.D.2d 185, 286 (N.Y. App. Div. 1st Dep't 2000)

(applying Martzloff). These cases neither bind this Court nor

are persuasive. They discuss sound in application to New York

Civil Law Section 214-c, New York State's statute of limitations

rules for personal injury claims arising from exposure to harmful substances. See N.Y. C.P.L.R. § 214-c. In rejecting sound in this context, the Martzloff court reasoned that, "All cases within the ambit of CPLR 214-c involve the ingestion of a substance," and therefore sound would not apply. Martzloff, 238 A.D.3d at 117. Whether sound can be ingested is a narrower, substantively different question than whether sound can be used as a force.

The use of the X100 as a projector of powerfully amplified sound is no different than other tools in law enforcement's arsenal that have the potential to be used either safely or harmfully, one example being distraction devices—items like stun grenade, flash bang, or concussion grenades—which "detonate with a blinding flash of light and a deafening explosion" and whose purpose is to be "extremely loud" and distracting. Terebesi v. Torreso, 764 F.3d 217, 236 (2d Cir. 2014). "When used properly [these tools] cause minimal damage," but some courts have held their usage "to be excessive force where the police used clear disregard for the safety of [those in the vicinity]." Ramage v. Louisvile/Jefferson Cnty. Metro Gov't, 520 Fed. App'x 341, 346–47 (6th Cir. 2013) (citing cases). Although distraction devices have the potential to be more harmful than LRAD devices because of injury from explosion, both tools can result in comparable

14

bodily injury if used improperly. Compare Bantum v. City of
N.Y., No. 97 Civ. 4221, 2001 WL 705889, at *1 (S.D.N.Y. June 21,
2001) (plaintiff alleged that police's use of a distraction
device "caused him to suffer a broken eardrum and emotional
trauma"), with (FAC ¶ 30 (noting that loud sounds "have the
potential to cause significant harm to the eardrums and delicate
organs of the ears")). This is force, and the kind which could
be used excessively.

Construed most favorably to the Plaintiffs, their alleged
injuries go beyond the *de minimis* threshold. As a result of
exposure to the X100's sound, Plaintiffs allege acute head pain
and hearing loss for differing periods of time following the
Protest. (FAC ¶¶ 168, 175, 194, 232, 273-75, 313-15, 345, 367-
70.) Plaintiff Appel states that doctors found that the noise
from the X100 caused bones to move in his ear, damaging a nerve.
(FAC ¶ 372.) Defendants point to Plaintiffs' video evidence to
show that while the X100 was in use, protestors are visible not
exhibiting signs of pain from the noise. (Supp. Mem. at 9.)
While suggestive evidence to the contrary, the angles and nature
of the video make details difficult to discern absolutely. It is
reasonably plausible that the video, which is frenetic in style
and does not stay on any one protester for an extended period of
time, does not rebut the claim that Plaintiffs, if situated

15

where and when they claimed to have been in relation to the
X100, sustained their alleged injuries. (See Garman Decl. Ex.
C.)


Furthermore, based on the written allegations and video
evidence, it can be plausibly inferred that the use of a high-
powered sound magnifier in "close proximity" to Plaintiffs was
not appropriate. United States v. Morris, 349 F.3d 1009, 1012
(7th Cir. 2003) (discussing the dangers and limited reasonable
contexts for using flash-bang devices). The Protest involved
large numbers of people, and so it is understandable that the
officers would want to increase the volume of their message to
reach the largest number of people. (See Garman Decl. Ex. C at
00:14-01:24; FAC ¶ 261, 300.) However, the allegations and video
make the Protest appear broadly in control, even when glass
bottles were thrown from the crowd toward the police. (See
German Decl. Ex. C at 1:24-1:35; FAC ¶¶ 115, 149, 212, 262,
358.) Under these circumstances, it is reasonably plausible that
there was disconnect between Defendants Maguire and Poletto's
need to use a powerfully loud device like the X100
"indiscriminately," (FAC ¶ 225), "almost continuously," (FAC
¶ 338), and within ten feet of Plaintiffs, (FAC ¶ 131), and the
harm alleged to be resultant from its use to those in close
proximity.

16

Defendants respond that even if the X100 was unnecessary and injurious, Plaintiffs' allegations do not demonstrate that Defendants Maguire and Poletto's actions rose to the level of malice or sadism to amount to excessive force claim because the officers are alleged to be requesting that those attending the Protest leave the street. (Supp. Mem. at 10-11.) Based on the allegations, crowd control was part of officers' objectives. However, Plaintiffs have also alleged that the X100 was used by Defendants Maguire and Poletto by deliberately pointing and angling it at Plaintiffs and others during the protest (FAC ¶¶ 131, 229.) Viewed in the light most favorable to Plaintiffs, Plaintiffs' allegations about the manner in which the X100 was used, that Defendants Maguire and Poletto knew, or should have known, that Plaintiffs would be harmed, "plausibly suggesting a claim for excessive force." Coleman v. City of Syracuse, No. 09 Civ. 1391 (GTS) (GHL), 2011 WL 13808, at *4 (N.D.N.Y. Jan. 4, 2011) (denying motion to dismiss for Fourteenth Amendment excessive force claim when plaintiff alleged defendant police officer's "unjustified" strike on plaintiff's person resulted in bone fractures).

Defendants' qualified immunity defense at the motion to dismiss stage is unavailing. A defendant is entitled to

17

qualified immunity "if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law." Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original) (internal quotation marks and citation omitted). However, "[u]sually, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion." McKenna v. Wright, 386 F.3d 432, 435 (2d Cir. 2004) (quoting Green v. Maraio, 722 F.3d 1013, 1018 (2d Cir. 1983)). At this stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." Id. at 436.

Defendants argue that the unconstitutionality of the officers' actions, specifically that amplified noise can constitute unconstitutional force, was not established at the

18

Protest, entitling them to qualified immunity. (Supp. Mem. at

12-14.) While there is little case law discussing the precise

issues present in the instant complaint, "officials can still be

on notice that their conduct violates established law even in

novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741

(2002). As discussed above, while LRADs might be new police

device developments, there is much case law discussing the need

for careful, vicinity-specific considerations when using tools

like distraction devices. These "analogous cases" could have

informed the officers that their actions, if as Plaintiffs

allege, were unreasonable. Negron v. City of N.Y., 976 F. Supp.

2d 360, 370-71 (E.D.N.Y. 2013) (quoting Landis v. Baker, 297

Fed. App'x 453, 463 (6th Cir. 2008)). As it is not "beyond

doubt" that Plaintiffs "can prove no set of facts in support of

[their] claim," dismissing Plaintiffs' claim on the grounds of

qualified immunity at this time would be inappropriate. McKenna,

386 F.3d at 436 (quoting Citibank, N.A. v. K-H Corp., 968 F.2d

1489, 1494 (2d Cir. 1992)).


    Accordingly, to the extent that Plaintiffs' claim is

premised on a Fourteenth Amendment excessive force violation,

Defendants' motion to dismiss Count One of the FAC is denied.

ii.  First Amendment Violation Claims (Count Two)

Plaintiffs have alleged that Defendants' use of the X100
violated their First Amendment right to assemble and express
protected speech. Specifically, Plaintiffs' allege that
Defendants' actions were a retaliation in response to
Plaintiffs' exercise of free speech, which has consequently
chilled Plaintiffs' speech, and that Defendants Maguire and
Poletto's use of the X100 was a dispersal order that
impermissibly regulated Plaintiff's speech because it was either
not content-neutral or insufficiently narrowly-tailored. (See
FAC ¶¶ 399-408.)

"To plead a First Amendment retaliation claim a plaintiff
must show: (1) he has a right protected by the First Amendment;
(2) the defendant's actions were motivated or substantially
caused by his exercise of that right; and (3) the defendant's
actions caused him some injury." Dorsett v. Cnty. of Nassau, 732
F.3d 157, 160 (2d Cir. 2013) (citing Curley v. Village of
Suffern, 268 F.3d 65, 73 (2d Cir. 2001)); see also Higginbotham
v. City of N.Y., 105 F. Supp. 3d 369, 378 (S.D.N.Y. 2015).
Police dispersal orders where "political speech [becomes]
unconditionally silenced" requires analysis under the "clear and
present danger standard." Wiles v. City of N.Y., No. 13 Civ.

20

2898 (TPG), 2016 WL 6238609, at *5 (S.D.N.Y. Oct. 25, 2016)
(citing Cantwell v. Connecticut, 310 U.S. 296, 308 (1940)). If,
however, a dispersal order made during a demonstration only
relocates demonstrators, the Second Circuit instructs courts to
review those actions like a "time, place, and manner
[regulation] restriction on speech." Id., 2016 WL 6238609, at *5
& n.1 (citing Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d
Cir. 2013)). Time, place, and manner restrictions are
permissible if they "(1) are justified without reference to the
content of the regulated speech, (2) are narrowly tailored to
serve a significant governmental interest, and (3) leave open
ample, alternative channels for communication of the
information." Marcavage v. City of N.Y., 689 F.3d 98, 104 (2d
Cir. 2012).

Defendants argue that several Plaintiffs are not entitled
to First Amendment protection because they were only present at
the protest to document it rather than protest, which Defendants
argue falls outside the realm of protected political speech.
(Supp. Mem. at 6 n.7; see FAC ¶¶ 139, 202, 288.) The Court need
not parse which Plaintiffs may or may not have been be entitled
to speech protection while at the Protest because even if they
were all present to protest, Plaintiffs have still failed to
state First Amendment violations claims.

21

With regard to the retaliation claim, Plaintiffs have not plausibly pled that Defendants' actions were motivated by the content of Plaintiffs' speech. Rather, Plaintiffs state that Defendants used the X100 to instruct Plaintiffs and others at the Protest to "get or stay on the sidewalk and out of the street" in the midst of an increasingly confrontational, though not yet uncontrollable, period. (FAC ¶ 122; see *supra* at 16-17.) This is a reasonable motivation: States have "a strong interest in ensuring the public safety and order" and "in promoting the free flow of traffic on public streets and sidewalks." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 768 (1994). In addition, Plaintiffs have failed to alleged plausible facts to show that Defendants Maguire and Poletto's use of the X100 was based on Plaintiffs' exercise of free speech.[3]

Plaintiffs' claim as to the dispel order similarly fails. First, "the clear and present danger standard" is inappropriate here, as Plaintiffs' FAC pleads only that the officers were

_____

[3] The one exception is Plaintiff Horse's claim that Defendants Maguire and Poletto targeted him due to a "critical comment" Horse made towards them. (FAC ¶ 228.) Given the context of the officer's actions and their use of the X100 directed at all surrounding protestors and demonstration attendees, even Plaintiff Horse's claim does not "plausibly establish" that Defendants' actions were inspired by his shout. Iqbal, 556 U.S. at 681.

trying to move the people onto the sidewalk, not end the
demonstration in full. Thus, to the extent that Defendants' use
of the X100 constitutes a dispel order, the actions are properly
analyzed as a time, place, manner restriction. Under that
metric, the claim first fails because the officers left open an
adequate alternative location within "close proximity" to the
original location in the street: the sidewalk. Wiles, 2016 WL
6238609, at *5 (accepting a park a few blocks away from the
current protest area as sufficiently proximate). The State has a
strong interest in permitting free flowing traffic on public
streets and sidewalks, "which is sufficient to justify a
narrowly tailored injunction." Id. And as already discussed,
there are no plausible allegations that Defendants Maguire and
Poletto used the X100 because of the content of any speech by
Plaintiffs.


     Accordingly, Defendants' motion to dismiss Count Two of the
FAC is granted.


          iii. Equal Protection And Substantive Due Process Violation
               Claims Under The Fourteenth Amendment (Count Three)

     Plaintiffs allege that Defendants violated their rights to
equal protection and substantive due process under the
Fourteenth Amendment. (FAC ¶¶ 409-411.) With regard to their

                                  23

substantive due process claim, Plaintiffs specifically contend
that Defendants' actions violated their constitutionally
protected "right to remain" and "right to travel" and that
Defendants' actions "shocked the conscious." (Opp. Mem. at 12-
13.) None of these claims can survive.

The Plaintiffs' additional substantive due process claim
fails. A police officer requesting that protestors move from the
street to the sidewalk is in furtherance of a reasonable State
interest and is the kind of "minor restriction[] on travel
[that] simply do[es] not amount to the denial of a fundamental
right." Selevan v. N.Y. Thruway Auth., 711 F.3d 253, 257 (2d
Cir. 2013). The Court has already addressed Plaintiffs'
excessive force claim as part of the FAC's Count One. See
Section (i) *supra*.

Plaintiffs' equal protection claim is insufficiently pled.
A plaintiff can maintain an equal protection claim "so long as
he establishes that he was treated differently than similarly
situated persons and that the unequal treatment he received was
motivated by personal animus." Jackson v. Roslyn Bd. of Educ.,
438 F. Supp. 2d 49, 55 (E.D.N.Y. 2006) (citing Harlen Assoc. v.
Inc. Village of Mineola, 273 F.3d 494, 500 (2d Cir. 2001)); see

24

also Brown v. City of Oneonta, N.Y., 221 F.3d 329, 337 (2d Cir.
2000) ("The Equal Protection Clause 'is essentially a direction
that all persons similarly situated should be treated alike.'"
(citation omitted)). Plaintiffs' FAC fails to plausibly allege
that Plaintiffs were treated any differently than any other
persons present at the protest. Instead, as Defendants note, the
FAC repeatedly alleges the opposite: that the Defendants Maguire
and Poletto used the 100X "indiscriminately," (FAC ¶ 225), and
against "all people in the area," (FAC ¶ 396; see also FAC
¶¶ 120, 406).

     Accordingly, Defendants' motion to dismiss Count Three of
the FAC is granted.

          iv.  Municipal Liability Claims (Count Four)

     Plaintiffs also bring claims against Defendants alleging
that (1) Defendants Maguire and Poletto possessed final
authority to enact policies that caused their alleged
constitutional violations, which were later ratified by
Defendant Bratton and (2) that Defendant NYC failed to enact
proper policies, supervision, and training, which resulted in

                              25

the violation of Plaintiffs' constitutional rights.[4] (FAC ¶¶ 412-22; see Opp. Mem. at 23-25 & n.61.) See also Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658 (1978).

To hold a municipal entity liable under Section 1983, a plaintiff must plead and prove that his constitutional rights were violated, that the alleged actions by the employees were the result of an official policy, custom, or practice of the municipal defendant, and that the policy, custom, or practice caused the plaintiff's alleged injuries. City of Canton v. Harris, 489 U.S. 378, 385 (1989); Monell, 436 U.S. at 690-95. A plaintiff may satisfy Monell's "policy, custom or practice" requirement in one of four ways. See Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). The plaintiff may allege the

---

[4] Although Plaintiffs state in their reply papers that they have "sufficient allege[d] municipal liability based on each of four familiar theories of Monell liability," (Opp. Mem. at 23), their reply papers only discuss the second and fourth Monell theories, (see Opp. Mem. at 23-26). To the extent that Plaintiffs alleges the remaining Monell theories, they are not plausibly plead. For the first theory, Plaintiffs only provide a conclusory allegation that Defendants Bratton and NYC "developed, adopted, and/or endorsed formal policies" with regard to LRAD use, (FAC ¶ 419), which cannot be reasonably pled while alleging that the NYPD did not appear to have any policies regarding LRAD use through Fall 2012 and without any additional facts alleged, (see FAC ¶ 106). For the third theory, Plaintiffs have alleged that the NYPD only started using LRADs at protests with any regularity shortly before the Protest, making it implausible to sustain a claim based on a "persistent and widespread" practice of LRAD abuse. (See FAC ¶ 71.)

existence of: "(1) a formal policy which is officially endorsed
by the municipality; (2) actions taken or decisions made by
government officials responsible for establishing municipal
policies which caused the alleged violation of the plaintiff's
civil rights; (3) a practice so persistent and widespread that
it constitutes a 'custom or usage' and implies the constructive
knowledge of policy-making officials; or (4) a failure by
official policy-makers to properly train or supervise
subordinates to such an extent that it amounts to deliberate
indifference to the rights of those with whom municipal
employees will come into contact." Moray, 924 F. Supp. at 12
(internal citations and quotation marks omitted). Proof of a
single incident of unconstitutional activity is usually
insufficient to demonstrate the existence of a policy, unless
"the unconstitutional consequences of failing to train could be
so patently obvious that a city should be liable under [Section]
1983" and that violation of constitutional rights must be a
"highly predictable consequence" of the failure to train.
Connick, 563 U.S. at 63-64.


Under the second theory of Monell liability, the complaint
must contain allegations that the defendant-official had final
policy making authority in order to subject the municipality to
liability. See Schwab v. Smalls, 435 F. App'x 37, 40 (2d Cir.

27

2011) (affirming the district court's dismissal of a Section 1983 claim where the complaint contained little more than a "vague assertion" that defendants had final policymaking authority). It is ultimately the plaintiff's burden to establish, as a matter of law, "that [an] official had final policymaking authority in the particular area involved . . . . It does not suffice for these purposes that the official has been granted discretion in the performance of his duties. Only those municipal officials who have final policymaking authority may by their actions subject the government to [Section] 1983 liability." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotations and citations omitted).

Under the fourth theory of Monell liability, a plaintiff can establish deliberate indifference by demonstrating that: "(1) a policymaker knows to a moral certainty that her employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 391 (S.D.N.Y. 2013) (quoting Walker v. City of N.Y., 974 F.2d 293, 297-98 (2d

28

Cir. 1992)) (internal quotation marks omitted). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." Id. (quoting Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012)). The failure to train municipal employees may constitute an actionable policy, but only when a plaintiff can "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (citation omitted).

Plaintiffs have not plausibly pled liability under Monell's second theory. Plaintiffs allege that Defendants Maguire and Poletto were authorized to make final policy with respect to LRAD use because they did not consult supervisors or obtain permission before using the LRAD, (see FAC ¶¶ 426-28), and that their policy was later ratified by Defendant Bratton, (FAC ¶ 424). As the Second Circuit has stated, just because an officer has "discretion to determine how to handle the particular situation" does not make that person a final decision-maker. Anthony v. City of N.Y., 339 F.3d 129, 139 (2d Cir. 2003) (finding a police sergeant not a final decision-maker). Police officers using equipment as part of their day-to-

29

day operations cannot reasonably be argued to be "responsible
under state law for making policy in that area of the
[municipality's] business." Jeffes, 208 F.3d at 57 (quoting City
of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)).
Furthermore, with regard to allegations of Defendant Bratton's
ratification, "[t]he one-off instance of 'ratification and
approval' asserted in the complaint . . . does not support 'an
inference of an unlawful municipal policy of ratification of
unconstitutional conduct within the meaning of Monell.'" Waller
v. City of Middletown, 89 F. Supp. 3d 279, 287 n.3 (D. Conn.
2015) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.
1983)).


     As for Monell's fourth theory of liability, Defendants
argue Plaintiffs have not plausibly alleged that Defendant NYC
was on notice as to an omission in their training program with
regard to LRAD devices. (See Supp. Mem. at 23-24.) Assuming the
allegations to be true and in the light most favorable to the
Plaintiffs, the FAC puts forward plausible claims that, by the
night of the Protest, Defendant NYC knew that police officers
were using LRAD devices as part of protest, (FAC ¶¶ 70-71), had
considered the LRAD devices' noise-magnifying capacities
important enough to study, (FAC ¶ 73-77), was aware of the

devices' noise-magnifying hazards[5], (see FAC ¶ 75), and did not change NYPD policies or practices to discuss the proper usage of LRAD devices in the field, (see FAC ¶¶ 97, 99-103).[6] The Chamberlain court's reasoning in allowing a Monell liability claim against the City of White Plain for failing to train police officers on how to deal with emotionally disturbed persons ("EDPs") to survive a motion to dismiss is instructive here:

> The Amended Complaint essentially asserts that WPPD officials knew to a "moral certainty," Walker, 974 F.2d at 297, that [White Plains police] officers would encounter EDPs in the course of their duties . . . . Furthermore, given the extreme volatility of such individuals and the need for caution when dealing with them to prevent unnecessary escalation, it is plausible that interactions with EDPs present officers with "difficult choice[s] of the sort that training . . . will make less difficult," Walker, 974 F.2d at 297, and that a "highly predictable consequence" of officers making the wrong choices, Connick, 131 S.Ct. at 1361 (internal quotation marks omitted), would be

---

[5] Defendants argue that the tests performed by the NYPD were for the Model 3300, not the X100, and are therefore "completely irrelevant." (Supp. Mem. at 25.) While the precise readings from the tests to not speak to the exact impact of the X100 on a listener, the tests demonstrate the range of power of the new LRAD tools and the plausibly pled need for training on LRAD equipment generally.

[6] Defendants point to the NYPD's Patrol Guide at proof of training, which Plaintiffs allege included instructions to police officers to use "the minimal necessary force" while on patrol. (Reply Mem. at 11; FAC ¶ 393.) That is not substantively sufficient guidance to ensure that officers know how to safely and effectively use potentially hazard equipment like LRAD devices.

"the deprivation of a citizen's constitutional
rights," Walker, 974 F.2d at 298.

Chamberlain, 986 F. Supp. 2d at 393. A comparable situation is

present here. Plaintiff's allegations paint a reasonably

plausible picture of Defendant NYC arming officers with

powerful, potentially harmful LRAD devices and placing those

officers in expectantly volatile protests, where officers would

be presented with opportunities to use the LRAD device. Even in

the absence of prior similar violations, the NYC knew that

officers with LRADs in the field were likely to face difficult

scenarios, such as increasingly agitated protests, where the

risk and harm of improperly using LRAD devices are great—

problems that could have been avoided with proper training.

Thus, "[t]he complaint states a claim under the single-incident

theory of liability contemplated in City of Canton, and

recognized by the cited authority post-Connick." Walker, 89 F.

Supp. 3d at 286-87.


Accordingly, to the extent that Plaintiffs' municipal

liability claim is premised on Defendant NYC's failure to

properly train under Monell, Defendants' motion to dismiss Count

Four of the FAC is denied.

v.    State And Common Law Claims (Counts Five Through Nine)

Plaintiffs' fifth through ninth claims assert causes of
actions under New York State and common law. The Court will
exercise supplemental jurisdiction over those claims that "form
part of the same case or controversy" of Plaintiffs' surviving
Fourteenth Amendment excessive force and Monell claims. 28
U.S.C. § 1367(a). Claims form part of the same case or
controversy when they "derive from a common nucleus of operative
fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).
"[I]n other words, they must be such that the plaintiff 'would
ordinarily be expected to try them all in one judicial
proceeding." Montefiore Med. Ctr. v. Teamsters Local 272, 642
F.3d 321, 332 (2d Cir. 2011) (quoting Gibbs, 383 U.S. at 725).
In deciding whether to exercise supplemental jurisdiction under
Section 1367(c)(3), a district court must balance "the
traditional 'values of judicial economy, convenience, fairness,
and comity'" Kolari v. New York-Presbyterian Hosp., 455 F.3d
118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v.
Cohill, 484 U.S. 343, 350 (1988)).

a. Assault And Battery (Count Five)

33

Plaintiffs allege state-law claim for assault and battery. (FAC ¶¶ 433-39.) The elements of assault and battery in New York are "substantially identical" to those of a Section 1983 claim for excessive force. Caravalho v. City of N.Y., No. 13 Civ. 174 (PKC) (MHD), 2016 WL 1274575, at *22 (S.D.N.Y. Mar. 31, 2016) (quoting Posr v. Doherty, 944 F.3d 91, 95 (2d Cir. 1991)). Defendants make similar arguments in seeking to dismiss this claim as with Plaintiffs' excessive force claim, in addition to seeking shelter under state law qualified immunity. Having denied Defendants' motion to dismiss Plaintiff's excessive force claim, it is proper for the Court to exercise supplemental jurisdiction over this claim, as both turn on the similar questions of the necessity in using the X100, the strength of the X100's force, and the intentionality of the Defendant officers when using the X100. At this early stage and "without a factual resolution . . . it is not possible to determine whether defendants are qualifiedly immune," making it inappropriate to dismiss the claim. Jones v. Parmley, 465 F.3d 46, 64 (2d Cir. 2006) (quoting Simpkin v. City of Troy, 638 N.Y.S.2d 231, 232 (N.Y. App. Div. 3d Dep't 1996)).

Accordingly, Defendants' motion to dismiss Count Five of the FAC is denied.

34

b. <u>False Arrest And False Imprisonment (Count Six)</u>

Plaintiffs allege common law claims of false arrest and imprisonment. (FAC ¶¶ 440-44.) Under New York law, the tort of false arrest is synonymous with that of false imprisonment. <u>Kraft v. City of N.Y.</u>, 696 F. Supp. 2d 403, 421 n.8 (S.D.N.Y. 2010) (quoting <u>Posr</u>, 944 F.2d at 96). "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" <u>Savino v. City of N.Y.</u>, 331 F.3d 63, 75 (2d Cir. 2003) (quoting <u>Bernard v. United States</u>, 25 F.3d 98, 102 (2d Cir. 1994)). As Plaintiffs were never confined as a result of the Defendants' use of the X100, <u>see</u> Section (i) *supra*, this claim will be dismissed.

Accordingly, Defendants' motion to dismiss Count Six of the FAC is granted.

c. <u>Negligence (Count Seven)</u>

Plaintiffs allege common law negligence by Defendants in use of the X100. (FAC ¶¶ 445-50.) To state a claim for

35

negligence, under New York Law a plaintiff must show: "(i) a
duty owed to the plaintiff by the defendant; (ii) breach of that
duty; and (iii) injury substantially caused by that breach."
Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d
Cir. 2002). Defendants contend that because Plaintiffs have
alleged intentional conduct on the part of Defendants they
cannot also allege negligence conduct for the same action.
Plaintiffs are correct: under New York State law, "when a
plaintiff brings excessive force . . . claims which are premised
upon a defendant's allegedly intentional conduct, a negligence
claim with respect to the same conduct will not lie." Clayton v.
City of Poughkeepsie, No. 06 Civ. 4881 (SCR), 2007 WL 2154196,
at *6 (S.D.N.Y. June 21, 2007) (citations omitted). As
Plaintiffs have pled sufficient facts to support an excessive
force claim, they "cannot additionally argue that the same facts
would give rise to a claim for . . . negligence." Id.


     Accordingly, Defendants' motion to dismiss Count Seven of
the FAC is granted.


          d. Constitutional Torts (Count Eight)


     Plaintiffs allege Defendants violated their rights under
Article I, Sections 8, 9, 11, and 12 of the New York

Constitution, which address the right to speak freely, peaceably

assembly, to be afforded equal protection of the law, and

protection against unreasonable seizures. (FAC ¶¶ 451-54.) The

New York Court of Appeals has recognized that a plaintiff may

bring constitutional tort claims for damages independent of a

common law cause of action. Brown v. States, 674 N.E.2d 1129,

1137-41 (N.Y. 1996). However, this claim is a "narrow remedy"

available only when there is no alternative remedy, such as

actions at common law or under Section 1983. Biswas v. City of

N.Y., 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (quoting Martinez

v. City of Schenectady, 97 N.Y.2d 78, 735 N.Y.S.3d 868 (2001).

As Plaintiffs have remedies for these alleged violates based on

similar grounds, all of which have been asserted in the FAC,

Plaintiffs' "state constitutional tort claim[s] [are] redundant

and precluded." Id.


     Accordingly, Defendants' motion to dismiss Count Eight of

the FAC is granted.


### e. Negligent Hiring, Screening, Retention, Supervision And Training (Count Nine)

Plaintiffs allege that Defendant NYC negligently hired,

screened, retained, supervised, and trained the Defendant

officers in violation of Plaintiffs' rights under New York State

37

law. (FAC ¶¶ 455-59.) New York law does not permit of a claim for negligent hiring, screening, retention, supervision, and training where defendants act within the scope of their employment. See Schoolcraft v. City of N.Y., 103 F. Supp. 3d 465, 521 (S.D.N.Y.) (collecting cases), on reconsideration in part, 133 F. Supp. 3d 563 (S.D.N.Y. 2015). The FAC alleges and Defendants have not denied that Defendants Maguire and Poletto were acting within the scope of their employment during the Protest. (See FAC ¶¶ 50, 458; Supp. Mem. at 30.) "[W]here a defendant employer admits its employees were acting within the scope of their employment, an employer may not be held liable for negligent hiring, training, and retention as a matter of law." Rowley v. City of N.Y., No. 00 Civ. 1793 (DAB), 2005 WL 2429514, at *13 (S.D.N.Y. Sept. 30, 2005).

Additionally, "an essential element of a cause of action in negligent hiring, retention, supervision, and training is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." Bouche v. City of Mount Vernon, No. 11 Civ. 5246 (SAS), 2012 WL 987592, at *9 (S.D.N.Y. Mar. 23, 2012) (quoting Saldana v. Village of Port Chester, No. 09 Civ. 6268 (SCR) (GAY), 2010 WL 6117083, at *5 (S.D.N.Y. July 10, 2010)). Plaintiffs have also not alleged facts sufficient to infer that Defendant NYC knew of the

38

Defendant officers' propensity to act in the manner alleged, namely using a powerful sound magnifier in an unnecessarily forceful manner.

Accordingly, Defendants' motion to dismiss Count Nine of the FAC is granted.

vi.   Claims Against Defendant Bratton

Plaintiffs have named former NYPD Police Commissioner Bratton as a Defendant in his individual capacity. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Iqbal, 556 U.S. at 677. Plaintiffs have failed to plausibly allege that Defendant Bratton was present at the time of the Protest or that he was personally involved in any decisions non-duplicative of those included in the surviving Monell claims against Defendant NYC. Accordingly, all claims against Bratton in his individual capacity are dismissed. See Williams v. City of N.Y., No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *7 (S.D.N.Y. July 21, 2015).[7]

---

[7] These same conclusions would apply were Bratton to have been replaced with now-NYPD Commissioner James O'Neill under Fed. R. Civ. P. 25(d).

39

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted with regards to Counts Two, Three, Six, Seven, Eight, and Nine, and denied with regards to Counts One, Four, and Five.

It is so ordered.

**New York, NY**
**May 3/ , 2017**

**ROBERT W. SWEET**
**U.S.D.J.**