USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 13, 2018

17-2065
*Edrei v. Bratton*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2017

(Argued: March 27, 2018     Decided: June 13, 2018)

Docket No. 17-2065

————————

ANIKA EDREI, SHAY HORSE, JAMES CRAVEN, KEEGAN STEPHAN, MICHAEL
NUSBAUM, and ALEXANDER APPEL,

*Plaintiffs-Appellees,*

– v. –

LIEUTENANT JOHN MAGUIRE, individually and in his official capacity, OFFICER
MIKE POLETTO, individually and in his official capacity, Shield No. 3762.

*Defendants-Appellants,*

WILLIAM JOSEPH BRATTON, New York Police Department (NYPD) Commissioner,
CITY OF NEW YORK.

*Defendants.\**

————————

————————

\* The Clerk of Court is directed to amend the official caption to conform to the above.

CERTIFIED COPY ISSUED ON 06/13/2018

B e f o r e :

      KATZMANN, *Chief Judge*, WALKER, and POOLER, *Circuit Judges*.

————————————

Plaintiffs, six individuals who participated in and observed protests in Manhattan on the night of December 4–5, 2014, sued Lieutenant John Maguire and Officer Mike Poletto ("defendants") of the New York Police Department under 42 U.S.C. § 1983. The complaint alleges, among other things, that defendants violated plaintiffs' Fourteenth Amendment right against excessive force when they used a long-range acoustic device ("LRAD"), also known as a "sound gun," to disperse non-violent protesters, resulting in significant injuries, including hearing loss. Defendants moved to dismiss, arguing, in part, that they were entitled to qualified immunity because the complaint neither stated a Fourteenth Amendment claim nor alleged a violation of clearly established law. The district court rejected both arguments, reasoning that LRADs, which can cause injuries comparable to those caused by other tools that are capable of excessive force, fit within the scope of existing precedents. We AFFIRM.

————————————

      GIDEON O. OLIVER (Michael Decker and Elena L. Cohen, *on the brief*), Law Offices of Gideon Orion Oliver, New York, NY, *for Plaintiffs-Appellees*.

      INGRID R. GUSTAFSON (Richard Dearing and Devin Slack, *on the brief*), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellants*.

————————————

KATZMANN, *Chief Judge*:

      This appeal arises out of the New York Police Department's ("NYPD" or "Department") response to a December 2014 protest in Manhattan. The six

individual plaintiffs allege that Lieutenant John Maguire and Officer Mike Poletto ("defendants") violated their Fourteenth Amendment rights by using a long-range acoustic device ("LRAD"), also known as a "sound gun," to compel them and other non-violent protesters to exit the street. The district court held that the plaintiffs adequately alleged an excessive force violation and, accepting the allegations as true, that the defendants were not entitled to qualified immunity. This case comes to us on an interlocutory appeal from that order.

We, like the district court, consider only the factual allegations in the complaint and the videos it incorporates. With this limitation, we are compelled to affirm the denial of qualified immunity. In a narrow ruling, we hold that purposefully using a LRAD in a manner capable of causing serious injury to move non-violent protesters to the sidewalks violates the Fourteenth Amendment under clearly established law. At the same time, recognizing that the complaint before us provides only the vantage point of the plaintiffs, we caution that once both sides present evidence—especially about what the officers observed and knew—the defendants may yet be entitled to qualified immunity.

3

BACKGROUND

I.      **Factual History**

On an interlocutory appeal from the denial of qualified immunity, our

jurisdiction is limited to deciding whether, based on facts alleged by the plaintiffs

or stipulated to by the parties, "the immunity defense is established as a matter

of law." *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996). For purposes of this appeal,

the defendants accept as true the allegations set forth in this factual history.

A.      **LRAD Technology and the NYPD**

LRADs are acoustic weapons developed for the U.S. military in the wake

of the deadly terrorist attack on the USS *Cole* in 2000. "If mounted aboard a Navy

ship, the device's loudspeaker could be used to 'warn off' boats that came too

close. If those warnings are ignored, the device could be used to send out sound

at a dangerously high level . . . to cause pain/hearing damage to try to repel the

attack." First Amended Complaint ("FAC") ¶ 11. This technique, known as "area

denial," has been used in both military and crowd control settings. *Id.*

An LRAD can produce louder sound than a traditional amplification

device, such as a megaphone, and can project over much greater distances. To

achieve this effect, LRADs concentrate sound into a 30- to 45-degree cone-shaped

4

beam. They also reshape acoustic energy to produce flatter sound waves that (1) reduce dampening as the wave travels and (2) interact with the air to create additional frequencies within the wave. Alex Pasternack, *The New Sound of Crowd Control*, <u>Motherboard</u> (Dec. 17, 2014), https://motherboard. vice.com/en_us/article/qkve7q/the-new-sound-of-crowd-control (last accessed Mar. 11, 2018). This can produce volumes of up to 146 decibels. For context, the threshold for human discomfort begins between 120 and 140 decibels and the National Institute of Health cautions that hearing loss can result from short exposure to sounds at or above 110 to 120 decibels.

The New York Police Department purchased two Model 3300 LRADs before the 2004 Republican National Convention in New York City. Like other LRADs, the Model 3300 has two functions. One, it can serve as a "loudspeaker" to broadcast police commands over vast distances. And, two, the "area denial" function can "propel piercing sound at higher levels . . . than are considered safe to human ears." App. at 85. According to a Department representative speaking at the time of the Convention, the LRADs were purchased to direct crowds to safety in the event of a calamity.

Following the convention, the NYPD used its LRADs sporadically and, then, mainly as loudspeakers. In 2010, the NYPD's Disorder Control Unit tested the Model 3300 at an empty parking lot in the Bronx. Measured from 320 feet away, the spoken voice commands registered at 102 decibels and the area denial mode at 110 decibels. The Department did not take readings within the 320-foot range, which it described as a "potential danger area." A report analyzing the test results observed that, in the "dangerous range (above 120 decibels), this device can cause damage to someone's hearing and may be painful." FAC ¶ 11.

Shortly thereafter, the NYPD purchased the more portable Model 100X, which also has loudspeaker and area denial functions. The 100X's product sheet boasts that it has a maximum volume of 136 decibels at one meter and the manufacturer guidelines caution not to use it within 10 to 20 meters of people. A diagram on the 100X's control panel shows a red beam emanating from the front of the device and instructs: "DO NOT ENTER WITHIN 10 METERS DURING CONTINUOUS OPERATION." *Id.* ¶ 25.

**B.     The Protest**

On December 3, 2014, a Staten Island grand jury declined to indict the NYPD officer who placed Eric Garner, an unarmed black man, in a fatal

6

chokehold. The next day, protests arose across the nation. In Manhattan, hundreds took to the streets to denounce police brutality. The plaintiffs, many of whom are activists and journalists, participated in and documented the protest. Over the course of the evening and into the pre-dawn hours, the demonstrators marched across the city, escorted by NYPD officers.

Sometime after 1:00 a.m., as the protest crossed through the intersection of 57th Street and Madison Avenue, officers made several arrests. Videos of the scene (which are incorporated into the complaint) show a crowd—cordoned off from the arrests by a chain of officers—gathered in a semicircle to observe. Unable to proceed through the intersection, cars idled in the street as protesters streamed past. Meanwhile, many onlookers inched closer to take photographs only to be waved off by officers or told to "get back." Although some demonstrators demanded that the officers "let [the arrestees] go," none interfered with the arrests. Several plaintiffs reported hearing what sounded like a glass bottle breaking, but it did not appear to strike or injure anyone.

Then, with no warning, NYPD officers discharged pepper spray. Several plaintiffs who had been watching the arrests began to flee. Seconds later the wail of a high-pitched alarm began pulsing though the streets. The defendants had

7

activated the LRAD's area denial function. According to plaintiffs, they had not

been ordered to disperse and no such order is audible on the video.

After several bursts from the alarm tone, Lieutenant Maguire and Officer

Poletto, both members of the Disorder Control Unit, began broadcasting

commands. One officer held the briefcase-sized device in front of him while the

other trailed behind and spoke into a corded microphone. "[T]his is the New

York City Police Department. You must not interfere with vehicular traffic. You

must remain on the sidewalk. If you do interfere with vehicular traffic, you will

be placed into custody." Video 1 at 3:23-3:41. Variants of this refrain, punctuated

by alarm tones, were repeated for about three minutes as the officers walked the

length of 57th Street between Madison and Park Avenues. Although many people

in the LRAD's path "were already fleeing on the sidewalks," the officers

followed close on their heels, sometimes from fewer than ten feet. FAC ¶

124.Plaintiffs maintain that the defendants "knew or should have known that the

use of the LRAD could cause permanent hearing damage and other injury." *Id.* ¶

130.

In the days and weeks following the protest, each plaintiff reported

physical injuries. Many claimed that they experienced significant ear pain,

prolonged migraines, vertigo, and ringing in the ears. Most sought medical

treatment. One plaintiff "had extreme difficulty with his hearing." *Id.* ¶ 370. His

doctor explained that "the pressure of the extreme level of the noise from the

LRAD had pushed a bone in his ear inwards, impacting and damaging a nerve in

his ear." *Id.* ¶ 372. His hearing improved after a course of steroidal medication.

Several plaintiffs allege that they are now afraid to attend protests, which, for

some, has harmed their professional opportunities as journalists.

## II.    Procedural History

In March 2016, the six plaintiffs sued Lieutenant Maguire and Officer

Poletto, as well as then-NYPD Commissioner William Bratton and the City of

New York. They asserted claims under 42 U.S.C. § 1983 premised on violations of

the First, Fourth, and Fourteenth Amendments, as well as related municipal

liability and New York state law claims. Defendants moved to dismiss the

amended complaint, arguing that plaintiffs had failed to state a claim and that

the officers were entitled to qualified immunity.

The motion was granted in part and denied in part. The district court

found that plaintiffs had adequately pleaded excessive force in violation of the

Fourteenth Amendment (as well as the related municipal liability claim) and

9

denied defendants qualified immunity. It also permitted the state-law assault and battery claims to proceed, including the claims against the City under a theory of *respondeat superior*. The district court dismissed the other claims, including all claims against Commissioner Bratton.

On the Fourteenth Amendment claim, the district court reasoned that "[t]he use of the [Model 100X] as a projector of powerfully amplified sound is no different than other tools in law enforcement's arsenal that have the potential to be used either safely or harmfully," such as stun grenades. Special App. at 16. As to qualified immunity, the district court rejected defendants' argument that amplified noise did not constitute unconstitutional force under existing precedent. "[T]here is much case law discussing the need for careful, vicinity-specific considerations when using tools like distraction devices," the court explained, and, if the circumstances were as plaintiffs allege, these analogous cases would have informed the officers of the illegality of their actions. *Id.* at 21.

Lieutenant Maguire and Officer Poletto timely filed this interlocutory appeal.

10

DISCUSSION

I.   **Appellate Jurisdiction and Standard of Review**

The sole issue on appeal is whether defendants are entitled to qualified immunity on the Fourteenth Amendment claim. Ordinarily a district court order denying a motion to dismiss is not appealable. *See* 28 U.S.C. § 1291. Yet the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). This is because qualified immunity represents not simply a bar on liability but also an "entitlement not to stand trial or face the burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, denying qualified immunity "conclusively determines that the defendant[s] must bear the burdens of discovery; is conceptually distinct from the merits of the plaintiff[s'] claim; and would prove effectively unreviewable on an appeal from a final judgment." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal quotation marks and brackets omitted). It follows that, "[p]rovided it turns on an issue of law," the district court's denial of qualified immunity is a final reviewable order. *Id.* (internal quotation marks omitted).

"Of course, [by] presenting [their] immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment[, the defendants] must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Briefly summarized, we accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both those that support the claim and "those that defeat the immunity defense." *Id.* This standard represents a "formidable hurdle." *Id.* at 434. Because the facts are undisputed, our review is *de novo*. *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001).

## II.    Qualified Immunity

Assured of our jurisdiction, we turn to the merits. Section 1983 establishes a private right of action for money damages against state officials, acting "under color" of law, who violate a constitutional or statutory right. 42 U.S.C. § 1983. This "deter[s] governmental abuse and remed[ies] unlawful governmental transgressions." *Newburgh*, 239 F.3d at 250. At the same time, "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v.*

12

*Creighton*, 483 U.S. 635, 638 (1987). To balance the need for accountability and the potential chilling effect, "the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims." *Newburgh*, 239 F.3d at 250. This defense is designed to "reduce[] the general costs of subjecting officials to the risks of trial" by immunizing them from monetary liability "based on unsettled rights." *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998) (internal quotation marks omitted).

Officers are entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Failure to establish either prong would resolve this case and we may "exercise [our] sound discretion in deciding which . . . should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Like the district court, we begin with the first prong.

### A.  Fourteenth Amendment Violation

The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the

13

Fourteenth. *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998). This is because "[t]he touchstone of due process," which "is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), bars "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). When the government action is executive, rather than legislative, the Supreme Court has cautioned that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 846 (internal quotation marks omitted). This standard is most readily satisfied when conduct is "intended to injure in some way unjustifiable by any government interest." *Id.* at 849.

While the parties agree that the Fourteenth Amendment establishes a right against excessive force, they disagree about the relevant test. Defendants maintain that the proper inquiry is whether the conduct shocks the conscience. Appellants' Reply Br. at 11. They argue that this standard includes a subjective element—whether the officers behaved "maliciously and sadistically for the very purpose of causing harm." Appellants' Br. at 33 (quoting *Tierney v. Davidson*, 133

14

F.3d 189, 196 (2d Cir. 1998)). According to defendants, this standard is "distinct

from, and more stringent than, objective reasonableness." Appellants' Reply Br.

at 11. Plaintiffs counter that conduct shocks the conscience when the use of force

was both "objectively unreasonable" and "intentional, as opposed to negligent."

Appellees' Br. at 33. In addressing this disagreement, we apply the law as it

exists at the time of decision. *See Whitney v. Empire Blue Cross & Blue Shield*, 106

F.3d 475, 477 (2d Cir. 1997) (per curiam).

Defendants are correct that many cases describe the test for excessive force

under the Fourteenth Amendment with the shorthand "shocks the conscience."

*See, e.g.*, *Rochin v. California*, 342 U.S. 165, 172 (1952). For many years, courts have

understood this standard to be distinct from the Fourth Amendment's

prohibition against "unreasonable" government action. *See Lewis*, 523 U.S. at 842–

43. As recognized in *Graham*, this distinction reflects the varied sources of

excessive force claims. 490 U.S. at 393–94. Arrestees may invoke the Fourth

Amendment's prohibition against "unreasonable" seizures. U.S. Const. amend.

IV. Those incarcerated for a criminal conviction draw on the Eighth

Amendment's ban on "cruel and unusual punishments." U.S. Const. amend.

VIII. Meanwhile, pretrial detainees and non-incarcerated persons rely on the constitutional guarantee of "due process." U.S. Const. amends. V, XIV.

In *Johnson v. Glick*, this Court identified four illustrative factors for assessing whether conduct, in the words of *Rochin*, "shocks the conscience." 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, *J.*) (quoting *Rochin*, 342 U.S. at 172). The factors are: "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether the force was . . . [inflicted] maliciously or sadistically." *Id.* In the decades since *Glick* was decided, these factors have continued to guide our Fourteenth Amendment excessive force analysis. *See, e.g.*, *Tierney*, 133 F.3d at 199. But they have never been exhaustive, nor is each factor necessary. *See Glick*, 481 F.2d at 1033 (stating only that "a court must look to such factors as . . . "). In particular, we have never treated malice or sadism as a requirement for stating (or proving) an excessive force claim under a due process theory. Where officials lacked "any legitimate government objective and [caused] substantial injury," we have treated malicious or sadistic conduct as presumptively unconstitutional. *Newburgh*, 239 F.3d at 252. But we have also found excessive force under the Fourteenth Amendment without ever examining an officer's subjective intent.

16

*See, e.g., Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987); *Bellows v. Dainack*, 555

F.2d 1105, 1106 & n.1 (2d Cir. 1977).

In 2015 (after the events at issue in this case) the Supreme Court revisited

the Fourteenth Amendment standard in *Kingsley v. Hendrickson*, 135 S. Ct. 2466

(2015). The question there was whether a pretrial detainee alleging a Fourteenth

Amendment violation must prove that the officers were subjectively aware that

the force was excessive, as in the Eighth Amendment context, or merely that the

force was objectively excessive. 135 S. Ct. at 2470. In resolving this question, the

Court began by clarifying that excessive force claims involve "two separate state-

of-mind questions." *Id.* at 2472. The first concerns the official's "state of mind

with respect to his physical acts." *Id.* Drawing on its decision in *Lewis*, the Court

explained that accidental or negligent acts are not subject to Fourteenth

Amendment liability while those committed purposefully, knowingly, or

(perhaps) recklessly are. *Id.*

The second mental state, and the one at issue in *Kingsley*, "concerns the

defendant's state of mind with respect to whether his use of force was

'excessive.'" *Id.* On this score, the Supreme Court held that, unlike in the Eighth

Amendment context, the standard for a pretrial detainee suing under the

17

Fourteenth Amendment is "objective" and merely requires showing that "the

force purposely or knowingly used against him was objectively unreasonable."

*Id.* at 2472–73. This objective showing can be established through contextual

factors and the Court identified six non-exhaustive "considerations." *Id.* at 2473.

These factors included proportionality or, as the Court described it, "the

relationship between the need for the use of force and the amount of force used."

*Id.* They also included related indicia such as "the extent of the plaintiff's injury;

any effort made by the officer to temper or to limit the amount of force; the

severity of the security problem at issue; the threat reasonably perceived by the

officer; and whether the plaintiff was actively resisting." *Id.*

Viewed against the backdrop of this circuit's Fourteenth Amendment

jurisprudence, *Kingsley* offers two important insights. First, the objective

standard it announced confirms that the subjective mental state referenced in

*Glick* and some of this Court's other precedents is not a necessary showing.

Second, and more significantly, *Kingsley* used modified terminology to describe

the Fourteenth Amendment standard. Although prior excessive force cases spoke

of whether the official's conduct "shocks the conscience," *Lewis*, 523 U.S. at 846–

18

47 (collecting cases), *Kingsley* asked whether the force was "objectively unreasonable," 135 S. Ct. at 2473. More on this later.

Returning to the case at hand, defendants protest that, contrary to plaintiffs' assertion, *Kingsley* is not the appropriate touchstone for assessing the alleged Fourteenth Amendment violation. On defendants' reading, *Kingsley*'s holding is doubly inapposite because it is limited to pretrial detainees and did not abdicate the traditional "shocks the conscience" standard. Both arguments are unpersuasive.

Defendants' first—and principal—argument is based on a misinterpretation of this Court's earlier statement that *Kingsley* "addressed only the legally requisite state of mind required for a pretrial detainee's excessive force claims." *Dancy v. McGinley*, 843 F.3d 93, 117 (2d Cir. 2016). Defendants understand this language as limiting *Kingsley* to pretrial detainees only. But this ignores the context. *Dancy* involved a Fourth Amendment excessive force claim and this Court was distinguishing between principles that applied under the Fourteenth Amendment and those that governed under the Fourth. *See id.* It follows that *Dancy* had no reason to address *Kingsley*'s applicability to non-detainees bringing claims under the Fourteenth Amendment.

19

Moreover, we have not treated the precise factual context at issue in *Kingsley*—a pretrial detainee claiming excessive force—as a limitation on the Fourteenth Amendment standard announced therein. In our one case to engage closely with *Kingsley*, we held that its standard applied not just to excessive force claims, but also to those alleging deliberate indifference toward pretrial detainees. *Darnell v. Pineiro,* 849 F.3d 17, 33–34 (2d Cir. 2017). In reaching this conclusion, the *Darnell* Court did not apply *Kingsley*'s language mechanically. Instead it looked to the sweep and substance of the Supreme Court's reasoning. We do the same.

To begin where *Kingsley* did, "a pretrial detainee can prevail" by alleging "that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 135 S. Ct. at 2473–74. As discussed above, this standard is the essence of all Fourteenth Amendment claims, not merely those brought by pretrial detainees. In *Lewis*, a case that involved a non-detainee, the Supreme Court grounded its analysis in the same principle: "the touchstone of due process" is protection from "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." 523 U.S. at 845–46 (brackets omitted). What's

20

more, *Kingsley*'s reliance on *Lewis* as the source of the Fourteenth Amendment standard belies defendants' suggestion that claims by non-detainees are subject to a distinct test. *See Kingsley*, 135 S. Ct. at 2472–73.[1]

The distinction *Kingsley* drew was not between pretrial detainees and non-detainees. Instead, it was between claims brought under the Eighth Amendment's Cruel and Unusual Punishment Clause and those brought under the Fourteenth Amendment's Due Process Clause. 135 S. Ct. at 2475. As the Court observed, not only do the two clauses use distinct language, but, "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished *at all*." *Id.* (emphasis added). The same is true of non-detainees, except more so. After all, with a non-detainee the government has not even shown probable cause of criminal activity, much less a public safety (or flight) risk warranting detention. For this reason, it would be extraordinary to conclude that "pretrial detainees . . . cannot be punished at all, much less 'maliciously and sadistically,'" *id.*, while requiring non-detainees to prove malice and sadism.

---

[1] Additionally, when the *Kingsley* defendants argued that *Lewis* supported a subjective intent standard, the Court had an opportunity to distinguish its earlier decision as a case limited to non-detainees. But the Court did no such thing. Instead, it explained why that argument misread *Lewis*'s holding. 135 S. Ct. at 2475.

Defendants offer no principled justifications to buttress such an implausible standard, nor could they. Their argument is contrary to this Court's entire body of non-detainee cases, which have long applied the standard announced in *Glick*, a pretrial detainee case. *See, e.g.*, *Newburgh*, 239 F.3d at 251–52; *Tierney*, 133 F.3d at 199. And yet, although defendants acknowledge that *Kingsley* represents a new gloss on the pretrial detainee standard, they would hold the non-detained plaintiffs to this Court's prior articulation of the pretrial detainee standard. To state the argument is to reveal its untenability.[2]

Shifting gears, defendants contend that *Kingsley* did not formally overrule the "shocks the conscience" standard. That may be true, but we think it is beside the point. This is because defendants' focus on phrasing reflects an overly formalistic view of Fourteenth Amendment law. To repeat, the central inquiry has always been whether the government action was rationally related to a

---

[2] Defendants, moreover, point to no case in our Circuit dealing with non-detainees—before or after *Kingsley*—that treated proof of subjective intent as a necessary precondition for a successful Fourteenth Amendment excessive force claim. Thus, even if they could convince us that *Kingsley* should be cabined to pretrial detainees (which they cannot), this would not require us to dismiss an excessive force claim absent an allegation of malice or sadism. *Kingsley* made explicit what we have long taken for granted: a government actor's use of force violates due process when it is objectively excessive.

legitimate government objective. *Lewis*, 523 U.S. at 846. Although the Supreme

Court has "spoken of the cognizable level of executive abuse of power as that

which shocks the conscience," this merely showed that the "due process

guarantee does not . . . impos[e] liability whenever someone cloaked with state

authority causes harm." *Id.* at 846, 848. Instead, "the Due Process Clause is

violated by executive action only when it can properly be characterized as

arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847 (internal

quotation marks omitted).

As the Supreme Court has observed, "the measure of what is conscience

shocking is no calibrated yard stick"; it merely "point[s] the way." *Id.* (internal

quotation marks omitted). Mindful of this indefiniteness, *Kingsley* is best read as

elaborating on this standard, not abandoning it. *Kingsley* held that excessiveness

is measured objectively and then identified various considerations that inform

the ultimate Fourteenth Amendment inquiry: whether the governmental action

was rationally related to a legitimate governmental objective. 135 S. Ct. at 2473

(considering such things as the "relationship between the need for the use of

23

force and the amount of force used").[3] To put a finer point on it, *Kingsley* teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force *is* conscience shocking.[4]

Although we now hold that *Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment, it bears emphasizing that this new formulation is but a modest refinement of *Glick*'s four-factor test, on which this Court has long relied. The first three factors identified in *Glick*—the need for force, the relationship between the need and the degree of force used, and the extent of the injury, 481 F.2d at 1033—parallel the six non-exhaustive factors identified in *Kingsley*. Consider *Glick*'s first factor, the need to use force. *Kingsley* effectively disaggregates this into three considerations that all bear on whether force was necessary. 135 S. Ct. at 2473 (encouraging courts to consider "the severity of the security problem," the threat perceived, and

───────────────

[3] Framed in these terms, defendants cannot seriously dispute *Kingsley*'s logic. After all, their own brief acknowledges that, "[i]t is where officials take injurious action with *no apparent government interest* that this Court has found their conduct conscience-shocking." Appellant's Br. at 39 (emphasis added).

[4] One might argue that this conclusion is in tension with *Dancy*'s observation that "Fourth Amendment claims are tied to reasonableness, which is considerably less demanding" than the Due Process Clause. 843 F.3d at 117. But, once again, because *Dancy* focused on the intent standard under the Fourth Amendment, it did not purport

"whether the plaintiff was actively resisting"). As for *Glick*'s next two factors—

"the relationship between the need and the amount of force that was used" and

"the extent of injury inflicted," 481 F.2d at 1033—these are explicitly incorporated

into *Kingsley*. *See* 135 S. Ct. at 2473 (highlighting "the relationship between the

need for the use of force and the amount of force used" and "the extent of the

plaintiff's injury").

Turning to the fourth *Glick* factor, whether the force was applied

"maliciously and sadistically for the very purpose of causing harm," 481 F.2d at

1033, *Kingsley* explained that this is not a "necessary condition for liability," 135

S. Ct. at 2476 (emphasis omitted). Instead it is simply one consideration "that

*might* help show that the use of force was excessive." *Id.* (emphasis added). This

interpretation is consistent with our own precedents, which have repeatedly

assessed excessive force claims without looking to subjective intent. *See, e.g.*,

*Robison*, 821 F.2d at 924 (holding that the assertion that officers "yanked [a

woman] out [of her car], threw her up against the fender, and twisted her arm

behind her back" was enough to prevent summary dismissal of an excessive

force claim (internal quotation marks omitted)); *Bellows*, 555 F.2d at 1106 & n.1

---

to address how *Kingsley* affected cases brought under the Due Process Clause.

(concluding that plaintiff stated an excessive force claim based solely on the injuries and absence of a legitimate government interest).

Applying *Kingsley*'s analysis to the allegations at hand, we conclude that the plaintiffs' complaint states a Fourteenth Amendment violation. First, consider the need for force. Under plaintiffs' account, which we must accept as true, the security threat posed by the protest was low. The video footage confirms that the demonstrators were non-violent and there was a robust police presence monitoring the crowd. Although someone may have thrown a glass bottle, this appears to have been an isolated and victimless incident. None of the onlookers filming and photographing the arrests interfered and additional officers were on scene to keep protesters at bay. The most significant problem confronting law enforcement appears to have been traffic disruption caused by protesters walking in the street. However, while mixing cars and pedestrians might have presented a hazard, this is the sort of public safety risk common to large public demonstrations, not necessarily an imminent threat warranting a significant use of force. In short, on the facts alleged, the "severity of the security problem" was minimal and the "threat reasonably perceived by the officers" was negligible. *Kingsley*, 135 S. Ct. at 2473.

In addition, there is no indication that plaintiffs were "actively resisting." *Id*. Quite the opposite: the complaint alleges that once the police began ordering people to move to the sidewalks the plaintiffs promptly complied. (One plaintiff admits that he briefly stepped off the curb while yelling a critical comment at the police. But this was, as most, *de minimis* resistance.)

Turning to proportionality, the disparity between the threat posed by the protest and the degree of force is stark. The Department's 2010 report describes the purpose of an earlier LRAD model's area denial function as "send[ing] out sound at a *dangerously high* level [to cause] attackers to turn away, or at least, to *cause pain/hearing damage* to try to repel [an] attack." App. at 85 (emphases added). The control panel on the Model 100X that was used here warned operators in capital letters that entering within 10 meters of the device during operation was dangerous. *See* FAC ¶ 25. The device's product sheet likewise listed the LRAD's maximum volume as 136 decibels at one meter, well above the 120 decibels threshold where pain begins and just short of the 140 decibels at which the report advised that "[s]hort term exposure can cause permanent damage." App. at 86. Exposure to this dangerous volume (which we must assume from the pleadings) is a severe consequence for blocking traffic.

27

The injuries alleged by the plaintiffs (another *Kingsley* consideration, *see* 135 S. Ct. at 2473) are consistent with the report's projections. They endured auditory pain, migraines, tinnitus, and hearing loss, of varying degrees and duration. Several plaintiffs claimed that they still had periodic tinnitus as of the complaint's filing (a year and a half after the protest) and at least one plaintiff said that he experienced constant ringing. Another suffered nerve damage and hearing loss that required medical treatment. These impairments fit comfortably on the spectrum of injuries that this Court has found sufficient to state a Fourteenth Amendment violation. *See, e.g., Newburgh*, 239 F.3d at 252 (holding that "head trauma, lacerations, and bruising" constitute a "substantial physical injury"); *Robison*, 821 F.2d at 924 (denying qualified immunity for a Fourteenth Amendment violation when officers caused bruises that lasted "a couple weeks").

*Kingsley* also asks whether the officers tried to "temper or to limit the amount of force." 135 S. Ct. at 2473. Nothing in the complaint suggests that they did. There was no audible dispersal warning before the defendants activated the area denial function, nor any other visible attempt to move protesters out of the street. Looking at the force itself, the plaintiffs allege that the officers used the

28

LRAD at close range while "pointing it" at the demonstrators. FAC ¶ 229. In addition, the alleged injuries support an inference that the LRAD was set to an extremely high decibel-level.

Pulling these threads together, plaintiffs' allegations indicate that the officers' use of the LRAD's area denial function was disproportionate to the limited security risk posed by the non-violent protest and caused substantial physical injuries. Or, stated somewhat differently, the defendants' use of a device capable of causing pain and hearing loss was an "exercise of power without any reasonable justification in the service of a legitimate government objective." *Lewis*, 523 U.S. at 846. Because defendants have chosen to appeal the denial of a motion to dismiss, we are compelled to accept the allegations as true and must therefore conclude that the complaint adequately states a Fourteenth Amendment claim.

### B.    Clearly Established Law

The remaining question is whether the constitutional right at issue was "clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). This inquiry "ensure[s] that the official being sued had fair warning that his or her actions were unlawful." *Terebesi v.*

29

*Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). And, because officers cannot have fair warning of rights that are not yet established, we look to precedent in existence at the time of the events. *See Anderson*, 483 U.S. at 639. Here, this means that, for purposes of "clearly established law," we apply the Fourteenth Amendment analysis from *Glick*, not the Supreme Court's 2015 decision in *Kingsley*.

We begin with the delicate task of defining the right at issue. In doing so, we must be mindful that, on the one hand, "[c]haracterizing the right too narrowly to the facts of the case might permit government actors to escape personal liability." *Newburgh*, 239 F.3d at 251. On the other hand, defining clearly established law at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Here, defendants' frame the question as "whether the officers violated the Fourteenth Amendment by using the LRAD 100X to aid in moving protesters to the sidewalks after the protest became obstructive and potentially violent." Appellants' Br. at 28. This framing puts not one but two thumbs on the scale in favor of defendants. First, it focuses on the officers' professed objective—moving

30

protesters onto the sidewalk—while ignoring the degree of force that the officers

allegedly used. Second, it recasts the protest as "violent," a characterization that,

based on plaintiffs' allegations and the scene captured in the videos, is at best

arguable. *See, e.g.*, *id.* at 34 (describing a "large crowd of hostile demonstrators—

who greatly outnumbered and had surrounded the officers, were becoming

violent, and were obstructing traffic"). Perhaps this is an inference that a

factfinder might ultimately make, but at this stage we must draw all inferences in

favor of the plaintiffs, not the defendants.

Defining the Fourteenth Amendment right according to the "particular

circumstances" requires attention to the precipitating events, the government

interest at issue, the degree of force used, and the reasonably anticipated

consequences of the government action. To illustrate, consider the Supreme

Court's analysis in *Plumhoff*. The Court began with the context, a "lengthy, high-

speed pursuit" that "posed a danger both to the officers involved and to any

civilians who happened to be nearby." 134 S. Ct. at 2023. The officers' objective

was to "protect those whom [the suspect's] flight might endanger." *Id.* After the

suspect crashed and then tried to speed away, several officers fired a collective 15

shots. *Id.* at 2024. It was undisputed that this was "deadly force." *Id.* at 2021,

31

2022, 2024. Weaving all these circumstances together, the Court addressed whether it was clearly established in 2004 that a suspect who leads a long and dangerous car chase has a right not to be subjected to deadly force used to protect public safety. *Id.* at 2023–24. The Court held that he did not. *Id.* Following this template, and accepting the facts alleged by the plaintiffs, the question here is whether, in 2014, non-violent protesters and onlookers, who officers had not ordered to disperse, had a right not to be subjected to pain and serious injury that was inflicted to move them onto the sidewalks.

Preliminarily, we address whether this conduct alleges a Fourteenth Amendment violation under the legal standard applicable in 2014. Although our earlier discussion drew on *Kingsley*, the result is the same under *Glick*'s parallel factors. To repeat, this Court's longstanding test for excessive force claims teaches that force must be necessary and proportionate to the circumstances. *See Glick*, 481 F.2d at 1033; *see also Newburgh*, 239 F.3d at 253 ("[W]hether force is excessive depends as much upon the need for force as the amount of force used."). Here, on the allegations that we must accept as true, the problem posed by protesters in the street did not justify the use of force, much less force capable of causing serious injury, such as hearing loss.

32

The most significant difference between the *Kingsley* factors applied above and *Glick* is, of course, the latter's inquiry into "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Glick*, 481 F.2d at 1033. But, as our prior cases show, this evidence has never been necessary for a Fourteenth Amendment excessive force claim. *See, e.g.*, *Robison*, 821 F.2d at 924; *Bellows*, 555 F.2d at 1106 & n.1. And, when parties choose to present evidence on this point, they can establish subjective intent through circumstantial evidence. *See Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995). Although the plaintiffs need not allege facts showing that defendants subjectively intended to use excessive force, we conclude that, given the gross disparity between the need for force and the level of pain and injury inflicted, the plaintiffs have sufficiently alleged that the officers behaved "maliciously and sadistically." *See Newburgh*, 239 F.3d at 252 (concluding that the fourth *Glick* factor was satisfied where the force used "far surpassed anything that could reasonably be characterized as serving legitimate government ends").

The remaining question is whether the right was clearly established. Would reasonable officers have known that subjecting non-violent protesters to

pain and serious injury simply to move them onto the sidewalks violated the

Fourteenth Amendment? Defendants insist that the circumstances before them

were too dissimilar from then-existing precedents to provide this notice. They

raise two principal arguments. Neither withstands scrutiny.

First, the defendants deny that it was clearly established in December 2014

that using force in a crowd control context violates due process. In their view,

because this Court has not applied "substantive due process principles to crowd

control," the officers lacked notice that the right against excessive force applies to

non-violent protesters. Appellants' Br. at 37. But that is like saying police officers

who run over people crossing the street illegally can claim immunity simply

because we have never addressed a Fourteenth Amendment claim involving

jaywalkers. This would convert the fair notice requirement into a presumption

against the existence of basic constitutional rights. Qualified immunity doctrine

is not so stingy. In fact, we rebuffed a nearly identical argument in *Newburgh*.

There, a teacher who brutally assaulted a student insisted that he was entitled to

qualified immunity because the right to be free from excessive force had not been

"applied to the educational setting." 239 F.3d at 253. Unpersuaded, we declined

to adopt such a piecemeal view of Fourteenth Amendment protections. *Id.* We see no reason to take a different tack here.

Were this not enough, a wealth of cases inform government officials that protesters enjoy robust constitutional protections. "[O]ur constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society." *Cox v. Louisiana*, 379 U.S. 559, 574 (1965); *see also Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("[T]he First Amendment protects political demonstrations and protests . . . ."); *Belknap v. Leary*, 427 F.2d 496, 499 (2d Cir. 1970) (Friendly, J.) (recognizing a "First Amendment right[] to protest peaceably against the war— or anything else"). Against this backdrop, it would be passing strange to presume that protesters exercising a foundational constitutional right have weaker substantive due process rights than citizens in other contexts.

To be sure, government officials may stop or disperse a protest when faced with an "immediate threat to public safety, peace, or order," including "interference with traffic upon the public streets." *Parmley*, 465 F.3d at 57 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). But this authority is not

35

without limits. Among other things, officials have an obligation, "absent

imminent harm," to inform demonstrators that they must disperse, *id.* at 60, and

may not use unreasonable force, *id.* at 63. In short, our cases amply establish that

protesters enjoy robust constitutional protection, protection of which reasonable

law enforcement officers are well aware.

In spite of this precedent, defendants, drawing on distinguishable out-of-

circuit authority, would have us believe that courts generally conclude that "use

of force in a crowd control context [does] not violate substantive due process."

Appellants' Br. at 37 n.12. Hardly. Our sister circuits and district courts in this

Circuit have routinely applied excessive force principles to crowd control

situations. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 882–83 (9th Cir. 2012);

*Buck v. City of Albuquerque*, 549 F.3d 1269, 1289–90 (10th Cir. 2008); *Asociacion de*

*Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 59–62 (1st Cir. 2008); *Darrah v.*

*City of Oak Park*, 255 F.3d 301, 306–08 (6th Cir. 2001); *Duran v. Sirgedas*, 240 F.

App'x 104, 112–13 (7th Cir. 2007) (summary order); *Piper v. City of Elmira*, 12 F.

Supp. 3d 577, 589–96 (W.D.N.Y. 2014). Training our focus on controlling

authority, we see that this Court has repeatedly emphasized that officers

engaging with protesters must comply with the same principles of

proportionality attendant to any other use of force. *See Parmley*, 465 F.3d at 53, 63; *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 119, 123-24 (2d Cir. 2004). A brief summary of these cases is instructive.

In *Parmley* we refused to condone officers' assault on protesters who distributed flyers on a public highway. *See* 465 F.3d at 52. The record showed that several dozen protesters had gathered on private property for a lawful demonstration. *Id.* At some point, a contingent walked to a nearby highway to distribute fliers to passing cars. *Id.* After the protesters left the highway, a large group of officers stormed onto the private property without "order[ing] the protesters to disperse or provid[ing] them with any warning or justification for their actions." *Id.* at 53. They went on to assault non-violent, compliant protesters, "beating them with . . . riot batons, dragging them by their hair and kicking them." *Id.* Failing to discern a legitimate justification for this violent response, we readily concluded that that the officers' motion for summary judgment based on qualified immunity was properly denied. *Id.* at 63.

We have also warned officers against gratuitously employing "pain compliance techniques," such as bending protesters' wrists, thumbs, and fingers backwards. *Amnesty Am.*, 361 F.3d at 119, 123–24. Reasoning that the pain

associated with these techniques was "comparable [to] amounts of force" that we considered unreasonable when "used during the arrest of a nonviolent suspect," we concluded that a reasonable factfinder could decide that the force was excessive. *Id.* at 124. We elaborated that liability would turn on whether a jury found either that such techniques were a proportionate response to protesters purposefully making themselves difficult to arrest or that "the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances." *Id.* Gratuitous infliction of a pain compliance technique—the strategy behind the LRAD's area denial function—is exactly what the current plaintiffs allege.

Both *Parmley* and *Amnesty America* gave the defendants fair warning that the prohibition on excessive force applies to protesters. This is true even though both those cases arose under the Fourth Amendment. *See Poe v. Leonard*, 282 F.3d 123, 137 (2d Cir. 2002) ("Although the Fourth Amendment cases are not on all fours with [plaintiff's] claim under the Fourteenth Amendment, they are instructive . . . .").[5] After all, there is no intuitive reason to think a recalcitrant

---

[5] Defendants' reply brief argues that Fourth Amendment cases "cannot establish the law for Fourteenth Amendment purposes." Appellants' Reply Br. at 22. This

protester who is being arrested has more robust rights than a compliant protester

who is not. Thus, we see no merit in defendants' argument that they lacked

notice of the substantive due process rights of protesters.

Shifting attention from the protesters to the technology at issue,

defendants' second argument is that, at the time of the events, the Fourteenth

Amendment did not apply to LRADs. This argument has two parts: First,

defendants contend that the officers cannot be liable because no decision from

this Court or the Supreme Court "held or clearly foreshadowed that it would be

unconstitutional to use an acoustic device under any circumstances," much less

"under circumstances like those faced by the officers." Appellants' Br. at 19, 36–

37 (emphasis omitted). Second, defendants insist that, because LRADs

"function[] solely by sound," which is not an "instrument[] of force," a

reasonable officer would not think that the Fourteenth Amendment applied. *Id.*

at 23; *see also id.* at 35. We disagree on both fronts.

---

argument is inconsistent with the practice of the Supreme Court and this Circuit, both
of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts.
*See, e.g.*, *Graham*, 490 U.S. at 396 (relying on language from *Glick*, a Fourteenth
Amendment case, to explain Fourth Amendment constraints); *Hudson v. McMillian*, 503
U.S. 1, 9 (1992) (drawing on *Glick* in the Eighth Amendment context); *Medeiros v.
O'Connell*, 150 F.3d 164, 170 (2d Cir. 1998) (analyzing Eighth Amendment case law to

Defendants' first argument echoes a common refrain in qualified

immunity cases—"pointing to the absence of prior case law concerning the

precise weapon, method, or technology employed by the police." *Terebesi*, 764

F.3d at 237 n.20. But novel technology, without more, does not entitle an officer

to qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 731 (2002) ("[O]fficials can

be on notice that their conduct violates established law even in novel factual

situations."). In our first encounter with stun grenades, we concluded that,

although neither this Court nor the Supreme Court had addressed that particular

technology, "the Fourth Amendment principles governing police use of force

apply with obvious clarity[] to the unreasonable deployment of an explosive

device in the home." *Terebesi*, 764 F.3d. at 237 (internal quotation marks and

citation omitted). Drawing on a decision from the Ninth Circuit, we declared,

"[a]n officer is not entitled to qualified immunity" for lack of notice "every time a

novel method is used to inflict injury." *Id.* (quoting *Mendoza v. Block*, 27 F.3d

1357, 1362 (9th Cir. 1994)). Instead, we instructed that "[s]ome measure of

abstraction and common sense is required with respect to police methods and

weapons." *Id.* at 237 n.20. To drive the point home, we listed a series of

---

define a Fourteenth Amendment right).

40

innovative non-lethal weapons to which officers should apply common sense, including "sound guns" or "acoustical weaponry." *Id.* Given our call for common sense in the face of new technology, defendants cannot credibly complain they lacked notice that the proscription on excessive force applied to acoustic devices.

As to whether LRADs are instruments of force, defendants go astray by focusing on the mode of delivery rather than the physical effect. Under this Court's precedent, a device that has "incapacitating and painful effects" when used on a person is considered an instrument of force. *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). Applying this standard, we have held that pepper spray, which employs chemical reactions rather than kinetic energy, "constitutes a significant degree of force." *Id.*[6] Drawing on well-established principles, we added that because "gratuitous force is unreasonable and therefore excessive[,] . . . we presume that no reasonable officer could have believed that he was

---

[6] Defendants claim that an LRAD differs from pepper spray because "it includes a highly effective loudspeaker mode that can help *avoid* the need for measures historically regarded as force." Appellants' Br. at 23. This is effectively an argument that LRAD's are dual-use devices capable of both exerting dangerous force and serving valuable, non-forceful functions. But the same is true of a riot stick, which can both bludgeon and direct traffic. Rather than absolving the riot stick from scrutiny, this dual functionality is all the more reason to focus on the particular action and ensuing effect, not the device itself.

entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Id.* at 99 n.5. In support, we relied on a First Circuit case concluding that unprovoked use of pepper spray against members of a nonthreatening crowd was excessive, an indication that this sort of gratuitous force against crowds is verboten. *Id.* (citing *Asociacion de Periodistas,* 529 F.3d at 60–62).

In *Terebesi*, to add just one more example, we followed the same approach. There, the officers urged that they were immune because no precedent established that the right against excessive force applied to stun grenades. 764 F.3d at 236. But we rejected that argument. Emphasizing the dangerous effects of these devices, which "cause[] fires, burns, and other injuries," we held that "a reasonable officer would [not] think it was constitutional to use these devices in routine searches." *Id.* at 236, 238.

We reach the same conclusion here. Even though sound waves are a novel method for deploying force, the effect of an LRAD's area denial function is familiar: pain and incapacitation. *See Tracy*, 623 F.3d at 98. In fact, this is what the LRAD was designed for. As explained in the NYPD's own report, the purpose of the area denial function is to "cause pain/hearing damage" that repels those in its path. App. at 85. Using common sense, any reasonable officer with knowledge of

42

the LRAD's operations would understand that the area denial function

represents a "significant degree of force." *See Tracy*, 623 F.3d at 98.

To recap, assuming the truthfulness of the allegations in the complaint,

and drawing all reasonable inferences in plaintiffs' favor, the defendants knew or

should have known that the area denial function could cause serious injury.

When engaging with non-violent protesters who had not been ordered to

disperse, no reasonable officer would have believed that the use of such

dangerous force was a permissible means of moving protesters to the sidewalks.

Whatever legitimate interest the officers had in clearing the street, the use of

sound capable of causing pain and hearing loss in the manner alleged in the

complaint was not rationally related to this end. We therefore conclude that the

district court properly denied the defendants' motion to dismiss based on

qualified immunity.

* * *

Our decision regarding the defendants' use of the LRAD is a narrow one.

We do not hold that the Fourteenth Amendment bars law enforcement from

using LRADs. To the contrary, we are confident that, in appropriate

circumstances, following careful study and proper training, LRADs can be a

43

valuable tool for law enforcement. Their usefulness as a long-range

communications device is plain. We also think that, under certain conditions, an

LRAD that is properly calibrated might be a lawful means of ordering (or

perhaps even compelling) protesters to disperse. We merely hold (1) that, on the

allegations before us, which we must accept as true, the plaintiffs have stated a

Fourteenth Amendment excessive force claim and (2) that purposefully using the

LRAD in a manner capable of causing serious injury to move non-violent

protesters to the sidewalks violated law that was clearly established as of 2014.

We are also mindful that the complaint before us is just one side of the

story, told from the perspective of the plaintiffs. But courts and juries must assess

excessive force claims from "the perspective of a reasonable officer on the scene,

including what the officer knew at the time, not with the 20/20 vision of

hindsight." *Kingsley*, 135 S. Ct. at 2473. It follows that, once the allegations are

tested by evidence, particularly evidence about what the officers saw and knew,

the defendants may yet be entitled to qualified immunity.

We can envision various factual showings that would change the calculus.

One key variable is the state of unrest at the protest. The evidence may show that

the defendants observed a more violent scene than is portrayed in the complaint

44

and incorporated videos. Another key consideration is how the LRAD was used, most notably the volume of the device and its proximity to protesters and passersby. And, third, as *Kingsley* acknowledges, much hinges on what the defendants knew. Perhaps the defendants had not seen the report on the Model 3300 and lacked knowledge of the LRAD's harmful effects. The complaint alleges that the NYPD "has not properly trained its officers" on LRAD use and acknowledges that Department's use of force protocols "do not account for LRAD use." FAC ¶¶ 98, 412. So perhaps the defendants had received training but reasonably believed that they were not using the device in an unsafe or gratuitous manner. Any one of these non-exhaustive factors could warrant a reappraisal of qualified immunity.

Finally, we emphasize that when viewing the evidence from the perspective of a reasonable officer a factfinder must afford "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). This is particularly true where officers "have obligations that tend to tug against each other." *Lewis*, 523 U.S. at 853.

> Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to

45

> show restraint at the same moment, and their decisions
> have to be made in haste, under pressure, and
> frequently without the luxury of a second chance.

*Id.* (internal quotation marks omitted). It follows that a jury or a court viewing events from the defendants' perspective must consider not just what the officers saw and knew, but also the rapidly evolving, uncertain, and tense circumstances in which they acted. We trust that discovery will provide fuller insight into this perspective.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order insofar as it denied defendants qualified immunity for the Fourteenth Amendment claim. This case is REMANDED for further proceedings.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit